# ATTACHMENT 1

Deposition Transcript Of

Plaintiff Tinny Suri

Held On November 16, 2021

*(Redacted Pursuant to F.R.Civ.P. 5.2)*

Page 1

1                    Tinny Suri

2            UNITED STATES DISTRICT COURT

3         IN THE EASTERN DISTRICT OF MICHIGAN

4                  SOUTHERN DIVISION

5

6

7   * * * * * * * * * * * * * * * *

8   TINNY SURI,

9            Plaintiff,
                                    Case No.
10  v.
                                2:21-CV-10866
11  EQUIFAX INFORMATION SERVICES,

12  LLC; et al.,

13           Defendants.

14  * * * * * * * * * * * * * * * *

15

16

17         VIDEOCONFERENCE DEPOSITION OF

18                  TINNY SURI,

19         WITH THE WITNESS LOCATED IN

20             CLARKSTON, MICHIGAN

21      HELD ON TUESDAY, NOVEMBER 16, 2021

22

23

24  Reported by:  DEBRA AMOS ISBELL, CCR,RDR,CRR

25  Job No:  202598

1              Tinny Suri

2

3

4

5

6

7          NOVEMBER 16, 2021

8      10:00 a.m. Eastern Time

9

10

11

12

13

14   Videoconference Deposition of

15   TINNY SURI, taken before

16   Debra Amos Isbell, a Registered

17   Professional Reporter, Registered

18   Diplomate Reporter, and Certified

19   Realtime Reporter.

20

21

22

23

24

25

```
 1                    Tinny Suri

 2          A P P E A R A N C E S:

 3      (ALL APPEARANCES BY VIDEOCONFERENCE)

 4

 5

 6  FOR THE PLAINTIFF TINNY SURI:

 7          LYNGKLIP & ASSOCIATES CONSUMER LAW CENTER

 8          13751 West 11 Mile Road

 9          Oak Park, MI 48237

10          BY:  SYLVIA BOLOS, ESQUIRE

11

12

13

14

15

16  FOR THE DEFENDANT WELLS FARGO:

17          TROUTMAN PEPPER HAMILTON SANDERS

18          222 Central Park Avenue

19          Virginia Beach, VA 23462

20          BY:  DAVID GETTINGS, ESQUIRE

21

22

23

24
```

```
 1                    Tinny Suri

 2   APPEARANCES (Continued)

 3

 4   FOR THE DEFENDANT EXPERIAN:

 5           JONES DAY

 6           150 West Jefferson Avenue

 7           Detroit, MI 48226

 8           BY:  CALLIE BARR, ESQUIRE

 9

10

11

12

13

14   FOR THE DEFENDANT EQUIFAX:

15           SEYFARTH SHAW

16           620 Eighth Avenue

17           New York, NY 10018

18           BY:  SARAH LYONS, ESQ.

19

20

21

22

23

24
```

Page 5

1                    Tinny Suri

2    APPEARANCES (Continued)

3

4    FOR THE DEFENDANT TRANSUNION:

5             SCHUCKIT & ASSOCIATES

6             4545 Northwestern Drive

7             Zionsville, IN 46077

8             BY:  WILLIAM HUSE, ESQUIRE

9

10

11

12

13

14

15

16   COURT REPORTER:  DEBRA AMOS ISBELL, CCR,CRR,CRC

17

18

19

20

21

22

23

24

```
 1                      Tinny Suri

 2                   I N D E X

 3   DEPOSITION OF TINNY SURI, 11/16/2021

 4

 5              EXAMINATION INDEX

 6       BY MR. GETTINGS  . . . . . . . . . . . . 10

 7       BY MS. BARR . . . . . . . . . . . . . 132

 8       BY MR. HUSE . . . . . . . . . . . . . 161

 9       BY MS. LYONS . . . . . . . . . . . . .217

10       BY MS. BOLOS . . . . . . . . . . . . .233

11       BY MR. GETTINGS  . . . . . . . . . . .253

12       BY MS. BARR . . . . . . . . . . . . . 256

13       BY MR. HUSE . . . . . . . . . . . . . 258

14       BY MS. LYONS . . . . . . . . . . . . .263

15

16                 EXHIBIT INDEX

17   Exhibit 1    LeafFilter agreement,           31
                  6/11/2015 -
18                WF_Suri 000398-399

19   Exhibit 2    Home Projects Visa Credit       34
                  Card Account Application,
20                6/11/2015 - SURI 000899

21   Exhibit 3    Important Terms of Your         38
                  Credit Card Account -
22                SURI 000900-0906

23   Exhibit 4    Voluntary Petition for          43
                  Individuals Filing for
24                Bankruptcy, 3/27/2018

25
```

Tinny Suri

| 1 | | | |
|---|---|---|---|
| | Exhibit 5 | Wells Fargo account statement, 3/13/2018 - SURI 000877-0878 | 59 |
| | Exhibit 6 | Wells Fargo account statement, 4/6/2018 - SURI 000879-0880 | 63 |
| | Exhibit 7 | Letter to Tinny Suri from Wells Fargo, 4/6/2018 | 67 |
| | Exhibit 8 | Letter to Tinny Suri from Wells Fargo, 4/9/2018 | 71 |
| | Exhibit 9 | Letter to Debra Suri from Wells Fargo, 4/9/2018 | 73 |
| | Exhibit 10 | Reaffirmation agreement, 5/7/2018 | 75 |
| | Exhibit 11 | Packet of documents sent to TransUnion - WF_000380-0424 | 79 |
| | Exhibit 12 | Letter to TransUnion from Tinny Suri - WF_000363-0365 | 84 |
| | Exhibit 13 | 2018 Credit Reporting Resource Guide - EIS-SURI-001454-1743 | 97 |
| | Exhibit 14 | Letter to Tinny Suri from Wells Fargo, 7/15/2020 - WF_Suri 000377 | 99 |
| | Exhibit 15 | Complaint & Jury Demand | 102 |
| | Exhibit 16 | Emails between Tinny Suri and Mariah Farris with Wyndham Capital Mortgage, 6/21-22/2021 - SURI 000907-908 | 111 |
| | Exhibit 17 | Wyndham Capital Mortgage Underwriting Conditional Approval, 4/5/2021 | 113 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                        Tinny Suri
        Exhibit 18  loanDepot documents,              116
 2                   3/23/2021

 3      Exhibit 19  Certificate of Service            136
                    Declaration of Mailing to
 4                  Experian, 2/9/2021 -
                    SURI 000550-0591
 5
        Exhibit 20  Experian FICO score,              138
 6                  1/12/2021 - SURI 000204-0270

 7      Exhibit 21  Experian Online Consumer          141
                    Disclosure, 4/16/2021 -
 8                  SURI 000311-0415

 9      Exhibit 21A Experian Online Consumer          141
                    Disclosure, 6/29/2021 -
10                  SURI 000911-1002

11      Exhibit 22  Tinny Suri's Responses to         145
                    Experian's Interrogatories
12
        Exhibit 23  Informative Research PreClose     154
13                  Monitoring Report - Wyndham
                    Capital Mortgage, 3/25/2021 -
14                  SURI 004924-4984

15      Exhibit 24  Tinny Suri's Responses to         167
                    TransUnion's Amended
16                  Interrogatories

17      Exhibit 25  Online dispute and               171
                    correspondence with
18                  TransUnion, 6/28/2020

19      Exhibit 26  Correspondence from              178
                    TransUnion, 8/1/2020
20
        Exhibit 27  Correspondence to TransUnion,    180
21                  7/24/2020

22      Exhibit 28  Certificate of Service           187
                    Declaration of Mailing to
23                  TransUnion, 2/9/2021 -
                    SURI 000690-0731
24

25
```

Tinny Suri

1

Exhibit 29   Letter to Tinny Suri from        189
2            Capital One, 6/17/2020

3   Exhibit 30   Statement of Credit Denial,    196
             Termination or Change from
4            loanDepot, 4/9/2021

5   Exhibit 31   Correspondence from            197
             Huntington National Bank,
6            3/26/2020

7   Exhibit 32   Huntington - Your Credit       198
             Score and the Price You Pay
8            for Credit, 6/2/2021

9   Exhibit 33   Notice of Incomplete           201
             Application and Request for
10           Additional Information from
             Huntington, 6/7/2021
11
    Exhibit 34   Letter from Colombo &          202
12           Colombo, 8/4/2021, with
             attached documentation from
13           Feldman Kia

14  Exhibit 35   Correspondence from Synchrony  206
             Financial, 8/13/2021
15
    Exhibit 36   Dispute to Equifax,            219
16           EIS-Suri-0001-45

17  Exhibit 37   Equifax results,               221
             EIS-Suri-000059-0064
18
    Exhibit 38   Tinny Suri's Responses to      222
19           Equifax's Interrogatories

20  Exhibit 39   TransUnion Unable to Complete  265
             Request - SURI 004916
21

22

23

24

1                    Tinny Suri

2                    TINNY SURI

3       was sworn and testified as follows:

4            THE WITNESS:  Yes.

5                    EXAMINATION

6  BY MR. GETTINGS:

7       Q.    Good morning, Mr. Suri.  We met briefly

8  before the deposition.  My name is Dave Gettings.

9  I represent Wells Fargo Bank, and I am from the

10  law firm of Troutman Pepper.  It's actually

11  Troutman Pepper Hamilton Sanders, but I don't

12  think you need to know all four of the names.

13            So we're here today taking your

14  deposition in a case that you brought against

15  Wells Fargo and multiple other defendants.

16            Do you understand that you're here for

17  your deposition today?

18       A.    Yes.

19       Q.    Have you ever been deposed before?

20       A.    No.

21       Q.    Do you understand that you are under

22  oath?

23       A.    Yes.

24            MS. BOLOS:  Hey, David, before you get

25  too far, I just want to make sure I say this at

1                      Tinny Suri

2    the beginning.  I just want to make sure to

3    preserve Mr. Suri's right to read and sign.

4             MR. GETTINGS:  Okay.  That's fine.

5             MS. BOLOS:  Thank you.

6    BY MR. GETTINGS:

7        Q.    What does being under oath mean to you?

8        A.    To be truthful to my knowledge of

9    everything that is asked and my questions to be

10   forthcoming.

11       Q.    Perfect.  All right.

12             Because this is an audio or a video

13   deposition, just some ground rules.  Many of

14   these would be the same if it was not a video

15   deposition.

16             But just please let me finish asking my

17   question before you respond.  Maybe even give the

18   court reporter an extra second between my

19   question and your answer so that Debbie is able

20   to take it down.

21             And then if you could give audible

22   responses as opposed to head shakes or gestures,

23   that will also be helpful.

24             If you don't understand a question that

25   I ask, please feel free to ask me to correct or

1                          Tinny Suri

2    clarify the question so that you understand.

3               Does that make sense?

4    A.     Yes.

5    Q.     Okay.  And if you don't ask for

6    clarification, we will assume you understand the

7    question.

8               Is that fair?

9    A.     Yes.

10   Q.     All right.  And then again, if you need

11   to take a break for any reason, please feel free

12   to ask to take a break.  The only thing I will

13   say is if I have a question pending, we may ask

14   to finish that question and finish your answer

15   before we take a break.

16              Is that fair?

17   A.     Sure, yes.

18   Q.     Okay.  Perfect.

19              Now, I don't need to know the details

20   right now, but are you taking any drugs or

21   medication that will affect your ability to

22   understand my questions?

23   A.     No.

24   Q.     And are you taking any drugs or

25   medication that could affect your ability to

```
 1                    Tinny Suri

 2   answer my questions truthfully?

 3        A.    No.

 4        Q.    I guess that's sort of a paradox.

 5   Because if you are, I'm not sure if I'd be able

 6   to get your answer.  So I've got to rephrase that

 7   next time.

 8              All right.  Did you bring anything with

 9   you to the deposition today?

10        A.    No.

11        Q.    All right.  So let me get your full

12   name, please.

13        A.    Tinny Asmat, A-S-M-A-T, Suri, S-U-R-I.

14        Q.    Have you ever gone by any other names?

15        A.    Tim Suri.

16        Q.    Do most people call you Tim or do most

17   people call you Tinny?

18        A.    Younger Tinny, now Tim.  Professionally

19   Tim.

20        Q.    What is your date of birth?

21        A.    ███████████████.

22        Q.    And what is your current address?

23        A.    ████████████████████████████████,

24   ██████████████.

25        Q.    How long have you lived at that
```

```
 1                    Tinny Suri
 2  address?
 3       A.    Going on six years.
 4       Q.    So if you could help me do the math.
 5  Do you recall when you moved into the ▊▊▊
 6  address?
 7       A.    2015.  So yeah, 2015, going on six,
 8  seven years.
 9       Q.    Do you remember the month in 2015?
10       A.    I don't.  I believe that was sometime
11  in April -- March, April.  I'm trying to recall,
12  but I'm not sure.
13       Q.    Okay.  Approximately March, April?
14       A.    Sure.
15       Q.    Where did you live prior to the ▊▊▊
16  ▊▊▊▊▊▊▊    address?
17       A.    I lived in ▊▊▊▊▊▊▊▊▊▊.
18       Q.    And was that at ▊▊▊▊▊▊▊▊▊▊▊?
19       A.    Yes.
20       Q.    And do you know the time period during
21  which you lived at the ▊▊▊▊▊▊ address?
22       A.    10 years.
23       Q.    So you lived at the ▊▊▊▊▊▊▊
24  address from approximately -- and it's an
25  approximation -- approximately spring 2005 to
```

```
 1                    Tinny Suri

 2   spring 2015?

 3       A.     Correct.

 4       Q.     Are you married?

 5       A.     Yes.

 6       Q.     What is the name of your spouse?

 7       A.     Debra, D-E-B-R-A, Lee, L-E-E, Suri.

 8       Q.     And how long have you been married to

 9   Debra?

10       A.     18 years.

11       Q.     So the loaded question:  You got

12   married to Debra in 2003?

13       A.     Correct.

14       Q.     Okay.  She's not here right now in case

15   you got it wrong, so don't worry about it.

16              And have you been continuously married

17   to Debra since 2003?

18       A.     Yes.  Just to throw in there, we were

19   born on the same day and got married that day, so

20   it's hard to forget.

21       Q.     You look like you're older than if you

22   were born in 2003.

23       A.     Yeah.  Well, she looks younger, but

24   she's older than I am by six years.  So I'm

25   lucky, I guess.
```

1                    Tinny Suri

2      Q.    All right.  Continuing with background,

3  how far did you go in school?

4      A.    High school.

5      Q.    Did you graduate from high school?

6      A.    No.

7      Q.    How far did you get in high school?

8      A.    11th grade.

9      Q.    And did you attend up through 11th

10  grade all in one high school?

11     A.    Four.

12     Q.    Four separate high schools?

13     A.    Yes.

14     Q.    And where were those high schools

15  located?

16     A.    Osborn High School, east side of

17  Detroit; Grosse Pointe North in Grosse Pointe,

18  Michigan; Torrance High School, Redondo Beach,

19  California; and then Novi, Michigan, Novi High

20  School.

21     Q.    And did you ever start -- or did you

22  ever take any post-high school education or

23  classes or try to seek any post-high school

24  degrees?

25     A.    I went to OCC for some elective

1                       Tinny Suri

2    classes, but didn't complete any of them

3    actually, for a couple of semesters.

4         Q.    And did you ever seek your GED or any

5    equivalent of a high school diploma?

6         A.    I did not.

7         Q.    All right.  Are you presently employed?

8         A.    Yes, I am.

9         Q.    Who is your present employer?

10        A.    The DGL Group.

11        Q.    D as in --

12        A.    D as in David.

13        Q.    G as in golf, L as in Lima?

14        A.    Correct.

15        Q.    And what does the DGL Group do?

16        A.    Consumer electronics.  Brand names, I

17   mean, of products, electronics, mobile

18   accessories, home health goods manufacturer.

19        Q.    Okay.  It's an electronics

20   manufacturer?

21        A.    Yes.

22        Q.    And where is the DGL Group based?

23        A.    Edison, New Jersey.

24        Q.    What is your title at the DGL Group?

25        A.    Director of sales.

```
 1                    Tinny Suri
 2      Q.    What do you do in the role of director
 3  of sales?
 4      A.    I manage a team of salespeople in the
 5  field in North America.  I am involved in
 6  contractual negotiations with the retailers and
 7  help support the sales in that effort for the
 8  company.
 9      Q.    Do you know an approximate amount of
10  how many direct reports you have as VP (sic) of
11  sales?
12            MS. BOLOS:  Objection, form.
13            MR. GETTINGS:  Okay.  Let me ask a
14  different question.
15      Q.    Do you have any direct reports as VP
16  (sic) of sales?
17      A.    Yes.
18      Q.    How many direct reports do you have?
19      A.    12.
20      Q.    And would you say you have any indirect
21  reports as well?
22      A.    Yes.
23      Q.    How many indirect reports do you have?
24      A.    Eight.
25      Q.    So would you say you manage a team of
```

```
 1                    Tinny Suri

 2  20 either directly or indirectly or is that not a

 3  fair classification?

 4       A.    That is a fair classification.

 5       Q.    And how long have you been -- well,

 6  first let me ask:  How long have you been at the

 7  DGL Group?

 8       A.    Since April of this year.

 9       Q.    April of 2021?

10       A.    Correct.

11       Q.    And have you been VP of sales the

12  entire time you've been at DGL Group?

13       A.    Director of sales, yes.

14       Q.    Oh, director of sales.  Excuse me.

15             All right.  So where were you employed

16  prior to April of 2021?

17       A.    That would be The Fesco Group.

18       Q.    F-E-S-C-O?

19       A.    Perfect.

20       Q.    What was your role at The Fesco Group?

21       A.    Vice president of sales.

22       Q.    I was just ahead of my time.

23             All right.  How long were you at The

24  Fesco Group?

25       A.    Three years.
```

1                         Tinny Suri

2       Q.      So were you at The Fesco Group

3   approximately April of 2018 to April of 2021?

4       A.      Yes.

5       Q.      Did you start at The Fesco Group

6   actually in April of 2018 or is that an

7   approximation?

8       A.      It's an approximation.

9       Q.      Do you recall exactly when you started

10  at The Fesco Group?

11      A.      I think it was close -- end of March,

12  beginning of April.

13      Q.      And were you the VP of sales the entire

14  time you were at The Fesco Group?

15      A.      Yes.

16      Q.      Any idea how many individuals you

17  managed as VP of sales at The Fesco Group?

18      A.      14.

19      Q.      And did that number remain relatively

20  consistent throughout your entire three years

21  there?

22      A.      Yes.

23      Q.      All right.  So we're going to keep

24  going back to 2015 just so we can get a full

25  picture from my perspective.

1                    Tinny Suri

2              So where were you employed prior to the

3    time you joined The Fesco Group?

4        A.    I was employed with Cambridge Sound

5    Management, Cambridge Sound.

6        Q.    I'm sorry.  I forgot to ask.  What does

7    the Fesco Group do?

8        A.    Same thing as DGL, electronics

9    manufacturer.

10        Q.    Are they also based -- well, where is

11    The Fesco Group based?

12        A.    New York City.

13        Q.    All right.  And then what was the time

14    period you were employed at Cambridge?

15        A.    That was 2016 to 2018, I believe.

16    About a year and a half.

17        Q.    All right.  And what does Cambridge do?

18        A.    They're an electronics company in

19    sound, speakers.  If you've ever heard of

20    Cambridge speakers, they're very famous.  But

21    electronics for consumers.

22        Q.    Manufacturing?

23        A.    Correct.

24        Q.    And what was your position at

25    Cambridge?

```
1                        Tinny Suri
2       A.    Director of sales.
3       Q.    Do you know how many either indirect or
4  direct reports you had at Cambridge?
5       A.    Eight.
6       Q.    All right.  And then probably last,
7  where were you employed prior to the Cambridge --
8  was it The Cambridge Group?  I'm sorry.
9       A.    Yeah.  Cambridge Sound Management, Inc.
10       Q.    Where were you employed prior to
11  Cambridge Sound Management, Inc.?
12       A.    I was with the Incipio Group for a very
13  short time.
14       Q.    Any recollection of how long you were
15  at the Incipio Group for?
16       A.    Seven months.
17       Q.    So do you recall approximately when you
18  started at the Incipio Group?
19       A.    It was in mid 2016, like July, I
20  believe, or May -- I'm sorry -- it could be
21  April, April of 2016 and seven months out, so
22  until close to November.
23       Q.    And what was your role at the Incipio
24  Group?
25       A.    Director of sales.
```

1              Tinny Suri

2      Q.    What does the Incipio Group do?

3      A.    Same exact thing, mobile accessories,

4   electronics manufacturer.

5      Q.    All right.  And I lied.

6            What did you do -- where were you

7   employed prior to the Incipio Group, just to go

8   back to 2015?

9      A.    That would be PCT Brands.

10     Q.    What does PCT Brands do?

11     A.    Electronics manufacturer.

12     Q.    And what was your role at PCT Brands?

13     A.    Executive vice president.

14     Q.    What was your role as the executive

15   vice president?  What did you do day to day?

16     A.    Day to day I managed the vice president

17   sales team, the VP of sales, the design team,

18   manufacturing.  I'd go to China every three

19   months to negotiate contracts with Chinese

20   companies and manage overall sales and objectives

21   for the company.

22     Q.    Okay.  And how long were you at PCT

23   Brands?

24     A.    A little over four years, four and a

25   half years.

1                     Tinny Suri

2       Q.     So is that from sometime in 2012 to

3  sometime in 2016?

4       A.     That is correct.

5       Q.     All right.  Besides the lawsuit that we

6  are presently involved in, have you ever been

7  involved in another lawsuit before?

8       A.     Lawsuit, yes, I have.

9       Q.     As a plaintiff or as a defendant?

10      A.     As a defendant.

11      Q.     When was that lawsuit?

12      A.     It was in 2017.

13      Q.     Can you tell me the general subject

14  matter of that lawsuit?

15      A.     Noncompete agreement.

16      Q.     Who was the plaintiff in that lawsuit?

17      A.     PCT Brands.

18      Q.     So did PCT sue you for -- at least PCT

19  was claiming that you violated a noncompete?

20      A.     They claimed, yes.

21      Q.     And I don't need to know any

22  confidential details right now.

23             Did the lawsuit go to trial or did it

24  settle?

25      A.     It settled.

1                       Tinny Suri

2       Q.    But you did not have to testify in a

3  deposition in that lawsuit?

4       A.    No.

5       Q.    So besides the present lawsuit we're

6  involved in and the PTC brands lawsuit, have you

7  ever been involved in another lawsuit?

8             MS. BOLOS:  Objection, form.

9       A.    No.

10      Q.    Were any of your lawyers in this case

11 also your lawyers in the PCT Brands case?

12      A.    No.

13      Q.    Have you ever filed for bankruptcy?

14      A.    No.

15      Q.    All right.  This question is not asking

16 about conversations between you and your lawyer.

17            Do you understand so far?

18      A.    Yes.

19      Q.    Okay.  So without finding out the

20 substance of conversations, my first question is:

21 Did you talk to anyone in preparation for this

22 deposition?

23      A.    Yes.

24      Q.    Okay.  Now, I still don't want to know

25 the substance yet, and we may never ask the

```
 1                    Tinny Suri
 2  substance.
 3           Who did you talk to in preparation for
 4  this deposition?
 5       A.    My legal counsel.
 6       Q.    And who was that specifically?
 7       A.    Sylvia, who's on the call now.
 8       Q.    Was anyone else present during those
 9  conversations?
10       A.    No.
11       Q.    And how many conversations did you have
12  with Sylvia in preparation for this deposition?
13       A.    One.
14       Q.    Do you recall when that was?
15       A.    Yesterday.
16       Q.    Do you recall how long it lasted?
17       A.    Approximately three hours.
18       Q.    Did you review any documents in
19  connection with that preparation session?
20       A.    Yes.
21       Q.    Do you recall how many documents you
22  reviewed?
23       A.    I don't recall.  Quite a few.
24       Q.    So besides your conversation with
25  Sylvia, have you talked to anyone else in
```

1                     Tinny Suri

2    preparation for this deposition?

3        A.    Yes.

4        Q.    Who?

5        A.    Ian.

6        Q.    Ian Lyngklip?

7        A.    Yes.

8        Q.    And when did you talk to Ian in

9    preparation for this deposition?

10       A.    Yesterday.

11       Q.    Was that in a separate call from the

12   Sylvia call?

13       A.    Yes.

14       Q.    How long did you speak to Ian Lyngklip

15   in preparation for this deposition?

16       A.    15 minutes.

17       Q.    Besides your conversation with Sylvia

18   and your conversation with Ian, did you talk to

19   anyone else in preparation for this deposition?

20       A.    No.

21       Q.    In preparation for the deposition, do

22   you know if you reviewed any documents that have

23   not been produced to the defendants in this case?

24       A.    No.

25       Q.    You didn't review any or you don't know

1                     Tinny Suri

2   if you reviewed any?

3             MS. BOLOS:  Objection, form.

4     Q.     You can answer.

5     A.     To my recollection, everything that we

6   reviewed, I believe, that was submitted to the

7   team.

8     Q.     When did you first believe that Wells

9   Fargo had wronged you?

10            MS. BOLOS:  Objection, form.

11    A.     So I received -- since it's been over a

12  year, I can't give you exact dates.  But earlier

13  this year I received a rejection letter from a

14  bank rejecting my Menards card with a very low

15  limit.  And then at that point, after receiving

16  that objection letter, I was a bit shocked.  And

17  I called.  And then -- well, the letter I

18  received said due to your credit, that you were

19  rejected.

20            So at that point red flags went up.

21    Q.     And what did you do when red flags came

22  up?  What was your next step?

23    A.     My next step was I went online and

24  pulled my credit report for the first time.  And

25  then I noticed in my TransUnion credit report

```
 1                      Tinny Suri
 2   that, outside of my perfect credit, I noticed
 3   there was a discrepancy under the Wells Fargo.
 4   So when I saw the WF&A next to it, I read the
 5   charge-off, collection charge-off, for $7,800 or
 6   the remaining balance of that and I also noticed
 7   that there was no payment history after a certain
 8   period, I realized it was a mistake.
 9        Q.    And then what were your next steps?
10        A.    My next step was to pull my Wells Fargo
11   agreement that I had from Leaf -- what is it
12   called -- LeafGuard and then looked at the
13   agreement.  And then also I ended up -- so I
14   could get my contract number for that account, I
15   contacted Wells Fargo's 800 number.
16        Q.    Do you recall approximately when your
17   first contact with Wells Fargo was regarding this
18   credit reporting issue you just described?
19        A.    It's been a while, so I'm going to --
20   unless you can show me -- I mean give me some
21   idea on the date so I can at least refresh my
22   memory.  But I am assuming sometime in June.
23        Q.    June of what year?
24        A.    Last year, 2020.
25        Q.    All right.  Have you ever been arrested
```

1                    Tinny Suri

2  for a crime?

3      A.    Arrested for a crime?  No.

4      Q.    Have you ever been charged with a

5  crime?

6      A.    No.

7      Q.    Have you ever been convicted of a

8  crime?

9      A.    No.

10     Q.    All right.  So we're going to talk a

11 little bit about the Wells Fargo account that's

12 at issue in the lawsuit.

13           Did you open a Home Projects Visa

14 credit card account with Wells Fargo?

15     A.    Yes.

16     Q.    Is that the only account you've ever

17 had with Wells Fargo?

18     A.    I don't recall.

19     Q.    Is it the only account you've had with

20 Wells Fargo since 2015?

21     A.    Again, I'm not sure, but I believe so.

22 But I may have had another account.  I'm not

23 sure.

24     Q.    Okay.  Why did you open the Home

25 Projects Visa credit card account with Wells

1                    Tinny Suri

2  Fargo?

3      A.    That was through the LeafGuard system,

4  the company that sold us our gutter system.  So

5  the application went through Wells Fargo as the

6  third-party provider or the back-end provider for

7  that loan.

8      Q.    And was your wife, Debra Suri, a

9  coapplicant on the Wells Fargo account?

10     A.    Yes.

11     Q.    So we're going to look at our first

12  exhibit.  I'm going to share my screen with you.

13  Hopefully it works smoothly.

14          Actually, before I do that, I'll drop

15  the exhibit in the chat, too, for Debbie's

16  benefit.

17          Mr. Suri, can you see my screen?  Does

18  it say Exhibit 1 for you?

19     A.    Yes.

20          (EXHIBIT 1, LEAFFILTER AGREEMENT,

21           6/11/2015 - WF_SURI 000398-399,

22           WAS IDENTIFIED.)

23     Q.    Is it big enough, at least right now,

24  for you to read?

25     A.    Yes.

1                         Tinny Suri

2        Q.     All right.  So I'm going to scroll down

3    to the actual document.   Exhibit 1 is just the

4    cover page.   And what I'm showing you is a

5    two-page document Bates numbered WF_Suri 398 and

6    399, although it looks like only 398 really has

7    words on it.

8        A.     Uh-huh (positive response).

9        Q.     Have you ever seen this document

10   before?

11       A.     Yes.

12       Q.     All right.  What is this document?  And

13   just for the record, the top of the letterhead

14   says LeafFilter Gutter Protection.

15       A.     Uh-huh (positive response).

16       Q.     What is this document?

17       A.     It looks like that's an application for

18   the loan.

19       Q.     All right.  Is this a document or an

20   agreement that -- well, let me back up.

21              Do you recognize the signature at the

22   bottom of this document?

23       A.     Yes.

24       Q.     Is that your wife's signature?

25       A.     That is correct.

```
 1                    Tinny Suri

 2      Q.    And it looks like she signed this

 3  agreement on June 11th, 2015.  Is that right, to

 4  the best of your recollection?

 5      A.    Yes.

 6      Q.    All right.  So did you and your wife

 7  purchase gutters for the

 8  address in June of 2015?

 9      A.    Yes.

10      Q.    And was that for a house that you both

11  lived in at the time?

12      A.    Yes.

13      Q.    Do you have any recollection of why

14  your wife was the only one to sign this agreement

15  as opposed to you signing it as well?

16      A.    Yes.

17      Q.    Why was that?

18      A.    I was out of town traveling for

19  business, and she called me, and I authorized her

20  to go ahead with the application.  Or we

21  discussed it and we agreed to the application.  I

22  didn't authorize her, but I gave her approval on

23  my side as well to go ahead with this project.

24      Q.    And was the cost of the gutters $7,168?

25      A.    Yes.
```

1                          Tinny Suri

2        Q.    Did you and Ms. Suri pay any amount of

3   that out of pocket or did you finance the entire

4   amount?

5        A.    I financed the entire amount.

6        Q.    I'm now going to show you a document

7   that we are going to mark as Exhibit 2.

8              (EXHIBIT 2, HOME PROJECTS VISA CREDIT

9              CARD ACCOUNT APPLICATION, 6/11/2015 -

10             SURI 000899, WAS IDENTIFIED.)

11       Q.    Mr. Suri, can you see my screen where

12  it says Exhibit 2?

13       A.    Yes.

14       Q.    All right.  So I'm showing you a

15  document we've marked as Exhibit 2.  It is

16  entitled Home Projects Visa Credit Card Account

17  Application, and it is Bates numbered

18  Suri 000899.

19             Have you seen this document before?

20       A.    Yes.

21       Q.    And what is this document?

22       A.    This is the actual application for the

23  credit card or for the loan.

24       Q.    For the Wells Fargo account?

25       A.    Correct.

1                        Tinny Suri

2      Q.     All right.  If you look at the bottom,

3   is that Ms. Suri's signature on there?

4      A.     Yes.

5      Q.     That's a terrible question.

6             The line on the left where it says

7   Signature of Applicant, is that your wife,

8   Ms. Suri's, signature?

9      A.     Yes.

10     Q.     And then the bottom right where it says

11  Signature of Coapplicant, is that your signature?

12     A.     Yes.  Well, yes, signed by my wife.

13     Q.     Okay.  So why don't you break that down

14  for me.  What do you mean by that?

15     A.     So I was out of town, as I mentioned,

16  and I told her to go ahead and sign my name as

17  the coapplicant for this loan.

18     Q.     So you gave your wife the authority to

19  sign your name as signature of coapplicant; is

20  that correct?

21     A.     Correct.

22     Q.     And was your intention in giving that

23  authority that you would be bound as a

24  coapplicant on this application?

25     A.     That is my understanding.

1                      Tinny Suri

2      Q.     And you don't claim that your wife

3  signed your name without your authority; is that

4  right?

5             MS. BOLOS:   Objection, form.

6      A.     Yes.

7      Q.     Do you claim that your wife signed as

8  coapplicant without your authority?

9      A.     No.   She had my authority.

10     Q.     What was your purpose in applying for

11  the Home Projects Visa credit card account?

12     A.     The purpose was to put a LeafGuard over

13  my gutters and protect them from the 50 acres of

14  trees I have behind my home from clogging.

15     Q.     Do you own those 50 acres or are they

16  someone else's trees?

17     A.     Just common area, but I back up to 50

18  acres.

19     Q.     All right.   Did you see this Home

20  Projects Visa credit card account application

21  before your wife signed her name and your name?

22     A.     I did not.

23     Q.     Did you ask your wife to review it

24  before she signed your name and her name?

25     A.     I don't believe I asked her to, but I

1                     Tinny Suri

2   assumed she read it, at least the front page of

3   it.  I'm not sure.  I can't answer that.

4        Q.    Understood.

5              All right.  If you go to the middle of

6   the page, do you see the bold paragraph that

7   begins with the letters "Acknowledgement"?

8        A.    Yes.

9        Q.    Do you see where it says:

10                 "You acknowledge receipt

11                 of a copy of the credit

12                 card agreement, including

13                 the important terms of

14                 your credit card account."

15                 Do you see that?

16       A.    Yes.

17       Q.    And so you agreed to that when your

18   wife signed your name with your authority;

19   correct?

20       A.    Yes.

21       Q.    All right.  And so by signing the

22   agreement or the application, you agreed that you

23   received the credit card agreement, including the

24   important terms of your credit card account;

25   correct?

1                        Tinny Suri

2      A.     Yes.

3      Q.     Now I'm going to show you a document

4   that we're going to mark as Exhibit 3.  I've

5   dragged it over to the chat.

6               (EXHIBIT 3, IMPORTANT TERMS OF YOUR

7               CREDIT CARD ACCOUNT -

8               SURI 000900-0906, WAS IDENTIFIED.)

9      Q.     All right.  This document marked as

10  Exhibit 3 is Bates numbers Suri 000900 through

11  Suri 000906.

12              Do you see that?

13     A.     Yes.

14     Q.     Okay.  Now, because it's Bates numbered

15  Suri with a Suri designation, you produced this

16  document to us in this lawsuit; is that correct?

17     A.     I believe so.

18     Q.     And did you also label it "Wells Fargo

19  contract" when you produced it?

20              MS. BOLOS:  Objection, form.

21     Q.     Well, let me ask a different question.

22              Do you know if you or your attorneys

23  labeled it "Wells Fargo contract" when you

24  produced it?

25     A.     I don't recall.  It's been a while.  So

1                     Tinny Suri

2    I would assume yes.  Unless you can show me how

3    it was presented, I could probably answer much

4    better.

5         Q.    I think you did.  I was just trying to

6    confirm it.

7         A.    Okay.

8         Q.    We can address that some other time.

9         A.    Okay.

10        Q.    Where did you -- let me ask a different

11   question.

12              Did you locate this contract in your

13   files in your house or in a desk drawer?  Where

14   did you find it prior to giving it to your

15   attorneys to produce?

16        A.    It was in my files.  It was provided to

17   me, I think, from Wells Fargo or whoever provided

18   the initial agreement.

19        Q.    So do you have a file cabinet with a

20   folder that's labeled Wells Fargo and a bunch of

21   documents in there?

22        A.    A pretty thick one, yes, I do.

23        Q.    And have you produced all the documents

24   in that file to us in this litigation?

25              MS. BOLOS:  Objection, form.

1                        Tinny Suri

2              THE WITNESS:  Do I answer that?

3              MR. GETTINGS:  You can answer.

4    A.    Yes.

5    Q.    Do you know if there are any documents

6    in that file that you have withheld from

7    production?

8    A.    Not to my recollection, no.

9    Q.    So do you recognize this document as

10   the contract related to the Wells Fargo account

11   at issue in this lawsuit?

12   A.    I believe so, yes.

13   Q.    And by signing or at least giving your

14   wife the authority to sign the credit card

15   application, you agreed to the terms of this

16   credit card agreement; isn't that correct?

17   A.    Yes.

18   Q.    All right.  So I'm going to direct your

19   attention to the part of the contract on page

20   Suri 000901 that's entitled Parties to This

21   Agreement on the left side.

22              Do you see that?

23   A.    I do.

24   Q.    And it says:

25              "This agreement is made

```
1                    Tinny Suri
2              between Wells Fargo
3              Financial Bank 4455 Spring
4              Mountain Road, Las Vegas,
5              Nevada, 89102" -- which it
6              defines as "(we, us, and
7              our) and each account
8              holder, whether primary or
9              joint" -- which it defines
10             as "(you and your)."
11             Correct?
12     A.      Yes.
13     Q.      So you were an account holder on the
14  Wells Fargo account; correct?
15     A.      Yes.
16     Q.      And your wife, Debra, was also an
17  account holder on the Wells Fargo account;
18  correct?
19     A.      Yes.
20     Q.      So in this agreement, in this contract,
21  "you" refers to both you as in Tinny Suri and you
22  as in Debra Suri; correct?
23     A.      Yes.
24     Q.      I'm now going to direct your attention
25  to the portion of the contract that's entitled
```

1                       Tinny Suri

2    Default on the relative bottom right of page

3    Suri 000902.

4              Do you see that section?

5    A.    I do.

6    Q.    All right.  Had you looked at this

7    Default section prior to the time you filed your

8    lawsuit?

9    A.    I don't recall, but I believe I read

10   part of this, yes.

11   Q.    Okay.  And the default section says:

12              "Your account will be

13              in default if any of the

14              following occur:"

15              And then it lists a series of

16   occurrences; correct?

17   A.    Yes.

18   Q.    All right.  And one of the occurrences

19   is you file for bankruptcy; correct?

20   A.    Yes.

21   Q.    And we just discussed earlier that

22   "you" refers to either you as in Tinny Suri or

23   you as in Debra Suri; correct?

24   A.    Yes.

25   Q.    So you agreed at the time you opened

Page 43

```
 1                    Tinny Suri
 2  the account that the account will be in default
 3  if Debra Suri filed for bankruptcy; correct?
 4            MS. BOLOS:  Objection, form.
 5      Q.    You can answer.
 6      A.    I believe so.  I'm not sure.  I mean
 7  the way it's spelled out, I guess there are some
 8  ways to interpret that differently.  But I would
 9  assume.
10      Q.    Well, how would you interpret it
11  differently?
12      A.    Well, I mean I would say that she --
13  I mean she filed bankruptcy.  But there were, I
14  think, other documents that supported -- there
15  was a reaffirmation on this, and that wasn't part
16  of the bankruptcy for her.
17            But that's a different conversation.
18      Q.    Okay.  And this provision doesn't say
19  anything about reaffirmation; right?
20            MS. BOLOS:  Objection, form.
21      A.    Correct.
22      Q.    All right.  I'm now going to show you a
23  document we're going to mark as Exhibit 4.
24            (EXHIBIT 4, VOLUNTARY PETITION FOR
25              INDIVIDUALS FILING FOR BANKRUPTCY,
```

1                   Tinny Suri

2              3/27/2018, WAS IDENTIFIED.)

3     Q.    I promise this is a lot cooler in

4  person.  I would slide documents to you and I

5  would have a cool binder.

6     A.    You're good.

7     Q.    So one day.

8           You'd have free snacks.  There would be

9  all sorts of stuff.

10    A.    Trust me, I do this every day since I

11 don't travel because of COVID.  So we're good.

12    Q.    So now I'm showing you a document that

13 we've labeled Exhibit 4.  It is a 54-page

14 document with a cover letter -- excuse me -- with

15 a cover page.  And the first substantive page is

16 labeled Voluntary Petition for Individuals Filing

17 for Bankruptcy.

18           If I scroll out like that so you can

19 see the whole page, are you still able to read

20 that or is it too small?

21    A.    It's a little small.

22    Q.    Okay.  I'll zoom in more.

23           All right.  Have you ever seen this

24 document entitled Voluntary Petition for

25 Individuals Filing for Bankruptcy with the name

1                     Tinny Suri

2   Debra Lee Suri as the individual identified on

3   the petition?

4       A.    I don't recall.  I mean it's been a

5   while.  This could be from our bankruptcy

6   attorney, but I don't remember.  But it could be,

7   correct.

8       Q.    Okay.  Your wife, Debra, filed for

9   bankruptcy; is that right?

10      A.    That is correct.

11      Q.    All right.  And she filed for

12  bankruptcy in April of 2018?

13      A.    That is correct.

14      Q.    Did you know your wife was going to

15  file for bankruptcy before she did so?

16      A.    Yes.

17      Q.    And did you agree with her decision to

18  file for bankruptcy?

19      A.    Based on our discussion with our

20  attorneys and their direction, yes.

21      Q.    Was it a joint decision that you made

22  together for her to file for bankruptcy?

23            MS. BOLOS:  Objection, form.

24      A.    Yes.

25      Q.    Was there a -- well, let me ask a

                        Tinny Suri

1   different question.

2          Do you recall what led your wife to

3   file for bankruptcy?

4      A.    Yes.   Financial issues, the lawsuit

5   that I was in for noncompete, and employment.

6      Q.    So let's break those down.   With

7   respect to the lawsuit, how did the lawsuit

8   necessitate or at least contribute to the

9   bankruptcy filing?

10          MS. BOLOS:   Objection.   If he answers

11  that question, he could be breaching a

12  confidentiality clause, David.

13          MR. GETTINGS:   Okay.   Well, let me ask

14  a different question.

15     Q.    Was the lawsuit creating a financial

16  drain on you that contributed to the decision to

17  file for bankruptcy?

18     A.    Yes.

19          MR. GETTINGS:   And Sylvia, if I ask any

20  more detailed questions on that, will you object

21  on the basis of confidentiality.

22          MS. BOLOS:   Ask the question and I'll

23  let you know.

24          MR. GETTINGS:   Sure.   Okay.

1                    Tinny Suri

2      Q.    Were you having to pay legal fees in

3   connection with the lawsuit that contributed to

4   the filing for bankruptcy?

5            MS. BOLOS:  Objection.  That would

6   likely breach the confidentiality clause.

7            MR. GETTINGS:  So are you instructing

8   him not to answer?

9            MS. BOLOS:  I am instructing him not to

10  answer for his own protection.

11     Q.    And Mr. Suri, are you taking your

12  counsel's advice?

13     A.    Yes.

14     Q.    Okay.  So we may go through the same

15  rubric again.

16            Did you have to pay damages in

17  connection with your lawsuit that contributed to

18  you -- or to your wife filing for bankruptcy?

19            MS. BOLOS:  Objection.  That's going to

20  likely cause him to breach the confidentiality

21  clause.

22            Mr. Suri, please don't answer the

23  question.

24     Q.    Mr. Suri, are you taking your counsel's

25  advice?

1                     Tinny Suri

2      A.     Yes.

3      Q.     Now, the second aspect that you said

4  that contributed to the bankruptcy was employment

5  related, I think you said.

6             What did you mean by that?

7      A.     I had to -- I had to leave my

8  employment based upon the breach of contract

9  lawsuit.

10     Q.     So for a period of time were you

11 unemployed?

12     A.     Very short, but yes.

13     Q.     For how long a period were you

14 unemployed?

15            That was a terrible question.

16            So what employer did you leave?

17     A.     I left Incipio.

18     Q.     And to which employer did you go?

19     A.     Cambridge Sound Management.

20     Q.     And this was in 2018; is that right?

21     A.     I believe so.  '17, '18.

22     Q.     Was Cambridge Sound Management a

23 defendant in that noncompete-related lawsuit we

24 talked about earlier?

25     A.     No.

1                    Tinny Suri

2      Q.    Do you recall where that lawsuit was

3  filed?  In what court system?

4      A.    That would be Oakland County, Michigan.

5      Q.    You said Oakland County, Michigan?

6      A.    Correct.

7      Q.    Was Incipio alleging in that lawsuit

8  that you were working with Cambridge when you

9  shouldn't have been?

10     A.    Let me step back.

11           PCT filed the lawsuit for me working at

12  Incipio.

13     Q.    Oh, okay.  So PCT filed the lawsuit

14  claiming that you were working with Incipio when

15  you shouldn't have been; is that right?

16     A.    That is correct.

17     Q.    Were you working with Incipio when you

18  were also employed by PCT?

19     A.    No.

20     Q.    All right.  Do you recall why you and

21  your wife elected that she file for bankruptcy as

22  opposed to you filing for bankruptcy given that

23  some of the contributing factors related to your

24  lawsuit or your employment?

25           MS. BOLOS:  Objection.  That's

1                      Tinny Suri

2  potentially covered by attorney/client privilege.

3  She had counsel for bankruptcy.

4          MR. GETTINGS:  Okay.  Well, I'll ask a

5  different question -- well, no, I'll ask the same

6  question.

7     Q.    Is the answer to that question based on

8  conversations with your counsel?

9          Would you like Debbie to read it back

10  again?

11          MS. BOLOS:  Yeah, why don't we read it

12  back again, David.  I already asserted

13  attorney/client privilege, and so I'm going to

14  instruct Mr. Suri not to answer it.  But if you

15  want to keep the same question, I'm still going

16  to instruct him not to answer it.

17          MR. GETTINGS:  Debbie, would you mind

18  just reading back my question?

19              (REQUESTED PORTION OF RECORD READ.)

20          MS. BOLOS:  Objection.  Attorney/client

21  privilege.

22          Mr. Suri, please don't answer that

23  question.

24     Q.    Are you taking your counsel's advice?

25     A.    Yes.

1                          Tinny Suri

2      Q.    What lawyer, Mr. Suri, did you retain

3  in connection with your wife's bankruptcy?

4      A.    I don't recall her name or the firm,

5  but I believe everything was submitted during

6  your discovery, I think.

7      Q.    Let me scroll down.  It's probably on

8  here somewhere.

9            Was it Kimberly Bedigian?

10     A.    That is the law firm, yes.

11     Q.    And the law firm is Stevenson &

12  Bullock, PLC?

13     A.    Yes.

14     Q.    Was Stevenson & Bullock, PLC,

15  representing you in connection with your wife's

16  bankruptcy?

17     A.    No.

18     Q.    So what conversations did you have with

19  Stevenson & Bullock regarding whether to file for

20  bankruptcy?

21           MS. BOLOS:  Objection.  Attorney/client

22  privilege to the extent Mr. Suri had any of those

23  conversations.  I think you should rephrase that

24  question, David.

25           MR. GETTINGS:  Why should I rephrase

1                    Tinny Suri

2    it?  He said they weren't representing him.

3              MS. BOLOS:  They're spouses.  It

4    doesn't mean that he wasn't present for those

5    conversations.

6              MR. GETTINGS:  Okay.  So are you

7    asserting attorney/client privilege with respect

8    to Debra and then spousal privilege with respect

9    to Mr. Suri and Mrs. Suri?

10             MS. BOLOS:  I'm asserting attorney/

11   client privilege to the extent Mr. Suri was

12   present for any conversations with that law firm.

13             MR. GETTINGS:  Okay.

14        Q.    So were you present -- well, let me ask

15   you this:  Did you ever have any conversations

16   with someone from Stevenson & Bullock outside of

17   the presence of your wife?

18        A.    No.

19        Q.    So who was present for conversations

20   between -- well, who was present for any

21   conversations you ever had with Stevenson &

22   Bullock?

23        A.    That would be Kimberly and that would

24   be my wife and myself.

25        Q.    All right.  So do you recognize

1                    Tinny Suri

2    Exhibit 4 as your wife's Voluntary Petition for

3    Bankruptcy?

4        A.    I don't know if I recognize it, but I

5    believe that is part of the document.

6        Q.    Okay.  And do you recall if you've ever

7    seen your wife's Voluntary Petition for

8    Bankruptcy before?

9        A.    I'm sorry.  Can you repeat that?

10       Q.    Yeah.  Do you recall if you've ever

11   seen your wife's Voluntary Petition for

12   Bankruptcy before?

13       A.    Have I seen this file before that my

14   wife --

15       Q.    Yeah.  This document; correct.

16       A.    I have not.  That was between the

17   lawyer and my wife.

18       Q.    Do you know if your wife filed for

19   Chapter 7 bankruptcy or Chapter 13 bankruptcy?

20       A.    You know what, I don't recall.

21       Q.    All right.  I'm going to scroll down to

22   page 19 of the bankruptcy filing.  The bottom

23   says page 19 of 53.  And it's entitled Schedule

24   E/F:  Creditors Who Have Unsecured Claims.

25               Do you see that?

Page 54

1                          Tinny Suri

2        A.    Yes.

3        Q.    Do you have any understanding of what

4   it means for a creditor to have an unsecured

5   claim?

6              MS. BOLOS:  Objection to form.

7        A.    I do not.

8        Q.    So in part 2, number 4, the

9   instructions say:

10                  "List all of your

11                  nonpriority unsecured

12                  claims in the alphabetical

13                  order of the creditor who

14                  holds each claim."

15             Do you see that?

16       A.    I see that.

17       Q.    So I'm going to go down to page 24 of

18  53.  And do you see that Wells Fargo Financial is

19  listed next to box 4.14?

20       A.    I see that.

21       Q.    All right.  And it says:  "When was

22  this debt incurred?"

23             And it says:  "2015."

24             Correct?

25       A.    I see that, yes.

1                          Tinny Suri

2        Q.    And there's an amount of $4,172 on the

3    right side?

4        A.    I do see that.

5        Q.    So this is the Wells Fargo account

6    that's at issue in your present lawsuit against

7    Wells Fargo; correct?

8              MS. BOLOS:  Objection, form.

9        A.    Yes.

10       Q.    So you would agree that your wife

11   included this Wells Fargo account in her

12   bankruptcy petition; correct?

13             MS. BOLOS:  Objection, form.

14       Q.    You can answer.

15       A.    Yes, if it's listed.

16       Q.    All right.  Now I'm going to go to part

17   3.  It says:  List Others to be Notified about a

18   Debt That You Already Listed.

19             Do you see that?

20       A.    Yes.

21       Q.    Okay.  I'm going to scroll down to the

22   end, and Wells Fargo Financial is listed in that

23   section as well.

24             Do you see that?

25       A.    I see it.

1                         Tinny Suri

2       Q.     And then it says:

3                    "On which entry in part

4              1 or part 2 did you list

5              the original creditor?"

6              And line 4.14 is identified right below

7    that.

8              Do you see that?

9       A.     I do see that.

10      Q.     And that line 4.14 is the line we

11   looked at a few minutes ago; correct?

12             MS. BOLOS:   Objection, form.

13      A.     Okay.

14      Q.     Do you agree or do you disagree?

15      A.     No.  I believe so.  I didn't know it

16   was 4.14.  But if it's written, I'll believe it.

17      Q.     I'll scroll back up.  I don't want you

18   to feel like you're being misled.

19      A.     No.  That's fine.

20             I see it, 4.14.  Yes; that's correct.

21      Q.     So I'm going to scroll down to the

22   Verification of Creditor Matrix on page 51 of 53.

23   You'll see on this Verification of Creditor

24   Matrix it says:

25                   "The above-named debtor

1                    Tinny Suri

2              hereby verifies that the

3              attached list of creditors

4              is true and correct to the

5              best of his/her

6              knowledge."

7         And then it's signed with an electronic

8   /S/ by Debra Lee Suri.

9              Do you see that?

10             MS. BOLOS:  Objection to form.

11    A.    Yes.

12             MR. GETTINGS:  What's the form

13   objection, Sylvia?

14             MS. BOLOS:  It's compound.

15             MR. GETTINGS:  Okay.

16    Q.    Well, does this verification of

17   creditor matrix look like it was signed by Debra

18   Lee Suri.

19             MS. BOLOS:  Objection, form.

20    Q.    You can answer.

21    A.    Yes.

22    Q.    And does this Verification of Creditor

23   Matrix say:

24              "The above-named debtor

25              hereby verifies that the

1                       Tinny Suri

2                   attached list of creditors

3                   is true and correct to the

4                   best of his/her

5                   knowledge"?

6       A.      Yes.

7       Q.      All right.  And then if I scroll down

8  to that creditor matrix, do you see Wells Fargo

9  Financial is listed in the creditor matrix?

10      A.      I do see that.

11      Q.      Okay.  So to this point we all -- not

12  to this point.  Let me strike that question.

13              So we all agree that in April of 2018

14  your wife, Ms. Suri, filed for bankruptcy;

15  correct?

16      A.      Yes.

17      Q.      And we agree that your wife filing for

18  bankruptcy was listed as an event of default

19  under the Wells Fargo card agreement we

20  previously looked at; correct?

21      A.      Yes.

22              MR. GETTINGS:  Mr. Suri, we've been

23  going for about an hour.  I tend to like to take

24  hour breaks.  So maybe we'll do five minutes and

25  then come on back?

1                    Tinny Suri

2              THE WITNESS:  Sure.

3              MR. GETTINGS:  Okay.  Debbie, we can go

4   off.

5              (A RECESS WAS TAKEN FROM 11:00 A.M.

6               TO 11:08 A.M.)

7   BY MR. GETTINGS:

8      Q.    Mr. Suri, I'm now going to show you

9   another exhibit, which we are going to label as

10  Exhibit 5.

11             (EXHIBIT 5, WELLS FARGO ACCOUNT

12              STATEMENT, 3/13/2018 -

13              SURI 000877-0878, WAS IDENTIFIED.)

14     Q.    And it is a document that you produced

15  to us Bates labeled Suri 000877 to 878.

16             Can you see it on your screen,

17  Mr. Suri?

18     A.    Yes.

19     Q.    All right.  So this is an account

20  statement that pertains to the account number

21  ending 9309.

22             Do you recognize that as the Wells

23  Fargo account that's at issue in the case?

24     A.    I believe so, yes.

25     Q.    All right.  And do you recognize this

1                       Tinny Suri

2   document as a Wells Fargo account statement?

3       A.    Yes.

4       Q.    All right.  Were all of the account

5   statements that you produced to us in this case

6   in that Wells Fargo folder you described to me

7   earlier?

8       A.    Yes.

9       Q.    Do you regularly save all of the

10  account statements you receive from the Wells

11  Fargo account?

12      A.    No.

13      Q.    Okay.  Why did you save -- well, let me

14  ask it a different way.

15            Did you save all of the Wells Fargo

16  account statements you received for this account?

17            MS. BOLOS:  Objection, form.

18            You can answer.

19      A.    No.  I mean I don't save all of them

20  for this account.  But this particular one I had

21  on hand.

22      Q.    Okay.  So all of the ones that you

23  produced to us in this lawsuit are those ones

24  that existed in your Wells Fargo folder?

25      A.    Correct.

Page 61

1                    Tinny Suri

2      Q.    All right.  And what was the process

3  for those statements making their way into that

4  folder?  Would you have received it in the mail,

5  looked at it, and then put it in the folder?

6           MS. BOLOS:  Objection to form.

7      A.    I believe so.

8      Q.    You can answer.

9      A.    Most likely.  I don't recall exactly

10  why, but I happened to have it.

11      Q.    Okay.  And this document is addressed

12  to Debra L. Suri and Tinny Suri at ▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮; correct?

14      A.    That is correct.

15      Q.    And that was your address in 2018?

16      A.    That is correct.

17      Q.    Do you recall receiving this statement

18  from Wells Fargo in 2018?

19      A.    I don't recall.  I most likely -- since

20  I have it, we received it.

21      Q.    That was going to be my next question,

22  so thank you.

23           All right.  In the middle of the first

24  page of this document do you see the portion that

25  says Summary of Account Activity?

1                        Tinny Suri

2       A.    Yes.

3       Q.    All right.  And then below that there's

4  another box that begins with New Balance?

5       A.    Yes.

6       Q.    All right.  And then two more lines

7  down it says Available Credit.

8             Do you see that?

9       A.    Yes.

10      Q.    And the available credit was 5,312, at

11  least as reflected on this statement.

12            Do you see that?

13      A.    I do.

14      Q.    Did you or your wife ever use this

15  account for any other funds besides those

16  connected with the gutters that were put on?

17      A.    No.

18      Q.    So was it just a one-time charge and

19  then no further charges on your end?

20      A.    That is correct.

21      Q.    All right.  Were you aware that you

22  could take additional -- let me say it a

23  different way:

24            Were you aware that you could use the

25  account for different potential credit if you had

```
 1                    Tinny Suri
 2   wanted to?
 3      A.    Yes.
 4      Q.    All right.  I'm going to show you
 5   another document that we're going to mark as
 6   Exhibit 6.
 7              (EXHIBIT 6, WELLS FARGO ACCOUNT
 8              STATEMENT, 4/6/2018 -
 9              SURI 000879-0880, WAS IDENTIFIED.)
10      Q.    Mr. Suri, do you see a document on your
11   screen that's labeled Exhibit 6?
12      A.    I do.
13      Q.    All right.  So this document was
14   produced to us with the Bates numbers Suri 879
15   through Suri 880, and it's labeled with November
16   2017 to November 2018 Wells Fargo statement.
17              Do you see that?
18      A.    I do.
19      Q.    And so for you to produce this
20   statement to us, does that mean that you had this
21   statement in your files as well?
22      A.    Most likely if I produced it, I had
23   it -- or I have it.
24      Q.    And this statement is addressed to
25   Debra L. Suri and Tinny Suri at
```

```
                                                    Page 64
 1                     Tinny Suri
 2  ██████████████; correct?
 3              MS. BOLOS:  Objection, form.
 4      A.    Yes.
 5              MR. GETTINGS:  What's the form
 6  objection, Sylvia?
 7              MS. BOLOS:  I don't think you actually
 8  read the address correctly there.
 9              MR. GETTINGS:  Oh, let me read it
10  again.
11              MS. BOLOS:  Thank you.
12      Q.    So it's addressed to Debra L. Suri and
13  Tinny Surry at ██████████████████████ --
14              MS. BOLOS:  No.
15      Q.    -- ████████████████; correct?
16              MS. BOLOS:  No, David, you still didn't
17  read it right.  I'm pretty sure there are three
18  zeroes unless there's something wrong with my
19  screen.
20              MR. GETTINGS:  Didn't I read three
21  zeroes?
22              THE WITNESS:  No.
23              MR. GETTINGS:  Okay.  Let me try a
24  third time.  Three years of law school, four
25  years of college, and that's what I get stumped
```

```
 1                        Tinny Suri
 2   up on.
 3        Q.    It's addressed to Debra L. Suri and
 4   Tinny Suri at ███████████████; correct?
 5        A.    Yes.
 6        Q.    Okay.  And do you have any specific
 7   recollection of receiving this statement?
 8        A.    I don't recollect it, but I do have it,
 9   so we received it.
10        Q.    Perfect.  So let's go to the middle of
11   the -- well, no, it's not the middle anymore --
12   the top left of the first page of the statement.
13              What does it list as available credit?
14        A.    Available credit is zero.
15        Q.    All right.  And that's different than
16   the available credit we saw in the previous
17   statement; correct?
18        A.    Sure.
19        Q.    And what does it list as the statement
20   closing date?
21        A.    4/6, so it's April 6, 2018.
22        Q.    All right.  Do you recollect April 6,
23   2018, as the date of your wife's bankruptcy
24   petition?
25        A.    I don't recall that exact date.
```

1                    Tinny Suri

2        Q.    Okay.  Do you have any understanding as

3   to why the available credit is showing as zero

4   dollars on this statement?

5        A.    I do not know.

6        Q.    All right.  Let's look at the middle of

7   this page, Bates number 879.  Do you see that the

8   second transaction listed says "charge off

9   account principals."

10            Do you see that?

11       A.    I see it.

12       Q.    And there's an amount listed of

13  $3,067.54.

14            Do you see that?

15       A.    I do see it.

16       Q.    And the transaction date connected to

17  that charge-off notation is April 6.

18            Do you see that?

19       A.    I do see that.

20       Q.    Does that indicate to you that Wells

21  Fargo charged off this account on April 6, 2018?

22       A.    Based upon the way it's written, I

23  would make that assumption, correct, yes.

24       Q.    So this statement from Wells Fargo

25  provided you and your wife notice that the

```
 1                      Tinny Suri

 2  account was charged off on April 6, 2018;

 3  correct?

 4      A.    Based on this statement, yes.

 5      Q.    That was really embarrassing when I

 6  kept saying the wrong number of zeroes.

 7            All right.  Now.  I'm now going to show

 8  you a document we're going to mark as Exhibit 7.

 9            (EXHIBIT 7, LETTER TO TINNY SURI FROM

10             WELLS FARGO, 4/6/2018, WAS

11             IDENTIFIED.)

12      Q.    Mr. Suri, can you see Exhibit 7 on your

13  screen?

14      A.    Yes.

15      Q.    All right.  So this is a letter from

16  Wells Fargo's production.  And it doesn't have a

17  Bates number on it.  So I'll have to get you the

18  Bates number on that.  And it's dated 4/6/2018.

19            Do you see that?

20      A.    I see it.

21      Q.    And it's addressed to Tinny Suri at

22  ████ -- gosh, I did it again -- ███████████

23  ███████████████████████████████████████.

24            Do you see that?

25      A.    I see it.
```

Page 68

1                    Tinny Suri

2       Q.    Do you recall receiving this letter

3    from Wells Fargo?

4       A.    No.

5       Q.    All right.  Do you, as we sit here

6    today, doubt you received it or don't have any

7    recollection either way?

8       A.    Neither one of us -- I'm speaking for

9    my wife and myself -- we never received this

10   letter.  To the best of our knowledge, we don't

11   have this, we didn't receive it.  Otherwise I

12   would have acted earlier.

13      Q.    Okay.  What do you mean otherwise you

14   would have acted earlier?

15      A.    I would have contacted Wells Fargo and

16   started this process a lot earlier than when I

17   did.

18      Q.    Okay.  But you agree that you received

19   the statement we looked at earlier that reflected

20   the charged-off account; correct?

21      A.    Most likely.  If I have it in my

22   possession, then I received it, yes.

23      Q.    In April of 2018 your address was ████

24   ████████████████; correct?

25      A.    That is correct.

                        Tinny Suri

1

2     Q.     And this letter states:

3            "Due to the debtor's

4            recent bankruptcy filing,

5            Wells Fargo is taking the

6            following actions:"

7            And then the second bullet says:

8            "If the account is a

9            line of credit, then it

10           will be restricted as to

11           additional advances and/or

12           closed."

13           Did I read that correctly?

14    A.     That's what it says exactly, yes.

15    Q.     Okay.  So with respect to the April 6th

16    letter we looked at a few seconds ago, is it

17    possible you received it?

18           MS. BOLOS:  Objection, form.

19    A.     I can't -- I don't know how to answer

20    that.  Possible.  But we read everything that we

21    receive, so I don't know -- neither one of us

22    recall that we ever received the letter.

23    Q.     And do you save everything you receive

24    in paper copy?

25    A.     Not everything.  But something like

Page 70

```
 1                    Tinny Suri
 2   this would have red flagged both of us.
 3        Q.    What would have been the red flag?
 4        A.    Well, the statement that's in the
 5   letter, bankruptcy filed, closed account.  I
 6   think all of those things would have been a red
 7   flag.
 8        Q.    Was the charge-off designation on the
 9   previous statement we looked at a red flag for
10   you?
11        A.    You know, we didn't read through the
12   whole statement.  Usually, like anyone else, we
13   get a statement, we make the payments.  But we
14   were making automatic payments through our Chase
15   Bank electronically.  So whatever statements we
16   received, we generally just thought they were
17   just statements.
18        Q.    Do you recall Ms. Suri entering into a
19   Reaffirmation Agreement with Wells Fargo?
20        A.    I know there was one in the process of
21   being created between Wells Fargo and the law
22   firm and my wife.
23        Q.    Do you recall how Ms. Suri and Wells
24   Fargo got in contact with respect to -- that's a
25   terrible question.  Let me say that again.
```

```
 1                    Tinny Suri

 2            How did Ms. Suri know to enter a

 3  Reaffirmation Agreement with Wells Fargo?

 4            MS. BOLOS:  Objection.  Attorney/client

 5  privilege.  You already know she had an attorney

 6  assisting her with bankruptcy.

 7       Q.   Are you going to follow your lawyer's

 8  advice?

 9       A.   Of course, yes.

10       Q.   All right.  I'd like to show you a

11  document we're going to mark as Exhibit 8.

12                 (EXHIBIT 8, LETTER TO TINNY SURI FROM

13                  WELLS FARGO, 4/9/2018, WAS

14                  IDENTIFIED.)

15       Q.   All right.  Can you see my screen where

16  it says Exhibit 8, Mr. Suri?

17       A.   Yes.

18       Q.   All right.  And you see there's a

19  letter -- this exhibit is a letter dated April

20  9th, 2018, addressed to Tinny Suri, 10008 Maple

21  Valley Drive?

22       A.   I see it.

23       Q.   And it says in the subject line:

24  Bankruptcy Notice Received.

25            Do you see that?
```

1                     Tinny Suri

2      A.    I see it.

3      Q.    Do you recall receiving this letter

4  from Wells Fargo?

5      A.    I do not.

6      Q.    Do you see in the middle of this letter

7  it says:

8                 "Due to the debtor's

9                 recent bankruptcy filing,

10                 Wells Fargo is taking the

11                 following actions:"

12            And then the middle line says:

13                 "If the account is a

14                 line of credit, then it

15                 will be restricted as to

16                 additional advances and/or

17                 closed."

18            Do you see that?

19      A.    I do see it.

20      Q.    Is it possible you received this letter

21  from Wells Fargo in April 2018?

22      A.    Don't recall.  I don't know how to

23  answer that because we never received it to both

24  my recollection and my wife's.

25      Q.    So are you saying you affirmatively

1                    Tinny Suri

2   never received it or are you saying you don't

3   recall receiving it?

4          MS. BOLOS:  Objection, form.

5     A.    Didn't receive it.

6     Q.    Well, how do you know you didn't

7   receive it?

8     A.    Because I would have opened it -- we

9   would have opened it, read it, discussed it, and

10  took action to contact Wells Fargo.

11    Q.    And again, what about this letter would

12  have caused you to take action?

13    A.    Due to the Reaffirmation Agreement and

14  discussion of how this occurred.

15    Q.    We're going to go through the same

16  exercise for one more letter.

17          (EXHIBIT 9, LETTER TO DEBRA SURI FROM

18           WELLS FARGO, 4/9/2018, WAS

19           IDENTIFIED.)

20    Q.    Mr. Suri can you see on my screen how

21  it says Exhibit 9?

22    A.    I do.

23    Q.    All right.  So now what I'm showing you

24  is another letter dated April 9th, 2018,

25  addressed to Debra L. Suri at ▮▮▮▮▮▮▮▮▮▮

Page 74

```
 1                     Tinny Suri

 2  ██████████████████████████████.

 3            Did I read that correct?

 4    A.    Yes, you did.

 5    Q.    And the letter says:

 6                "This is to advise you

 7                that we have closed the

 8                above-referenced account

 9                because we have been

10                notified the owner(s) of

11                this account has filed

12                bankruptcy."

13            Did I read that correctly?

14    A.    Yes.

15    Q.    Do you recall receiving this letter

16  from Wells Fargo in April 2018?

17            MS. BOLOS:  Objection, form.

18    A.    No.

19    Q.    Do you recall your wife receiving this

20  letter from Wells Fargo in April 2018?

21            MS. BOLOS:  Objection, form.

22            THE WITNESS:  Do you want me to answer

23  that?

24            MS. BOLOS:  Yes.

25    Q.    You can answer the question.
```

1                        Tinny Suri

2       A.    No, she didn't receive it.

3       Q.    Well, are you sure she didn't receive

4  it or you just don't recall her receiving it?

5       A.    I know she didn't receive it because

6  she opens all the letters that we receive.  And

7  this would have triggered a response.

8       Q.    So you are presuming she did not

9  receive it because you don't recall a response

10 being triggered; is that fair?

11      A.    That is correct.

12      Q.    All right.  Now I'm going to show you a

13 document we're going to label as Exhibit 10.

14            (EXHIBIT 10, REAFFIRMATION AGREEMENT,

15             5/7/2018, WAS IDENTIFIED.)

16      Q.    All right, Mr. Suri.  Do you see

17 Exhibit 10 on your screen?

18      A.    I do.

19      Q.    All right.  And this document, the

20 first page is entitled Cover Sheet for

21 Reaffirmation Agreement.  And then if you scroll

22 further down, the third page -- or I guess it's

23 the fourth page -- well, the third page of the

24 document is entitled Reaffirmation Agreement.

25            Do you see that?

```
 1                      Tinny Suri
 2              MS. BOLOS:  Objection, form.
 3      A.      I do.
 4              MR. GETTINGS:  What's the form
 5  objection, Sylvia?
 6              MS. BOLOS:  It's compound.
 7      Q.      Okay.  Do you see the first page of the
 8  document is entitled Cover Sheet for
 9  Reaffirmation Agreement?
10      A.      I do.
11      Q.      Okay.  And do you see the third page of
12  the document is entitled Reaffirmation Agreement?
13      A.      I do.
14      Q.      Okay.  Let's start with the cover page.
15              Have you ever seen this Official Form
16  472 Cover Sheet for Reaffirmation Agreement
17  pertaining to your wife's bankruptcy?
18              MS. BOLOS:  Objection, form.
19      A.      Yes.
20      Q.      When did you first receive it?
21      A.      I want to say a copy was produced by
22  the law firm to my wife and then shared with me.
23      Q.      Are you aware of your wife reaching a
24  Reaffirmation Agreement with Wells Fargo
25  pertaining to the account we've been discussing?
```

                          Tinny Suri

1

2       A.      Yes.

3       Q.      When did you first learn that your wife

4   had reached a Reaffirmation Agreement with Wells

5   Fargo?

6       A.      After her attorney contacted her after

7   reviewing with the judge or the court system with

8   the bankruptcy that this was reaffirmed.

9       Q.      And do you have any understanding of

10  what it means to reaffirm a debt in bankruptcy?

11      A.      Well, I'm not a legal expert, so I

12  couldn't tell you the jargon.  But I would assume

13  that it's to continue making the payments as

14  agreed to in the loan -- in the stipulation in

15  the loan agreement.

16      Q.      I'm going to turn to page -- or I guess

17  I should say Part B of this agreement, page 9 of

18  13 of the PDF.

19              Does this look like your wife's

20  signature on this page?

21      A.      Yes.

22      Q.      And does it appear to you that your

23  wife signed this document on May 7, 2018?

24      A.      The  way it's written, yes.

25      Q.      And do you see a Wells Fargo signature

1                        Tinny Suri

2   on this page as well?

3       A.    I do.

4       Q.    You did not sign the Reaffirmation

5   Agreement; correct?

6       A.    No.

7       Q.    At the time your wife signed -- well,

8   let me state it a different way.

9             The date of this Reaffirmation

10  Agreement is later in time than the statement we

11  looked at earlier from Wells Fargo indicating

12  your account had been charged off; correct?

13      A.    That is correct.

14      Q.    So at the time your wife signed the

15  Reaffirmation Agreement, Wells Fargo had already

16  charged off the account at issue; correct?

17            MS. BOLOS:  Objection, form.

18      A.    Correct.

19      Q.    Okay.  I'm going to go back to page 5

20  of the PDF.  Actually it's page 6 of the PDF.

21  It's labeled page 3 of the Reaffirmation

22  Agreement in the top right corner.

23            Do you see the section of the

24  Reaffirmation Agreement entitled Repayment

25  Schedule?

1                    Tinny Suri

2      A.     I see it.

3      Q.     It states that:

4             "Your payment schedule

5             under the Reaffirmation

6             Agreement will be 24

7             payments in the amount of

8             $127.81 each, payable on

9             the 10th day of each month

10            unless altered later by

11            mutual agreement in

12            writing."

13            Do you see that?

14     A.     I see it.

15     Q.     So the agreement required monthly

16  payments of $127.81; correct?

17            MS. BOLOS:  Objection, form.

18     A.     Yes.

19     Q.     What monthly payments in what amount

20  were required under the agreement?

21            MS. BOLOS:  Objection, form.

22     A.     127.81.

23     Q.     I'm now going to show you a document

24  we're going to label as Exhibit 11.

25            (EXHIBIT 11, PACKET OF DOCUMENTS SENT

1                    Tinny Suri

2              TO TRANSUNION - WF_000380-0424, WAS

3              IDENTIFIED.)

4      Q.     This document is Bates numbered

5    WF_Suri 000380 all the way to 424.

6              So to give you some context, my

7    understanding is that this document is from a

8    packet of information you sent to TransUnion in

9    which you included a previous letter you sent to

10   Wells Fargo or fax you sent to Wells Fargo.

11             In looking at this document, does my

12   description sound correct?

13             MS. BOLOS:  Objection, form.

14     Q.     You can answer.

15     A.     Yeah.  I don't recall, but I would

16   assume you are correct, yes.

17     Q.     Okay.  And in this document it says

18   "Attention Denise Sauerbrei," and then it's

19   addressed to Denise, and then it's signed by

20   Tinny Suri.

21             Do you see that?

22     A.     I do.

23     Q.     Do you recall sending this

24   communication to Wells Fargo?

25     A.     I do.

1                    Tinny Suri

2      Q.    And this document looks like you

3   enclosed in the communication to Wells Fargo a

4   Reaffirmation Agreement, a bank payment history,

5   and a LeafFilter agreement.

6            Do you see that?

7      A.    I do.

8      Q.    I'm going to scroll down to the payment

9   history, which starts on Wells Fargo Suri 000384.

10           Do you recall creating this document,

11  which is entitled Tinny and Debra Suri Payment

12  History for Wells Fargo CC, and then it lists the

13  account number ending in █████?

14     A.    I see it.  I do remember.

15     Q.    How did you go about creating this

16  payment history?

17     A.    Went online, pulled everything from

18  Chase, and included the payment history.

19     Q.    Okay.  Is this an accurate reflection

20  of your payment history to Wells Fargo?

21     A.    I believe so, yes.

22     Q.    So go ahead and look at the payment you

23  listed for May 29th, 2018.

24     A.    Okay.

25     Q.    And what is that listed as?

```
                          Tinny Suri
1

2        A.    120.

3        Q.    So that was an amount that was less

4   than referenced in the Reaffirmation Agreement;

5   correct?

6        A.    Sure.

7        Q.    Do you recall why you made a payment

8   that was less than referenced in the

9   Reaffirmation Agreement?

10       A.    I don't know.  I believe my wife was

11  making the payments automatically, so she didn't

12  change them but continued to make the same

13  payments every month.

14       Q.    Okay.  And so look at the next payment

15  from June 2018.  What is that amount?

16       A.    That would be -- June '18?

17       Q.    Yeah.  Why don't you look at July.

18  It's listed as July 2018 on your payment history.

19       A.    I think it's 120.  July, 7/2?

20       Q.    Correct.

21       A.    Yeah.  120.

22       Q.    Okay.  And actually every payment up

23  through October 29th, 2019, is listed as 120;

24  correct?

25       A.    Yes.
```

1                      Tinny Suri

2     Q.    So for each of these months your wife,

3  Ms. Suri, made a payment that was less than the

4  payment required by the Reaffirmation Agreement;

5  correct?

6     A.    That is correct.

7     Q.    So for each of these months Mrs. Suri

8  did not comply with the Reaffirmation Agreement;

9  correct?

10          MS. BOLOS:  Objection, form.

11    A.    Sure.  I mean she made the payments,

12  but I understand.

13    Q.    So do you agree?

14    A.    I agree.

15    Q.    We'll go back up to the first page of

16  the letter.

17          So in this letter to Denise, the third

18  sentence, it says:

19                "I personally had no idea

20                there was charge-off my

21                perfect credit history

22                until I was recently

23                notified via a denial

24                letter from my bank for a

25                new credit card."

```
 1                    Tinny Suri

 2           Do you see that?

 3     A.    Uh-huh (positive response).

 4     Q.    All right.  We did establish earlier,

 5  though, that Wells Fargo provided you with a

 6  statement that listed the account as being

 7  charged off prior to the time you sent this

 8  letter; correct?

 9     A.    I understand, yes.

10     Q.    I'm now going to show you a document

11  we're going to label as Exhibit 12.

12           (EXHIBIT 12, LETTER TO TRANSUNION FROM

13            TINNY SURI - WF_SURI 000363-0365, WAS

14            IDENTIFIED.)

15     Q.    Can you see Exhibit 12 on your screen,

16  Mr. Suri?

17     A.    Yes.

18     Q.    So this document is Bates numbered

19  WF_Suri 363 to 365.

20           All right.  Can you explain to me what

21  this document is?

22     A.    I believe that is my dispute letter

23  either through my -- and I don't recall, so

24  either through the internet or something that I

25  sent to -- or I mailed to TransUnion.  So I don't
```

1                       Tinny Suri

2   recall.

3       Q.     Understood.

4              So you don't recall the medium through

5   which you sent it, but this is a dispute

6   communication you sent to TransUnion?

7       A.     I believe so.  I think this was done

8   online.

9       Q.     And the first -- or I guess the second

10  box on page 363, it references Wells Fargo Bank

11  account ending in ████; correct?

12      A.     Correct.

13      Q.     Is that the Wells Fargo account that

14  we've been discussing today?

15      A.     I believe that is correct.

16      Q.     All right.  And then in the Reason It's

17  Wrong box, is that you explaining to TransUnion

18  the reasons you believe Wells Fargo's credit

19  reporting is incorrect?

20      A.     That is correct.

21      Q.     So in this section you say:

22                  "You are inaccurately

23                  reporting the account

24                  status as 'charge-off.'"

25              Do you see that?

1                          Tinny Suri

2      A.     I do.

3      Q.     Okay.  Do you agree that Wells Fargo

4  did in fact charge off the account?

5             MS. BOLOS:  Objection to form.

6      A.     Based upon my understanding, they

7  charged it off, yes.

8      Q.     So if they charged it off, why do you

9  state:

10             "You are inaccurately

11             reporting the account

12             status as 'charge-off'"?

13     A.     It was at that point, to my

14  understanding later, that -- initially I did not

15  know it was charged off.  So when I didn't

16  receive any of the letters, I wouldn't have

17  known.  But in the statement that you've shown,

18  we didn't read it.

19     Q.     So can we all agree that it was in fact

20  accurate to report the account as charged off?

21             MS. BOLOS:  Objection, form.

22     A.     I don't know how to answer that,

23  because I would have acted differently if I would

24  have recognized it earlier.  So I don't know how

25  to answer that question.

1                          Tinny Suri

2      Q.    Well, do you think it was inaccurate

3   for Wells Fargo to report the account as charged

4   off?

5      A.    Yes.

6      Q.    Why?

7      A.    There's another -- because we had a

8   conversation with the bankruptcy attorney in

9   regards to the date of the bankruptcy.  And they

10  agreed with us that the bankruptcy was not

11  finalized until July after the fact, in fact.  So

12  what you're showing me is before the fact.  But

13  after the fact was that the bankruptcy attorney

14  said it was a mistake because the bankruptcy did

15  not finalize, and no one can act upon it until it

16  was finalized, until July of that year, not in

17  April.

18     Q.    So what does that explanation have to

19  do with whether it was inaccurate for Wells Fargo

20  to report the account as charged off?

21           MS. BOLOS:  Objection, form.

22     A.    I believe it was prematurely reported

23  or labeled as a charge-off.

24     Q.    And your basis for believing that is

25  what?

                          Tinny Suri

1

2     A.      Speaking to the attorney.

3     Q.      Okay.

4             MR. GETTINGS: Sylvia, if I keep probing

5     this conversation, are you going to object on

6     privilege grounds?

7             MS. BOLOS:  I mean if you're trying to

8     discover the substance of his conversations with

9     counsel, yes.

10            MR. GETTINGS:  All right.  Well, let me

11    state it a different way.

12    Q.      Are the reasons you believe it was

13    inaccurate to report it as charged off based on

14    your conversations with counsel?

15    A.      Yes.

16    Q.      Do you have any basis for that belief

17    besides conversations with counsel?

18    A.      When you say side conversations with

19    counsel -- I'm sorry.

20    Q.      I said besides.

21    A.      Oh, besides?

22    Q.      Yes.

23    A.      No.  It's with counsel.

24    Q.      So part of this deposition is to

25    understand how you're going to testify at trial.

1                    Tinny Suri

2  So if I ask you at trial why do you believe it

3  was inaccurate for Wells Fargo to report your

4  account as charged off, is your response going to

5  be:  Well, I can't testify to that because it's

6  based on my conversation with counsel?

7           MS. BOLOS:  Objection, form.

8    A.    I don't know how I will answer until I

9  convey or converse with my legal counsel to

10  determine the right course or approach on that

11  one.  So I don't know.

12   Q.    Well, it sort of an important question.

13           MR. GETTINGS:  Sylvia, do you want to

14  take a break?

15           MS. BOLOS:  We can take a break if you

16  guys want.  I'm good either way.  I don't really

17  know why you're inviting me to one.  I must look

18  tired.

19           MR. GETTINGS:  No, no, no.  My issue

20  is -- and we can stay on the record.  My issue is

21  that he's saying he doesn't know how he's going

22  to answer why he believes the account was

23  reported inaccurately because he has to consult

24  with counsel.  And I'm entitled to understand how

25  he's going to testify at trial in this

1                     Tinny Suri

2    deposition.

3            So if you want to consult with him,

4    I've got no objection to that.  But it's a

5    question we're going to need an answer to.

6            And if the answer is -- if the answer

7    is he doesn't have any basis besides

8    conversations with counsel and that's how he's

9    going to testify at trial, that's fine, too.

10           MS. BOLOS:  Well, I inserted an

11   objection.  And if you want, I can add to it.

12   But you're asking him to speculate to what he's

13   going to do into the future.

14           MR. GETTINGS:  You mean in terms of

15   trial testimony?

16           MS. BOLOS:  Yeah.  And I think that's

17   what he's trying to say.

18           Mr. Suri, if you want to confer with me

19   and take a break, it sounds like Mr. Gettings is

20   okay with that, and you and I can confer if you'd

21   like.  If you want to continue, then let

22   Mr. Gettings know what you want to do here.

23           THE WITNESS:  Yeah.  Let's confer real

24   quick because it's something I need to discuss

25   with you.

1                    Tinny Suri

2              MS. BOLOS:  Sure.

3              MR. GETTINGS:  Okay.  We'll take five

4    minutes.

5              THE WITNESS:  Okay.

6                (A RECESS WAS TAKEN FROM 11:50 A.M.

7                TO 11:57 A.M.)

8              MS. BOLOS:  So David, for the question

9    you were asking, Mr. Suri just wants to make sure

10   he's not waiving his attorney/client privilege.

11   As he said, he did confer with counsel.  But if

12   you want to ask him about the charge-off and his

13   mental impressions before he conferred with

14   counsel, then he's prepared to answer your

15   questions.

16             MR. GETTINGS:  Yeah.  And I will agree

17   he is not waiving privilege by answering that

18   question.  So I'll reask it.

19        Q.    So in your letter to TransUnion you

20   said:

21                  "You are inaccurately

22                  reporting the account

23                  statuss as 'charge-off.'"

24             Why do you believe it was inaccurate to

25   report the account status as charged off?

```
 1                    Tinny Suri
 2     A.    Well, after receiving the denial letter
 3  and after contacting Wells Fargo with Denise
 4  initially, after that I pulled the Reaffirmation
 5  Agreement, called the attorneys, the bankruptcy
 6  attorneys, spoke to them, my wife and I, and
 7  inquired about -- and spoke about this issue.
 8  And she asked us when this was --
 9           MS. BOLOS:  Mr. Suri, I'm just going to
10  stop you there.  I know we're preserving the
11  privilege, but I don't want you to reveal
12  conversations with counsel.
13           THE WITNESS:  No problem.
14           MS. BOLOS:  If you could just explain
15  maybe the impetus leading up to making that phone
16  call, I think that's what Mr. Gettings is getting
17  at.
18     A.    So yeah, we made the phone call to --
19           MS. BOLOS:  Before the phone call.
20           THE WITNESS:  What's that?  Before the
21  phone call?
22           MS. BOLOS:  Uh-huh (positive response.)
23     A.    And then our counsel advised us that
24  there was a mistake.  And that was incorrect.
25           And that's the best, I think, I can do
```

1                      Tinny Suri

2    right now until they're deposed.  I don't know

3    how to answer that.

4        Q.    And prior to that conversation with

5    counsel, why did you believe that it was

6    inaccurate to report it as charged off?  Or did

7    you have a belief?

8        A.    I didn't have a -- I mean I don't

9    remember.  But the best of my knowledge is that

10   the dates didn't work in the way that -- when it

11   was charged off and the filing of the bankruptcy.

12   So I wanted to confer with counsel is this

13   correct.  And I was advised otherwise.

14       Q.    Do you agree that when your wife filed

15   for bankruptcy, that placed the Wells Fargo

16   account in default?

17             MS. BOLOS:  Objection, form.

18       A.    I don't know how to answer that

19   legally.  I'm not an attorney, so I don't know

20   how to address it.

21       Q.    And when you said earlier that the

22   dates didn't match up with respect to the

23   charge-off, what did you mean by that?

24       A.    Between the Reaffirmation Agreement

25   dates and timing and the time the bankruptcy was

1                        Tinny Suri

2    finalized, counsel told me otherwise, that it was

3    incorrect.

4        Q.    Is your complaint that Wells Fargo

5    shouldn't have charged off the account?

6        A.    I believe that's exactly right.

7        Q.    And why do you think Wells Fargo should

8    not have charged off the account?

9        A.    I think that was based on this last

10   response that I just provided in regards to the

11   dates and the timing and the payment history,

12   that we paid it off.  So I think there were a few

13   factors involved.  And not being notified, I

14   mean, through the channels outside of the

15   statement that you provided.  But we paid

16   everything on time, like I said, and other

17   factors.

18       Q.    So is your perspective that because

19   your wife entered the Reaffirmation Agreement,

20   Wells Fargo should not have charged off the

21   account?

22       A.    I would agree to that.

23       Q.    Does it matter to you whether the

24   charge-off occurred prior to the Reaffirmation

25   Agreement?

1                    Tinny Suri

2              MS. BOLOS:  Objection, form.

3      A.    Does it matter to me?  Yes.

4      Q.    And how does that matter to you?  In

5  what way does that matter to you?

6      A.    Again, I think I tried to answer that

7  earlier.  I think it was prematurely reported.

8  But again, the bankruptcy wasn't finalized, and

9  the Reaffirmation Agreement is to reaffirm the

10 loan and pay it off.  That was my understanding.

11     Q.    I'm going to keep looking at

12 Exhibit 12.  It's the exhibit we were looking at

13 before we took a break.

14              So in this line that says Reason It's

15 Wrong pertaining to the Wells Fargo account, it

16 says:

17                   "I did not file for

18                   bankruptcy.  My wife,

19                   Debra Suri, filed for

20                   bankruptcy."

21              Do you see that?

22     A.    Uh-huh (positive response).

23     Q.    And we agreed earlier that Debra filing

24 for bankruptcy was a condition of default under

25 the Wells Fargo account agreement; correct?

1                    Tinny Suri

2          MS. BOLOS:  Objection, form.

3     A.    I believe the way it was written, that

4  is true.

5     Q.    And then it says:

6              "Second, the account was

7              reaffirmed and not charged

8              off in bankruptcy."

9          Do you see that?

10    A.    Yes, I do.

11    Q.    In your mind when you wrote that

12 dispute, is it possible that the account was both

13 charged off and then subsequently reaffirmed?

14         MS. BOLOS:  Objection, form.

15    A.    I think there's two different things

16 here.  So I don't know how to answer that.  I

17 think that the charge-off was premature and the

18 reaffirmation was on time to reaffirm that loan

19 and not to be a charge-off or unpaid.  That's my

20 understanding.

21    Q.    Okay.  When you say the charge-off was

22 premature, what do you mean by that?

23    A.    I mean that it was reported

24 prematurely.  That's how I would read that.  And

25 since it was a reaffirmation of the loan, that it

1                    Tinny Suri

2  should not have been a charge-off.

3     Q.    All right.  I'm going to show you a

4  document we're going to mark as Exhibit 13.

5              (EXHIBIT 13, 2018 CREDIT REPORTING

6              RESOURCE GUIDE - EIS-SURI-001454-1743,

7              WAS IDENTIFIED.)

8     Q.    This is a document entitled 2018 Credit

9  Reporting Resource Guide.

10             Let me share my screen with you.

11             Have you ever seen this document

12  before?

13    A.    I don't recall.  I don't believe so.

14  Resource Guide?  No.

15    Q.    Okay.  I'll just scroll down to page

16  187 of the PDF.

17             Do you see where it says Frequently

18  Asked Questions and Answers?

19    A.    Yes.

20    Q.    And then 27(b) says:

21             "How should an account

22             be reported when one

23             borrower filed Bankruptcy

24             Chapter 7 or 11 and the

25             other borrower did not?"

```
 1                    Tinny Suri

 2            Does that accurately -- well, let me

 3   state it a different way.

 4            Your wife filed for Bankruptcy Chapter

 5   7; correct?

 6       A.    I believe so.  I don't know which

 7   chapter.

 8       Q.    And you did not file for bankruptcy;

 9   correct?

10       A.    Correct.

11       Q.    And you were both borrowers on the

12   Wells Fargo account we're discussing; correct?

13       A.    Correct.

14       Q.    Okay.  Do you recall when you first

15   reached out to Wells Fargo to discuss its credit

16   reporting on the account?

17       A.    It's been over a year.  I would

18   assume -- and I'm speculating.  You may have the

19   document you can show me, and I may be able to

20   tell by looking at it.  But I would say June of

21   last year.

22       Q.    All right.  When you reached out to

23   Wells Fargo, was it first by phone or by letter?

24   How did you do it?

25       A.    Phone.
```

1                        Tinny Suri

2       Q.     Did you have multiple phone

3   conversations with Wells Fargo at different

4   times?

5       A.     Oh, yes.

6       Q.     Approximately how many do you think you

7   had?

8       A.     I don't recall.  I mean people didn't

9   respond back; called, voicemails, spoke to a

10  couple of people.  But I think you have all my

11  records.  I don't really recall.

12      Q.     Did you find the Wells Fargo

13  representatives you spoke to helpful or not?

14      A.     Yeah, a couple of people were helpful.

15  Others responded back.  Some were, I would say,

16  abrupt.

17      Q.     I'm now going to show you a letter

18  we're going to mark as Exhibit 14.

19              (EXHIBIT 14, LETTER TO TINNY SURI FROM

20              WELLS FARGO, 7/15/2020 -

21              WF_SURI 000377, WAS IDENTIFIED.)

22      Q.     So this is Bates labeled WF_Suri

23  000377.  It's a letter addressed to Tinny Suri

24  dated July 15th, 2020.

25              Do you recall receiving this letter

```
 1                    Tinny Suri
 2   from Wells Fargo?
 3        A.    Is this in regards to my dispute?  I
 4   believe I did.
 5        Q.    Yeah.  The subject says:
 6                   "Important information
 7               about credit dispute for
 8               account ending ███."
 9               All right.  In this letter Wells Fargo
10   says:
11                   "We have submitted a
12               request to the consumer
13               reporting agencies to
14               which your account was
15               reported to make changes
16               to your credit file.  The
17               following is a list of
18               changes that we submitted
19               to the consumer reporting
20               agencies about your
21               account."
22               And then it lists your account as:
23                   "Closed/paid in full/
24               charge-off account, zero
25               balance as of 3/29/2020."
```

1               Tinny Suri

2          Do you see that?

3     A.    I do.

4     Q.    Okay.  So let's take those one by one.

5          As of July 15th, 2020, was your Wells

6   Fargo account closed?

7     A.    I'm sorry.  By which date you're

8   reading?

9     Q.    As of July 15th, 2020.

10    A.    It was closed by then.

11    Q.    And as of July 15th, 2020, was your

12   Wells Fargo account paid in full?

13    A.    Correct.

14    Q.    And as of July 2020 had your Wells

15   Fargo account been charged off?

16    A.    That is correct.

17    Q.    And then as of March 29th, 2020, did

18   your Wells Fargo account have a zero balance?

19    A.    Yes.  It was the last day of payment.

20    Q.    Do you recall how many disputes you

21   submitted to the consumer reporting agencies

22   pertaining to your Wells Fargo account?

23    A.    I don't recall.  But I believe every

24   one of them received a dispute, all three of

25   them, including Wells Fargo, of course.

1               Tinny Suri

2      Q.    Understood.

3            I'd like to show you a document we are

4  going to mark as Exhibit 15.

5            (EXHIBIT 15, COMPLAINT & JURY DEMAND,

6             WAS IDENTIFIED.)

7      Q.    Can you see Exhibit 15 on your screen,

8  Mr. Suri?

9      A.    Yes.

10     Q.    This document is a copy of the

11 complaint that was filed on your behalf in the

12 Eastern District of Michigan.

13           Have you seen this complaint before?

14     A.    Yes, I have.

15     Q.    Now, without telling me the substance

16 of any conversations you've had with counsel, did

17 you take part in crafting this complaint?

18     A.    My counsel did this on my behalf based

19 upon my information I provided.

20     Q.    Okay.  And once the complaint was

21 finished, did you review it before it was filed?

22     A.    I did.

23     Q.    Do you believe everything said in the

24 complaint is true and accurate?

25     A.    Yes, I believe so.

1                          Tinny Suri

2     Q.    Okay.  So I'm going to direct your

3   attention to paragraph 17 of the complaint.  And

4   it says:

5              "Even though Mr. Suri

6              continued making regular

7              payments and paid off the

8              loan, WFB" -- which means

9              Wells Fargo -- "made false

10             reports to the national

11             credit reporting agencies

12             Equifax, Experian, and

13             TransUnion."

14             Do you see that?

15    A.    I do.

16    Q.    And is that an accurate statement?

17    A.    I believe so, yes, based upon my

18  understanding as well.

19    Q.    Okay.  It says:

20             "WFB falsely reported

21             that no data was available

22             concerning Mr. Suri's

23             monthly payments after

24             February of 2018, while

25             that data was in fact

1                   Tinny Suri

2              available and would have

3              shown that Mr. Suri and

4              Mrs. Suri had been making

5              all regularly scheduled

6              payments."

7         Did I read that correctly?

8    A.    You did.

9    Q.    So what do you mean by the allegation

10   that "Wells Fargo falsely reported that no data

11   was available"?

12        MS. BOLOS:  Objection, form.

13   A.    So when I pulled the credit report

14   initially when I was aware of this and on my

15   credit report it showed zero past the date of --

16   the date that they closed or charged it off,

17   after that it showed no more history payments at

18   all.  Which that has changed recently, but that's

19   what it showed back then.

20        So based on that, we made this

21   assumption -- or not assumption, this fact that

22   it wasn't reported correctly.

23   Q.    If Wells Fargo had reported the actual

24   monthly payments that were made on the account

25   and the dates of those payments, would that

```
 1                      Tinny Suri
 2   satisfy the concern you raised here in paragraph
 3   17a?
 4              MS. BOLOS:  Objection, form.
 5      A.    No.  Because it's still a charge-off.
 6   That's a whole different --
 7      Q.    We'll get there.  So I'm only focusing
 8   on 17a right now.  If Wells Fargo had reported
 9   the actual monthly payments that were made on the
10   account and the dates of those payments, would
11   that satisfy the concern you raised in paragraph
12   17a?
13              MS. BOLOS:  Objection, form.
14      A.    Partly, yes, but not fully.
15      Q.    What's the rest of it?
16      A.    The rest of it -- I mean payment
17   history is important, but it's also the tagline
18   of how it's labeled as a charge-off in
19   collections.  I think that's what you're going to
20   get to.
21      Q.    Yeah, we'll get there.  So we'll move
22   on.
23      A.    Okay.
24      Q.    So you've got nothing else to say with
25   respect to my question regarding 17a before we
```

1                         Tinny Suri

2    move to 17b; is that right?

3        A.    Correct.

4        Q.    Okay.  So then you say:

5                    "Wells Fargo falsely

6                 reported the pay status to

7                 reflect that the account

8                 was charged off, thus

9                 implying that Mr. Suri

10                stopped paying the debt

11                and failed to make

12                payments for a period in

13                excess of 180 days."

14               Did I read that correct?

15       A.    You did.

16       Q.    Okay.  We previously agreed that Wells

17   Fargo -- excuse me.

18               We previously agreed that the account

19   was actually charged off; correct?

20               MS. BOLOS:  Objection, form.

21       A.    We agreed that that's how Wells Fargo

22   reported it.  We didn't agree that that's how I

23   agreed to it, yes.

24       Q.    Well, you agree the account was charged

25   off?

1                    Tinny Suri

2      A.    Well, I agree that you reported it was

3  charged off.  But do I agree the charge-off was

4  accurate?  I don't.

5      Q.    Okay.  Well, that's a separate

6  question.

7      A.    Okay.

8      Q.    So let's break it down.

9            So your position is that the account

10 should not have been charged off; correct?

11     A.    That is correct.

12     Q.    But you agree that the account was in

13 fact charged off; correct?

14           MS. BOLOS:  Objection, form.

15     A.    Yes.

16     Q.    Okay.  To your knowledge, did Wells

17 Fargo ever report to the credit reporting

18 agencies that Mr. Suri stopped paying the debt

19 and failed to make payments for a period in

20 excess of 180 days?

21     A.    Can you repeat that question?  I'm

22 sorry.

23     Q.    Sure.  To your knowledge, did Wells

24 Fargo actually report to any of the consumer

25 reporting agencies that Mr. Suri stopped paying

```
1                    Tinny Suri
```

2   the debt and failed to make payments for a period

3   in excess of 180 days?

4        A.    I don't know what Wells Fargo

5   communicated with the three agencies.  I

6   generally base it upon what I pulled from the

7   credit reports.  So I don't know how to answer

8   that correctly.  I would assume that it was

9   incorrect based upon the reporting, but I saw no

10  payment history after the charge-off date.

11       Q.    Okay.  In paragraph 17c you state that:

12              "Wells Fargo Bank

13              falsely reported the

14              payment history of the

15              account to reflect that

16              payments were not made."

17          Do you see that?

18  A.    I do.

19       Q.    And is that effectively the same thing

20  you reference in paragraph 17a?

21              MS. BOLOS:  Objection, form.

22  A.    Yes.

23       Q.    Okay.  And then it says in paragraph

24  17d:

25              "Wells Fargo Bank

1                     Tinny Suri

2              falsely reported a special

3              comment, also indicating

4              that the account had been

5              charged off before it was

6              paid in full."

7         Do you see that?

8    A.    I do.

9    Q.    And is that the same charge-off you

10   were referencing in paragraph 17b?

11        MS. BOLOS:  Objection, form.

12   A.    Yes.

13   Q.    Okay.  Are there any other aspects of

14   Wells Fargo's credit reporting on this account

15   that you claim are inaccurate besides what we've

16   discussed from paragraph 17?

17   A.    No.  I believe that's pretty much what

18   you read.

19   Q.    Okay.  Do you claim that Wells Fargo

20   failed to conduct a reasonable investigation when

21   it received from the consumer reporting agencies

22   the disputes you made regarding the credit

23   reporting on the account?

24   A.    Yes.

25   Q.    And what do you base your claim on that

1                    Tinny Suri

2  Wells Fargo failed to conduct a reasonable

3  investigation?

4      A.    Well --

5           MS. BOLOS:  Objection.  I'm just going

6  to insert an attorney/client privilege.  I mean

7  if you want to limit your question away from his

8  discussions with counsel on that.

9           MR. GETTINGS:  Sure.

10          MS. BOLOS:  Otherwise I'm going to

11 instruct him not to answer.

12          MR. GETTINGS:  I'll state it a

13 different way, and maybe we'll get there.

14     Q.    Are you aware of any facts indicating

15 that Wells Fargo failed to conduct a reasonable

16 investigation in response to your credit disputes

17 to the consumer reporting agencies?

18     A.    I don't know what investigations Wells

19 Fargo conducted internally, so I can't answer

20 that.  I can only assume, based upon no changes

21 made to my credit report and being tagged as

22 charged off in collections -- or charge-off, I

23 would assume that nothing was done.  That's my

24 assumption, again, without knowing anything about

25 the investigation.

1                       Tinny Suri

2      Q.    All right.  So as we sit here today,

3   are you aware of any facts indicating that Wells

4   Fargo failed to conduct a reasonable

5   investigation or is it just an assumption on your

6   part?

7      A.    Again, I can't answer because I don't

8   know what Wells Fargo did to conduct an

9   investigation.  That's the best answer I can

10  provide you.

11     Q.    Understood.

12           I'm now going to show you a document

13  we're going to label as Exhibit 16.

14           (EXHIBIT 16, EMAILS BETWEEN TINNY SURI

15            AND MARIAH FARRIS WITH WYNDHAM CAPITAL

16            MORTGAGE, 6/21-22/2021 -

17            SURI 000907-908, WAS IDENTIFIED.)

18     Q.    Can you see Exhibit 16 on your screen,

19  Mr. Suri?

20     A.    I do.

21     Q.    All right.  This is a document you

22  produced to us Bates labeled Suri 000907 to

23  000908.

24           Can you explain to me what this

25  document is?

1              Tinny Suri

2         MS. BOLOS:  Objection, form.

3    A.    It's communication between my mortgage

4  company and myself in regards to my credit, my

5  credit score, and my application for a mortgage

6  in regards to what my credit history and what my

7  credit score -- how it would reflect based upon

8  what type of rates I could receive.

9    Q.    So in June 2021 did you apply to

10  Wyndham Capital Mortgage for a refinance loan?

11    A.    So I think there's a misunderstanding.

12  I refied my home in April.  This was for a new

13  mortgage.

14    Q.    Okay.  So you refinanced your home, and

15  this is the home where I couldn't get the numbers

16  right at 10008 Maple Valley Drive; is that right?

17    A.    That's correct.  This one here, this

18  letter was for application -- well, which I

19  applied for a new mortgage for a possible new

20  home and locking in a rate.

21    Q.    Okay.  So you refinanced your existing

22  loan in April of 2021; is that right?

23    A.    That is correct.

24    Q.    Okay.  And then were you looking to buy

25  a second home in June 2021 or looking to move in

1                     Tinny Suri

2  June 2021?

3      A.     Looking to downsize, to move.

4      Q.     And did Wyndham Capital Mortgage

5  approve you for a new mortgage loan in June of

6  2021?

7      A.     Yes, it did.

8      Q.     Let me show you a document we are going

9  to mark as Exhibit 17.

10             (EXHIBIT 17, WYNDHAM CAPITAL MORTGAGE

11              UNDERWRITING CONDITIONAL APPROVAL,

12              4/5/2021, WAS IDENTIFIED.)

13     Q.     Can you see Exhibit 17 on your screen,

14  Mr. Suri?

15     A.     I do.

16     Q.     Okay.  So this document is entitled

17  Underwriting Conditional Approval related to

18  Wyndham Capital Mortgage.

19             Do you see that?

20     A.     I do.

21     Q.     So does this document pertain to your

22  refinance or pertain to your inquiry regarding a

23  potential new mortgage?

24     A.     This was a refinance.  If this was done

25  in March, yeah, a refinance.

1                    Tinny Suri

2      Q.    Okay.  And so you were able to -- well,

3  I guess I should say Wyndham Capital Mortgage

4  approved you for a refinance in, it looks like,

5  around -- well, let me say that again.

6            So you applied for a refinance in March

7  of 2021 with Wyndham Capital Mortgage, and

8  Wyndham Capital Mortgage approved it; correct?

9      A.    Correct.

10     Q.    And was Wyndham Capital Mortgage the

11 mortgage company that you ultimately went with

12 for the refinance?

13     A.    Yes.

14     Q.    And was the rate at which you

15 refinanced your mortgage 3.375?

16     A.    Correct.

17     Q.    Do you know what the rate was on your

18 mortgage prior to the refinance?

19     A.    Yes, I do.  It was 3.75.

20     Q.    Did you also take cash out from this

21 refinance transaction?

22     A.    Yes, I did.

23     Q.    Do you recall how much?

24     A.    I think it was -- I don't recall.  I

25 believe 10,000 or $12,000.

1                        Tinny Suri

2      Q.    Do you recall what you put that money

3   towards?

4            MS. BOLOS:  Objection.  David, what's

5   the relevance of the cashout.

6            MR. GETTINGS:  I'm entitled to explore

7   damages and figure out how he's been damaged.

8            MS. BOLOS:  I think your entitled to

9   explore and discover what could eventually be

10  admissible.  I don't understand how he used any

11  cash-out money would be relevant here.

12  BY MR. GETTINGS:

13     Q.    You can answer the question, Mr. Suri.

14           THE WITNESS: Sylvia, it's okay to

15  answer that question?

16           MS. BOLOS:  It is.

17           But David, if you're going to keep

18  going down that road -- hopefully you don't --

19  but we can just end the deposition and go for a

20  protective order.  It's not relevant.

21           But Mr. Suri, you can answer it.

22     A.    Yeah.  Paid down a couple of credit

23  cards.

24     Q.    Those credit cards that you paid down,

25  were any of them in collections?

1                    Tinny Suri

2      A.     No.

3      Q.     All right.  I'd like to show you a

4  document we're going to mark as Exhibit 18.

5             (EXHIBIT 18, LOANDEPOT DOCUMENTS,

6             3/23/2021, WAS IDENTIFIED.)

7      Q.     This is a document you produced to us

8  Bates labeled -- maybe it was loanDepot's

9  production.  It's a document we received either

10  from you or loanDepot, which is a 45-page PDF.

11  It looks to be a series of disclosures from

12  loanDepot.  And I'm trying to get a date on here.

13  Yep, right around March 23rd, 2021.

14             Do you recall applying to loanDepot

15  for, I guess, a quote on the refinance loan you

16  received in March 2021?

17      A.     Possibly.  I did a few.  I don't recall

18  all of them.

19      Q.     Okay.  And if you go down to this

20  Current Employment/Self-Employment section, do

21  you see it lists your employer or business name

22  as Fesco Group?

23      A.     Yes.

24      Q.     Did you provide that information to

25  loanDepot?

```
 1                    Tinny Suri

 2     A.     I believe so.  I don't recall, but I

 3  could have because I was still employed there.

 4     Q.     Okay.  And it lists a gross monthly

 5  income of $15,000 per month.

 6            Do you see that?

 7     A.     I do.

 8     Q.     Did you provide that information to

 9  loanDepot at the time?

10     A.     I believe I could have, yes.

11     Q.     And was that an accurate representation

12  of your income at that time?

13     A.     Yeah, sure.

14     Q.     So let's talk about damages a little

15  bit more generally.

16            Are you claiming that you've suffered

17  damages as a result of Wells Fargo's credit

18  reporting on the account?

19            MS. BOLOS:  Objection, form.

20     A.     Yeah.  I mean:  Do I think there's

21  different forms of damages?  I think --

22     Q.     We'll get there.

23     A.     Well, I would say yes.  Let's start

24  there.

25     Q.     So what are the damages you are
```

1                    Tinny Suri

2    claiming as a result of Wells Fargo's credit

3    reporting?

4       A.    Well, I think there's a couple of

5    things.  I mean employers in my level and my

6    capacity, at my career level, pull credit

7    reports.  That could be damaging based upon the

8    reflection of where my credit report is today.

9    That's number one.

10            Number two, when you apply for a

11   mortgage for a 30-year loan and you look at the

12   one- or two-point difference based upon a credit

13   report of what I could have achieved, financially

14   it makes a major impact across 30 years.  So

15   that's another thing.

16            And the other part is it's a little

17   more personal when you go apply for loans.  It's

18   a little embarrassing when you're a 630, 670;

19   applying for loans and not getting favorable --

20   provided or getting favorable rates based upon my

21   credit score.  And I think those are damaging.

22   And I think from a personal standpoint, that

23   the -- if you notice my credit report, it's

24   pretty good.  It's clean.  There's nothing there

25   except for this red mark and stain.  And I think

1                     Tinny Suri

2    that's affected everything that I just mentioned.

3         Q.     So are you aware of any employers

4    pulling your credit report while the Wells Fargo

5    account was showing as charged off?

6         A.     I don't know all of them because I had

7    to provide that information.  So I don't know who

8    pulled what.  I can't answer that.

9         Q.     So as you sit here today, you're not

10   aware of any employers pulling your credit report

11   and the credit report reflecting a Wells Fargo

12   charge-off; is that right?

13             MS. BOLOS:  Objection, form.

14        A.     Correct.

15        Q.     So besides the refinance transaction we

16   discussed in March 2021 and the new mortgage you

17   were exploring later on in 2021, have you applied

18   for any other credit in the last, we'll say, five

19   years?

20        A.     Sure.  Cars.  I lease cars every two

21   years, three years.  Purchased a car.

22        Q.     When was the last time you purchased a

23   car?

24        A.     Purchased was back in 2015.  Leased the

25   last two times -- this new car last year.

1                    Tinny Suri

2      Q.    And what car did you lease last year?

3      A.    It's my wife's.  It's a Kia Seltos.

4  Well, it's under my name.  Yeah, a Kia Seltos

5  four-by-four.

6      Q.    And are you aware of the terms of that

7  lease changing at all based on the existence of a

8  Wells Fargo charge-off on your credit report?

9      A.    I don't know how to answer that, but

10  the lease term is three years.  But what the

11  rate -- I don't know what the interest rate was

12  on that lease to control based upon my credit

13  score.  They don't share that information with

14  me, so I couldn't answer that accurately.

15      Q.    Okay.  Are you aware of the terms of

16  any car lease changing based on the existence of

17  a Wells Fargo charge-off on your credit report?

18      A.    No, nothing that was shared with me.

19  But I know that in the past where I purchased or

20  leased a car, when they came back and explained

21  to me that I could get the best rate based upon

22  my great credit score I had, I can only assume

23  that later -- recently that my interest rates

24  could be a reflection without knowing, without

25  them sharing that information with me.  So I

1                    Tinny Suri

2    don't know.

3        Q.    Okay.  So let's move on from car loans.

4    Let's talk about other forms of credit.

5            Are you aware of any rates on credit

6    cards that you've taken out or opened increasing

7    as a result of the Wells Fargo account showing on

8    your credit report?

9        A.    You mean new credit cards are you

10   asking?

11       Q.    New or existing credit cards.  Are you

12   aware of any instance where the rate on a credit

13   card changed based on Wells Fargo reporting a

14   charge-off on your credit report?

15       A.    I had a couple of credit cards change

16   their interest rate to a little higher interest

17   rate, but they did not tell me why.  So I can't

18   answer if it's due to the charge-off or my credit

19   rating changing.  I can't tell you that.

20       Q.    When did that occur?

21       A.    A few months ago.  We received a letter

22   from one of our credit cards that the interest

23   rate just went up.  And I could produce that.

24   I'll find it.

25       Q.    Which credit card was that?  Do you

1                          Tinny Suri

2  recall?

3      A.    I don't remember.  Quite a few.

4      Q.    Besides the one a few months ago, do

5  you have any recollection of any other credit

6  card changing your rate in the last several

7  years?

8      A.    I don't recall, no.

9      Q.    So we've talked about auto loans, we've

10  talked about credit cards.  We'll get to

11  mortgages in a second.

12           Besides auto loans and credit cards and

13  putting aside mortgages as well, have you applied

14  for any other forms of credit in the last three

15  years?

16      A.    So a home equity loan with Huntington

17  Bank twice and both approved; one paid off in

18  full and the other one I declined because the

19  rates changed, and I didn't want to pay that high

20  interest rate.  So I declined the second loan

21  after being approved.

22      Q.    When was that second loan that you

23  declined?

24      A.    That was, I believe, after the mortgage

25  -- I would say May, June of this year.

1                          Tinny Suri

2       Q.     2021?

3       A.     Yes.

4       Q.     Was your wife a coapplicant on that

5  loan?

6       A.     (Shaking head negatively.)  Just me.

7       Q.     And did Huntington Bank tell you why

8  the rates changed?

9       A.     Did not.

10      Q.     Do you know why the rates changed?

11      A.     I do not.

12      Q.     Okay.  So let's talk about mortgage

13  loans now.

14             You refinanced your mortgage with

15  Wyndham Capital Mortgage in the March/April 2021

16  time frame; correct?

17      A.     Correct.

18      Q.     Prior to that refinance, had you

19  applied for a mortgage loan or a refinance loan

20  between 2015 and 2021?

21      A.     No.

22      Q.     Approximately how many mortgage

23  companies did you inquire with regarding the

24  refinance?

25      A.     I don't recall.  I think it could be

```
 1                     Tinny Suri
 2    three or four companies.  I'm not sure.
 3        Q.    And was the Wyndham Capital offer the
 4    best rate you received of those companies to
 5    which you applied?
 6        A.    Yes.
 7        Q.    Now, with respect to the new mortgage
 8    that you applied for later in 2021, how many
 9    companies did you inquire with with respect to
10    that mortgage?
11        A.    You know what, I don't recall.  It
12    could be three or four companies outside of
13    Wyndham.
14        Q.    And did each of those companies approve
15    you for a new mortgage?
16        A.    I don't know.  I mean I don't remember.
17    Because I did provide the information to them,
18    and they ran my credit history and everything
19    else.  I don't recall.  I know that I selected
20    one, that was Wyndham, went back to them, and
21    they gave me a preapproved letter, provided one,
22    and locked in the interest rate for me for 30
23    days.
24        Q.    And did you ultimately take out that
25    loan with Wyndham that it approved?
```

1                    Tinny Suri

2      A.     I did not.  I didn't sell my home.

3      Q.     So you put your house up for sale but

4  weren't able to sell it?

5      A.     Correct.

6      Q.     Were you under any sort of contract,

7  contingent or otherwise, to purchase a home at

8  that same time?

9      A.     No.  We bid on a home and had the

10  inspection and walked away.  That was it.

11      Q.     Do you recall why you walked away?

12      A.     40 pages of bad inspection report.

13      Q.     Are you still looking to move?

14      A.     Yes.

15      Q.     Are you currently applying for any

16  mortgages?

17      A.     Not yet.

18      Q.     Do you know what your credit score was

19  in March of 2018?

20      A.     No.

21      Q.     Do you know what your credit score was

22  at the time that you filed the complaint?

23      A.     I did after realizing -- when I pulled

24  my credit score, then I realized what it was.

25      Q.     All right.  So what is the -- let me

1                     Tinny Suri

2   ask it a different way.

3            As we sit here today, are you aware

4   specifically of any credit scores attributed to

5   you?  And if so, in what time frame were they

6   attributed?

7       A.    When you say "attributed to me," you're

8   saying in the last -- since I was aware of what

9   has happened and I pulled my credit score?

10      Q.    Let me ask a different nonlawyer

11  question.  What I'm just trying to get at is your

12  understanding of what your credit score has been

13  throughout the years.

14           So what is the most recent you can

15  recall pulling your credit card score and what

16  was it?

17      A.    So I've never pulled my credit score

18  prior to all of this.  And we'll step back and

19  explain why I knew what my credit score was prior

20  to that.

21           But first, I pulled my credit score,

22  being aware of this incident.  And like I said,

23  as soon as I was denied, I pulled my credit score

24  and realized it was 630, 670.  It was a mistake

25  to be that low, but that's what it was.  And then

1                    Tinny Suri

2   I continued to pull from Credit Karma, a

3   third-party source, just to continue -- and

4   actually I paid a subscription to TransUnion for

5   a few months to maintain and monitor what was

6   going on through the dispute, if any changes were

7   being made.  And I continue on to this day.

8            So my credit score hasn't gone above

9   700 in the last -- who knows how many months.

10           I'm smiling because I can't believe it

11  myself, but that's where I'm at.

12           But prior to that my acknowledgement

13  was from all the loans that I've applied for.

14  And a lot of creditors do not share your credit

15  score with you because that's not what they do.

16  And you're well aware of that.  But what they do

17  tell me is, because of my excellent credit and my

18  great credit score that I had previously, I had

19  the best rates possible and they extended all the

20  best opportunities to have these loans.

21           And so my assumption would have been --

22  and at one point -- I can't tell you who -- a few

23  years prior to that, prior to 2015, one did

24  disclose my credit score, and they told me it was

25  up to 780.

```
 1                    Tinny Suri
 2          So that's the best I can tell you to
 3  answer that question.
 4     Q.    And when you say your score has not
 5  gone above 700, what bureau are you referencing a
 6  report from that said that?
 7     A.    All of them.
 8          So let me rephrase that.
 9          So all of them I monitor.  That's
10  Equifax, TransUnion, and Experian.  And they
11  fluctuate.  One hits 701, the next week later
12  673.  So it fluctuates on a continuous basis.
13  And I can provide those -- I saved a lot of
14  those.  Every time I pull one I save the
15  screenshot.  So I have those records on file as
16  well.
17     Q.    Any sense in the last two years as to
18  the highest credit score from any of the bureaus
19  you think was attributed to you?
20     A.    You're asking me what's the highest
21  I've seen in the last two years?
22     Q.    Correct.
23     A.    Since this started I don't know.  I
24  think the highest I've seen since I've pulled my
25  credit report from this incident, I would say the
```

1                       Tinny Suri

2    highest was 706 at one point.

3        Q.     I'm going to pull back up Exhibit 18

4    again.   This is the loanDepot subpoena response

5    that we received.

6        A.     Sure.

7        Q.     And this document is showing a credit

8    score from Experian of 757 in March 2021.

9               Have you seen this document before?

10       A.     Never saw that document.

11       Q.     Okay.   Would it surprise you if in

12   March 2021 Experian was showing a 757?

13       A.     I'd be shocked, but I didn't know that.

14   But after, when I pulled my credit score, it was

15   not even close to that.   So I don't know how that

16   happened.

17              I'm sorry.   What date was that?

18       Q.     March 20, 2021.

19       A.     Okay.

20       Q.     Does that change any of your answers?

21       A.     I don't know why it dropped all the way

22   down to 670 in the next two months.   It's

23   shocking.

24       Q.     As we sit here today, are you aware of

25   any specific dollar amount that Wells Fargo's

1                    Tinny Suri

2    credit reporting on your account has cost you in

3    your mind?

4              MS. BOLOS:  Objection, form.

5        A.    No, I don't know.

6        Q.    Are you asserting in this lawsuit that

7    Wells Fargo's credit reporting has caused you any

8    emotional damages?

9        A.    No.

10        Q.    Are you asserting in this lawsuit that

11    Wells Fargo's credit reporting has caused you any

12    physical damages?

13        A.    No, no physical damages.

14              MR. GETTINGS:  Mr. Suri, I think I am

15    pretty close to done.  What I'm going to do is

16    take 10 minutes, if that's okay with you, look at

17    my notes, come back.  And then, assuming I'm done

18    or close to done, what I would suggest, Sylvia,

19    is that I finish up my questions, we break for

20    lunch, and then the CRAs can go.

21              MS. BOLOS:  So you want to take a

22    10-minute break you said and then come back,

23    finish up for Wells Fargo, and then do a lunch?

24              MR. GETTINGS:  Correct.

25              Does that work for everyone else?

```
 1                    Tinny Suri

 2            MS. BOLOS:  It works for me.

 3            Mr. Suri, I think you're good; right?

 4            THE WITNESS:  I'm good.

 5            MR. GETTINGS:  Okay.  So let's take 10

 6  minutes, and I'll be back and hopefully be quick.

 7            THE WITNESS:  Thank you.

 8            (A RECESS WAS TAKEN FROM 12:51 P.M.

 9            TO 1:02 P.M.)

10  BY MR. GETTINGS:

11     Q.   All right.  Only a few more questions,

12  Mr. Suri.

13            So Mr. Suri, you and your wife made the

14  joint decision that you would both be account

15  holders on the Wells Fargo account; correct?

16     A.   Correct.

17     Q.   And you and your wife made the joint

18  decision that she would file for bankruptcy in

19  April of 2018; correct?

20     A.   That is correct.

21            MR. GETTINGS:  I have no further

22  questions, Mr. Suri.

23            So we can go off the record, Debbie.

24            (A DISCUSSION WAS HELD OFF THE RECORD.)

25            (LUNCH RECESS FROM 1:02 P.M.
```

```
 1                      Tinny Suri

 2            TO 1:31 P.M.)

 3                  EXAMINATION

 4   BY MS. BARR:

 5        Q.    Mr. Suri, my name is Callie Barr, and I

 6   represent Experian in this case.  A lot of the

 7   introductory questions we've already gone

 8   through, hallelujah.  So I'm going to start here

 9   by just looking at the complaint, which was

10   marked as Exhibit 15.  So I'm going to screen

11   share with you.

12            Does that look right for everyone?

13        A.    I can see it.

14        Q.    You can see it?  Okay.  Great.

15            So we're going to go to page 9.  This

16   is Factual Allegations -- well, first -- yeah,

17   this is already marked Exhibit 15.  This is the

18   complaint.  It says Factual Allegations Relative

19   to Experian.

20            Do you see that?

21        A.    I do.

22        Q.    And we have:

23               "On January 12, 2021,

24            Mr. Suri obtained a copy

25            of his Experian consumer
```

```
 1                    Tinny Suri

 2            file which is used by

 3            Experian to generate

 4            consumer reports ...

 5            Is that right?

 6   A.    Yes.

 7   Q.    And how did you get a copy of your

 8 consumer file?

 9   A.    I'm trying to recall because I'm not

10 sure if I remember correctly.  But I pulled it

11 down.  I went online and pulled my credit file

12 online from Experian directly as well as the

13 other ones.

14   Q.    Okay.  So you have an account with

15 Experian?

16   A.    I did.  I don't anymore, but I did a

17 while back.

18            Well, let me rephrase that.  I'm sorry.

19            So I had an account with TransUnion

20 working for all three credit bureaus.  So I paid

21 for that subscription.  And I believe at that

22 point I pulled down Experian and the TA -- or the

23 TransUnion credit reports.

24   Q.    Okay.  Was this the first report that

25 you pulled after discovering that the account was
```

1                     Tinny Suri

2   charged off?

3            MS. BOLOS:  Objection, form.

4    A.    I don't recall.  I think I pulled the

5   reports prior to that as well.  But I think this

6   was a second copy.

7    Q.    Okay.  Thank you.

8            It says:  "That disclosure of

9   Mr. Suri's" -- this is paragraph 4.

10            "That disclosure of

11            Mr. Suri's file contained

12            inaccurate credit

13            information relating to

14            the WFB account."

15            Or the Wells Fargo Bank account.

16            Did I read that right?

17   A.    Yes.

18   Q.    Can you explain that to me?

19            MS. BOLOS:  Objection, form.

20   A.    I'm sorry.  I didn't get the question.

21   Can I explain to you what?  I'm sorry.

22   Q.    How that disclosure contained

23   inaccurate information.

24   A.    So you're saying how the things that we

25   submitted to Wells Fargo -- that was submitted,

1                    Tinny Suri

2  how was that misinformation?  So as I mentioned

3  before, I believe that the charge-off was

4  incorrect and that affected my credit score.  And

5  I think I tried to answer that earlier.  Am I

6  adding to it?

7      Q.    No.  I think that's right.  And I

8  think, just to clarify, you agreed that the

9  account was charged off, but you disagreed with

10 their decision to charge it off; is that right?

11     A.    I believe so, yes.

12     Q.    Okay.  And then in paragraph 48:

13              "On February 8, 2021,

14            Mr. Suri disputed the

15            inaccurate information

16            with Experian ..."

17            Can you explain that to me?

18            MS. BOLOS:  Objection, form.

19     A.    So can I explain that to you --

20     Q.    Let me ask a better question.

21            How did you dispute this information?

22     A.    So my attorneys put together a dispute

23 letter based upon my information and submitted it

24 to Experian.

25            Is that what you're asking?

```
 1                    Tinny Suri

 2      Q.    Yep.  Thank you very much.

 3            I'm going to stop share here for a

 4  minute.

 5            I'm now going to share what's going to

 6  be Exhibit 19.  I believe that was where we left

 7  off.  Correct me if I'm wrong.  And I'll share

 8  this in the chat as well.

 9            (EXHIBIT 19, CERTIFICATE OF SERVICE

10             DECLARATION OF MAILING TO EXPERIAN,

11             2/9/2021 - SURI 000550-0591, WAS

12             IDENTIFIED.)

13      Q.    Mr. Suri, can you see this?

14      A.    I can.

15      Q.    Can you tell me what this is?

16            MS. BOLOS:  Objection, form.

17      A.    So that looks like that was a letter

18  mailed out to you -- or to Experian, I'm sorry,

19  certified.  Yeah.  So for proof of delivery.

20      Q.    Thank you.

21            And right here do you see where it says

22  the address?  It says Experian, 701 Experian

23  Parkway, Allen, Texas, 75013-3715.

24      A.    I do see that.

25      Q.    And this is a United States Postal
```

1                    Tinny Suri

2  Service certified mail receipt; is that right?

3      A.    Yes.

4      Q.    And can you tell me what this is?

5      A.    This is my address and the Experian

6  Parkway address and my Social Security number.

7      Q.    This is your dispute letter, is that

8  right, to Experian?

9      A.    I believe so.

10     Q.    And then you stated that your attorneys

11 put this together for you and mailed it to

12 Experian; is that right?

13     A.    I believe that is correct, yes.

14     Q.    Do you know is this the same letter

15 that was also sent that we discussed earlier?

16     A.    Yes.  This looks like the identical

17 letter for the other dispute.

18     Q.    And here, as we said earlier, you're

19 disputing this Wells Fargo Bank account as a

20 charge-off; is that right?

21     A.    That's correct.

22     Q.    I'm going to stop share there.

23           Thank you for your patience with me.

24           We're going to pull up another new

25 exhibit.  So this will be Exhibit 20.

```
 1                    Tinny Suri
 2             (EXHIBIT 20, EXPERIAN FICO SCORE,
 3              1/12/2021 - SURI 000204-0270,
 4              WAS IDENTIFIED.)
 5             MS. BARR:  It seems to take a minute
 6   for me to get the screen share.  Here we go.
 7        Q.    Are you able to see this?
 8        A.    Yes, I can.
 9        Q.    And can you tell me what this is,
10   please?
11             MS. BOLOS:  Objection, form.
12        A.    It looks like my FICO score, 704.
13        Q.    Okay.  And right there it says
14   Experian.  It has a date generated of January
15   12th, 2021.
16        A.    Okay.
17        Q.    Is that right?
18        A.    That's what I see there, yes.
19        Q.    And earlier in your complaint the date
20   of the online disclosure was also January 12th,
21   2021; is that right?
22        A.    It could be.  I don't remember.  The
23   disclosure, the one you shared earlier?
24        Q.    Okay.  So I'll just show you here on
25   the complaint.
```

1                    Tinny Suri

2      A.    Yeah, I see it.

3      Q.    Okay.  January 12th.  So I just want to

4  make sure we're on the same -- so this is the

5  consumer disclosure that you are mentioning in

6  the complaint; is that right?

7      A.    Correct.

8      Q.    Okay.  Are you able to see --

9      A.    I see the Wells Fargo statement, yes.

10     Q.    And is this the account that is at

11 issue here?

12     A.    That is correct.

13     Q.    And the account type is a revolving

14 charge account; is that right?

15     A.    I see that, yes.

16     Q.    Its payment status is paid and was a

17 charge-off; is that right?

18     A.    I see that.

19     Q.    So Experian isn't your creditor; is

20 that right?

21          MS. BOLOS:  Objection, form.

22     A.    That's correct.

23     Q.    And we agreed that this account was

24 charged off; correct?

25          MS. BOLOS:  Objection, form.

1                     Tinny Suri

2      A.     We agreed it was charged off

3  incorrectly, but yes.

4      Q.     And then this account was paid; is that

5  right?

6      A.     Paid in full.

7      Q.     What is it that you believe Experian

8  did wrong here?

9      A.     I think -- well, I can't answer that

10  because I don't know what the process is and what

11  Experian did or did not do during the dispute.

12  So my assumption would be that if the charge-off

13  is still showing, that I would assume that

14  there's some incorrect reporting between the

15  entities.  And that's the best I can answer that

16  question.

17           MS. BARR:  Okay.  If everybody can give

18  me a minute, I'm going to drop that consumer

19  disclosure in the share.

20      Q.     So Mr. Suri, is it your position that

21  Experian should be liable for any inaccuracy on

22  your credit report?

23           MS. BOLOS:  Objection, form.

24      A.     I don't know how to answer that

25  question because legally I'm not an attorney, so

```
 1                    Tinny Suri
 2  I don't know what the liabilities may be.  I
 3  don't know what the communications were between
 4  Experian and Wells Fargo in order to rectify
 5  this.  So I can't answer that.  I have to leave
 6  that to the legal system to address that.
 7      Q.    Okay.  So why are you suing Experian?
 8      A.    Again, I think it's inaccurate
 9  reporting, to my knowledge, and based upon what I
10  hired my counsel to assist; and to let the legal
11  system decide what the recourse will be to
12  correct this between the credit bureaus and Wells
13  Fargo.  That's the best way I can address this.
14      Q.    Okay.  So is it right to say that your
15  dispute with Experian is that it reported
16  something that you believe is incorrect?
17      A.    Exactly.
18      Q.    Okay.  I'm going to pull up our next
19  consumer disclosure here.  And also I'll drop
20  this one in in a moment.  And this will be
21  Exhibit 21.
22                  (EXHIBIT 21, EXPERIAN ONLINE CONSUMER
23                   DISCLOSURE, 4/16/2021 -
24                   SURI 000311-0415, WAS IDENTIFIED.)
25                  (EXHIBIT 21A, EXPERIAN ONLINE CONSUMER
```

1                    Tinny Suri

2            DISCLOSURE, 6/29/2021 -

3            SURI 000911-1002, WAS IDENTIFIED.)

4      Q.    Okay, Mr. Suri.  Do you see that this

5  has your name on the top, Tinny Suri, it says

6  personal and confidential, and the date generated

7  is April 16, 2021?

8      A.    I see it, yes.

9      Q.    And would you agree that this is an

10  Experian online consumer disclosure?

11      A.    It looks like it to me.

12      Q.    Okay.  And do you see this where it

13  says WF Bank NA?

14      A.    I see it.

15      Q.    And this is the account that we've been

16  discussing?

17      A.    Yes, it is.

18      Q.    Status says:  "Paid, closed.  $3,067

19  written off."  Is that right?

20      A.    That's what I see.

21      Q.    And it says March of 2020?

22      A.    I see that as well.

23      Q.    And this is the same consumer

24  disclosure that was also in your complaint; is

25  that right?

1                    Tinny Suri

2              MS. BOLOS:  Objection, form.

3      A.      Correct.

4      Q.      So we're also going to look here --

5   this is on page 100.  It says Contact Experian.

6              Do you see that?

7      A.      I do.

8      Q.      And it says Mail Experian, and it says

9   PO Box 9701, Allen, Texas, 75013; is that right?

10     A.      Sure.

11     Q.      Mr. Suri, we're going to go back to

12  Exhibit 19.  The address listed where your

13  dispute was sent was Experian, 701 Experian

14  Parkway; is that right?

15     A.      I see that, yes.

16     Q.      And those are different addresses,

17  aren't they?

18     A.      They are, clearly.

19     Q.      How did you get an address to send --

20  well, you didn't; right?  Your attorney sent the

21  letter; is that right?

22     A.      On my behalf, yes.

23     Q.      So Experian did not receive your

24  dispute at the given dispute address; is that

25  right?

1                    Tinny Suri

2          MS. BOLOS:  Objection, form.

3     A.    I couldn't answer that.  I don't know

4  if they did or not.

5     Q.    Okay.  But the address where your

6  dispute was sent was not the address that we just

7  saw on the consumer disclosure; is that right?

8     A.    Two different addresses, I agree.

9     Q.    Okay.  And your dispute was not sent to

10  the address that was on the consumer disclosure;

11  is that right?

12     A.    A PO box, no, it was not sent to a PO

13  box.

14     Q.    Okay.  I'm now going to show

15  Exhibit 23.  And Mr. Suri, this says:

16               "Enclosed please find

17               Plaintiff's Responses

18               to Experian's

19               Interrogatories."

20          Do you see that?

21     A.    I do.

22     Q.    Did you read these?

23     A.    Yes, I have.

24     Q.    And you verified them?

25     A.    To the best of my knowledge, yes.

```
 1                       Tinny Suri

 2               THE COURT REPORTER:  Callie, I think

 3   this should be 22.  Did I miss one?

 4               MS. BARR:  Is this 22?

 5               THE COURT REPORTER:  I think this is

 6   22, yes.

 7               MS. BARR:  19 should be the letter, 20

 8   is a consumer disclosure, 21 is another consumer

 9   disclosure.  You're right, 22.  Thank you.

10               (EXHIBIT 22, TINNY SURI'S RESPONSES TO

11               EXPERIAN'S INTERROGATORIES, WAS

12               IDENTIFIED.)

13    Q.    So interrogatory 19 says:

14                "Describe all actual

15                 damages suffered by

16                 Plaintiff as a result of

17                 Experian's alleged

18                 actions, including the

19                 nature of each item of

20                 damage, the amount of each

21                 item of damage, the date

22                 each item of damage was

23                 incurred ..." et cetera.

24          Do you see that?

25    A.    I do.
```

1                    Tinny Suri

2        Q.    Can you explain how you've been damaged

3   by Experian?

4              MS. BOLOS:  Objection, form.

5        A.    I think, again -- I think I addressed

6   that earlier as far as my financial liabilities

7   could be affected, mortgage rates, being upset at

8   what I've worked hard to put together.  I think I

9   have the right to be upset after looking at my

10  credit report and where I've gone from to this

11  point based upon a negative blemish on my credit

12  prior to perfect credit.  And I think those are

13  the best ways I can address it.  And like I said,

14  I addressed it earlier.

15             So there's other things that can have a

16  cause and effect that can be financially

17  compounded or affect me through like purchasing a

18  new home, new rates, or just even embarrassment

19  from my creditors or potential opportunities for

20  employment that could pull my credit report.

21             So I think that's the best way I can

22  address that.

23       Q.    Okay.  I'm going to read your response

24  to this interrogatory.  You say:

25                 "My injuries include

```
 1                    Tinny Suri

 2              symptoms of anxiety,

 3              exhaustion, irritability,

 4              frustration, and nerves.

 5              These symptoms have caused

 6              me to operate under high

 7              levels of stress, suffer

 8              from worrying and lessened

 9              sleep, to be distracted

10              throughout the day, and

11              have led to decreased time

12              spent enjoying family and

13              friends.  My wife has

14              knowledge of my injuries."

15         Is that right?

16    A.    Correct.

17    Q.    And these are your emotional damages;

18  is that right?

19         MS. BOLOS:  Objection, form.

20    A.    Yeah.  I would say that's affected me

21  in a negative way.  So yes.

22    Q.    Besides what's written here, is there

23  anything that you would add to that as far as

24  emotional damages?

25    A.    No.  I think that covers pretty much
```

1                    Tinny Suri

2   it.

3        Q.    Was your wife's bankruptcy stressful?

4              MS. BOLOS:  Objection, form.

5        A.    Sure it was.

6        Q.    Did that cause anxiety?

7              MS. BOLOS:  Objection, form.

8        A.    No.  Because while we were well aware

9   of what was going to happen and how, we made that

10  decision.  But when you're blindsided like this,

11  it's a different story.

12       Q.    Did the lawsuit cause you anxiety or

13  cause emotional distress?

14             MS. BOLOS:  Objection, form.  Which

15  lawsuit are you talking about?

16             MS. BARR:  The lawsuit that he

17  mentioned earlier today.

18             MS. BOLOS:  So not the one we're in a

19  deposition for?

20             MS. BARR:  Correct.

21       Q.    I'm sorry.  I'll be clear.

22             We just talked about your wife's

23  bankruptcy.  And so the lawsuit that led to your

24  wife's bankruptcy, did that cause stress?

25       A.    Sure.

1                       Tinny Suri

2       Q.    Okay.  Have you taken any medication

3   for this?

4       A.    No.  I mean if you're looking at

5   medication for depression and all that, no.

6       Q.    Have you seen any medical personnel for

7   your emotional distress?

8       A.    No.

9       Q.    Any counselors?

10           MS. BOLOS:  Objection, form.  Are you

11   talking about attorneys?

12       A.    No, I haven't seen any counselors.

13       Q.    Do you have any physical symptoms?

14           MS. BOLOS:  Objection, form.

15           THE WITNESS:  Can I address that?

16           MS. BOLOS:  Yes.

17       A.    So let me tell you just a cause and

18   effect, because I didn't bring this up earlier.

19   I had open heart surgery, five bypasses, so

20   stress.  I'm a type 2 diabetic, stress.  So all

21   of this has compounded part of my health, yes.

22   And that all happened within the last five years.

23   So yes.

24       Q.    When did you say you had your open

25   heart surgery?

1                    Tinny Suri

2      A.     2015.

3      Q.     You also said you're a type 2 diabetic;

4    is that right?

5      A.     That's correct.  Stress affects all of

6    that.  So I just wanted to make sure everybody

7    knows that.

8      Q.     Are those conditions themselves

9    stressful to have?

10     A.     That's a good question.  But if you

11   manage it correctly -- with my constitution and

12   my attitude, those things aren't that stressful

13   if you manage it correctly.  But if you compound

14   the stresses to any of my ailments like that, it

15   does make a cause and effect.

16     Q.     Okay.  Let's see.  I've got another

17   question here.

18             So interrogatory number 5, it says:

19               "For each denial of

20               credit or insurance during

21               the past five years,

22               describe the denial ...

23               the reasons given for the

24               denial, any dispute

25               related to the denial."

1                    Tinny Suri

2            Do you see that?

3    A.    I do.

4    Q.    Okay.  It says:

5                "Plaintiff identifies to

6             the best of his knowledge

7             the following creditors to

8             whom he submitted

9             applications for credit

10            within the past 24 months

11            and was either denied

12            credit or received credit

13            on less than favorable

14            terms."

15          So here you have:

16                "In May/June 2020 I

17            applied to Capital One for

18            a Menards Big Card, and my

19            application was denied and

20            Capital One stated it

21            relied upon a TransUnion

22            report in ..." deciding

23            that decision.

24          So that has nothing to do with

25    Experian; is that right?

1                    Tinny Suri

2     A.     I saw that, yes.

3     Q.     Okay.  And it says:

4               "I reviewed my credit

5               file and disputed the

6               reporting with Wells Fargo

7               and the credit reporting

8               agencies.  In June 2021 I

9               applied to refinance my

10              mortgage and while my

11              application was ultimately

12              approved, I believe that

13              it was approved on less

14              favorable terms than had

15              the Wells Fargo account

16              been reported accurately."

17           Is that right?

18    A.     That is correct.

19    Q.     On this application were you told that

20 you were approved on less favorable terms?

21    A.     On the initial application, no.  But I

22 did request additional information, which you

23 have a copy of, the response from Wyndham

24 Capital.

25    Q.     What are you referring to?

```
                            Tinny Suri
 1
 2      A.     It wasn't my refinance.  It was for the
 3  new mortgage, I believe, in June of this year.
 4      Q.     Right.  So let me clarify.  In June you
 5  applied for a new mortgage.  And it's not your
 6  refinance, it's your new mortgage that you
 7  believe was approved on less favorable terms; is
 8  that right?
 9      A.     That is correct.
10      Q.     Okay.  Were you told that you were
11  given less favorable terms on what Wells Fargo
12  was reporting?
13      A.     So specifically Wells Fargo?  No.
14  Based upon my credit score, because of a cause
15  and effect -- based on credit score.  They didn't
16  say Wells Fargo.  Based on my credit score that
17  affected -- cause and effect from Wells Fargo
18  reporting.
19            That's me saying that.  But for them
20  they didn't say specifically Wells Fargo.
21      Q.     Okay.  So that's just your assumption?
22            MS. BOLOS:  Objection, form.
23      A.     If you want to put it that way, okay.
24  My credit score wouldn't have been affected if
25  Wells Fargo had reported it correctly.  So
```

```
1                    Tinny Suri
2  however you want to take it, but yes.
3      Q.    Okay.  We're going to look at
4  Exhibit 23.  Mr. Suri, if you see this, it
5  says Informative Research PreClose Monitoring
6  Report.  And this is from Wyndham Capital
7  Mortgage.
8            Do you see that?
9      A.    I do.
10           (EXHIBIT 23, INFORMATIVE RESEARCH
11            PRECLOSE MONITORING REPORT - WYNDHAM
12            CAPITAL MORTGAGE, 3/25/2021 -
13            SURI 004924-4984, WAS IDENTIFIED.)
14     Q.    And this was ordered on March 25th,
15  2021.
16           Do you see that?
17     A.    That was my refi, yes.
18     Q.    And right here it has Bureau Score
19  Information on page 3.
20           Do you see that?
21     A.    I do.
22     Q.    Okay.  And can you tell me what
23  Experian's score was at this time?
24     A.    757.
25     Q.    757.  And then we're going to scroll
```

Tinny Suri

1    down.

2

3            Okay.   There's a faster way to do this

4    probably.

5            Right here.

6            Do you see where it says WF Bank NA?

7    A.     I do.

8    Q.     Okay.   And this is the account that

9    we've been discussing; correct?

10   A.     That is correct.

11   Q.     Okay.   It says a paid charge-off right

12   here.

13           Do you see that?

14   A.     I do.

15   Q.     Okay.   Now, if we go back and we look

16   at your January 12th, 2021 consumer disclosure --

17   do you see this right here?   It has the Wells

18   Fargo Bank account.

19   A.     I do.

20   Q.     Okay.   And the score here says 704.

21   A.     I see that.

22   Q.     And this was on January 12th, 2021; is

23   that right?

24   A.     That is correct.

25   Q.     Okay.   And here this is in March 2021;

```
1                    Tinny Suri

2   is that right?

3       A.    I see that, three months later.

4       Q.    Three months later.  And this says 757;

5   is that right?

6             MS. BOLOS:  Object to the form.

7       A.    I see that.

8       Q.    I'm sorry.  I didn't get your answer.

9       A.    I do see that, yes.

10      Q.    Okay.  So there's actually an increase

11  in the credit score here; is that right?

12      A.    That's what it appears to be.

13      Q.    We're going to go to Exhibit 16.  I

14  believe this was 16.  This was the letter.

15            Give me one minute.

16            All right.  The date on this letter is

17  June 22nd, 2021.

18            Do you see that?

19      A.    I see it.

20      Q.    Okay.  And right here, second

21  paragraph, last sentence:

22                "We pull from all three,

23                Experian (757), Equifax

24                fax (697), and TransUnion

25                (700).  These were your
```

```
 1                    Tinny Suri

 2            scores that were pulled."

 3            Do you see that?

 4     A.    I do.

 5     Q.    Okay.

 6                "Yes, you would have

 7                qualified for a slightly

 8                better rate if your median

 9                score was higher.

10                Anything above 740 is

11                going to give you the top

12                tier pricing of interest

13                rates."

14            Do you agree that that's what that

15   says?

16     A.    That's what it says, yes.

17     Q.    Okay.  An Experian score of 757 was

18   more than that; right?  It was more than 740; is

19   that right?

20     A.    I agree.

21     Q.    So Experian would not be the cause of

22   any damage here; is that right?

23            MS. BOLOS:  Objection, form.

24     A.    Yeah.  It wouldn't have affected my

25   score in this particular case, yes.
```

1                    Tinny Suri

2      Q.    And Experian was not mentioned on the

3  Capital One?

4      A.    That is correct.  It was not mentioned

5  on the Capital One dispute, yes.

6      Q.    I think your actual score was actually

7  higher in March than it was in January, the 757;

8  is that right?

9            MS. BOLOS:  Objection to form.

10     A.    It appears to be that way.

11     Q.    So Experian hasn't damaged you;

12  right?

13           MS. BOLOS:  Objection to form.

14     A.    I don't know what the damages are that

15  I can answer that.  But a negative mark is still

16  on my report.  And how that affects my future I

17  can't address.

18           MS. BARR:  I'm just going to take like

19  a five-minute break.  Is that okay?

20           MS. BOLOS:  Sure.

21           MS. BARR:  Thank you.

22           (A RECESS WAS TAKEN FROM 2:08 P.M.

23            TO 2:17 P.M.)

24  BY MS. BARR:

25     Q.    Not very many more questions from me

Page 159

1                    Tinny Suri

2    and I'll pass the baton.

3            MS. BOLOS:  It's like a marathon.

4    Q.    So do you have any document, Mr. Suri,

5    that says that Experian specifically caused you

6    any form of credit harm?

7            MS. BOLOS:  Objection, form.

8    A.    I don't.  Outside of the credit report,

9    I possess nothing else that mentions any of those

10   things against Experian besides my dispute.

11   That's all.

12   Q.    And has any credit furnisher told you

13   specifically that Experian has caused you

14   damages?

15           MS. BOLOS:  Objection, form.

16   A.    Not to my knowledge yet, no.

17   Q.    And then your emotional damages in

18   regard to Experian are specifically because

19   Experian reported the Wells Fargo account as

20   charged off and paid; is that right?

21   A.    Yes.

22   Q.    Okay.  Is there any other reason?

23           MS. BOLOS:  Objection, form.

24   A.    No.

25   Q.    And then finally, to your knowledge,

Page 160

1                    Tinny Suri

2    were any of Experian's procedures unreasonable?

3              MS. BOLOS:  Objection, form.

4         A.    When you say "procedures," I don't

5    understand.  Can you clarify?

6         Q.    Sure.  What could Experian have done

7    better here?

8              MS. BOLOS:  Objection, form.

9         A.    Again, I don't know what the

10   communications between Experian and Wells Fargo

11   to rectify that charge-off would have been, so I

12   can't really address that.  But I think that

13   could have been something that would have been

14   done viable for me as a positive.

15        Q.    Okay.  But if Wells Fargo charged off

16   the account and Experian reported it as charged

17   off, what could Experian have done better?

18             MS. BOLOS:  Objection to form.

19        A.    I don't know how to address that.  I

20   don't know.  I don't know the workings between

21   all the credit unions and how you work

22   internally, so I can't address that.

23             MS. BARR:  I'm done.  Thank you for

24   your time.

25             THE WITNESS:  Thank you.

1                    Tinny Suri

2                  EXAMINATION

3  BY MR. HUSE:

4     Q.    All right.  I believe it's my turn.

5          Good afternoon, Mr. Suri.  My name is

6  William Huse.  I'm counsel for credit reporting

7  agency TransUnion.  I'm going to try to move

8  through as quickly as I can.  We've got a number

9  of documents, though.  And I apologize if some of

10  my questions seem disjointed because of the

11  questions already previously asked.

12          First and foremost, with respect to

13  emotional distress damages, are you seeking any

14  emotional distress damages from TransUnion?

15          MS. BOLOS:  Objection, form.

16     A.    I don't know if it's emotional distress

17  damages.  I think there's a whole total -- I

18  would say there's a bundle issue going on here.

19  I think there's quite a few things all in one

20  box, and I think that's just a part of it.  But

21  what are the damages?  I don't know.  Like I

22  said, I'm not an attorney, and I have to leave

23  that up to the courts to decide based upon what's

24  been already submitted.  That's the best way I

25  can answer that.

```
 1                    Tinny Suri

 2      Q.     Okay.  Then to be clear, are your

 3  damages you're seeking against TransUnion, are

 4  they based on the fact that TransUnion reported

 5  your Wells Fargo account that we've been

 6  discussing here today as a paid charge-off?

 7      A.     Incorrectly as a paid charge-off, yes.

 8      Q.     You understand that TransUnion is a

 9  credit reporting agency, don't you?

10      A.     I totally understand that.

11      Q.     What's your understanding of what a

12  credit reporting agency does?

13      A.     They report the credit based upon what

14  the creditors submit to the agency and post it.

15  It's as simple as that.  And I would assume that

16  all of them protect the consumers as well; that

17  when there's a discrepancy involved, that they

18  would investigate.  And based upon documents,

19  like this time submitted by my attorneys and

20  myself, that they could come to a resolution or

21  resolve instead of just saying nothing.  So yes.

22      Q.     Okay.  Do you know how a credit

23  reporting agency gets its information about you?

24      A.     I would assume that it's submitted by

25  creditors.
```

1                        Tinny Suri

2       Q.     Okay.  Do you understand that

3    TransUnion, Equifax, and Experian are different

4    companies?

5       A.     I do understand that.

6       Q.     In thinking about the facts of your

7    case, do you ever have trouble keeping

8    TransUnion, Equifax, and Experian separate from

9    each other?

10             MS. BOLOS:  Objection to form.

11      A.     Sure.  Yes, I do.  I keep them

12   separate.

13      Q.     So you never get confused on which

14   credit reporting agency may have reported what or

15   anything like that?

16             MS. BOLOS:  Objection, form.

17      A.     The only way I could do that is by

18   pulling my credit report from each individual

19   bureau and what I've done and look at them side

20   by side.  But I understand.

21      Q.     Okay.  We're going to -- if you don't

22   mind, I'll share my screen here and go back to

23   Exhibit 15, the complaint.

24             Let's see.  That should do it.  And if

25   you'll let me know if you do not see a title head

```
 1                    Tinny Suri

 2   saying Factual Allegations Relative to

 3   TransUnion.

 4       A.    It's loaded.  I do see Factual

 5   Allegations Relative to TransUnion, yes.

 6       Q.    Okay.  So you would agree, especially

 7   with the filing information at the top, this is

 8   part of your complaint filed in this action;

 9   correct?

10       A.    Correct.

11       Q.    All right.  So again, much like you

12   discussed with Ms. Barr about Experian, we're

13   talking about inaccurate credit information

14   relating to the Wells Fargo Bank account?

15       A.    That's correct.

16       Q.    Particularly it being reported as a

17   paid charge-off?

18       A.    That's what we're discussing, yes.

19       Q.    Okay.  So now with respect to

20   TransUnion -- and I just want to get it really

21   nailed down here so I'm clear -- it's your

22   position that Wells Fargo did not have the legal

23   right to charge off this account when it did

24   because of the timing of the bankruptcy and the

25   Reaffirmation Agreement and then the payments
```

1                    Tinny Suri

2   made thereafter; is that accurate?

3            MS. BOLOS:  Objection to form.

4       A.    That is correct.

5       Q.    Okay.  Looking at -- and I will try and

6   Zoom out just a little bit just so we get this

7   page here.

8            As you can see now on the complaint, we

9   see paragraphs 53 to 59 --

10      A.    Okay.

11      Q.    -- which are all of the paragraphs

12  under the Factual Allegations Relative to

13  TransUnion heading.

14           In reading those paragraphs, does that

15  accurately summarize the entirety of your claims

16  against TransUnion?

17           MS. BOLOS:  Objection, form.

18      A.    Based upon everything that I'm just

19  rereading really quickly just to make sure

20  there's no discrepancies, yeah, this covers it.

21      Q.    All right.  You note specifically in

22  your complaint that on February 8th, 2021, you

23  disputed with TransUnion.

24      A.    That's correct.

25      Q.    Is that the only dispute upon which you

Page 166

1                       Tinny Suri

2   are basing your claims for recovery against

3   TransUnion?

4            MS. BOLOS:  Objection, form.

5       A.    So previous to this I did mail

6   TransUnion with a certified letter in my initial

7   direct dispute prior to hiring my counsel, and my

8   counsel submitted this afterwards.  So this is

9   the second time.

10      Q.    Okay.

11      A.    I'm sorry.  Let me rephrase that.

12            I did it online, then I sent them a

13  certified mail, and then my counsel sent this

14  one.  So I want to make sure I've got my timing

15  right.

16      Q.    So your claims are trying to encompass

17  all of those disputes?

18      A.    Possibly, yes.

19      Q.    Okay.  Then if we can move on, we'll

20  mark as Exhibit 24 -- these are identified as

21  your responses to TransUnion, LLC's, amended

22  interrogatories.

23            Have you seen these before?  And I'm

24  more than happy to scroll through these pages if

25  you'd like.

                            Tinny Suri

1

2     A.     No.  I've seen them.

3            (EXHIBIT 24, TINNY SURI'S RESPONSES TO

4              TRANSUNION'S AMENDED INTERROGATORIES,

5              WAS IDENTIFIED.)

6     Q.     And you helped prepare answers for

7    these?  Not necessarily typing but providing the

8    information?

9     A.     I did collaborate with my attorney on

10   this.

11    Q.     Okay.  And you did verify them as

12   accurate?

13    A.     To the best of my knowledge, yes.

14    Q.     As we sit here today, do you still

15   believe these responses to be accurate and

16   complete?

17    A.     Again, yes.  To the best of my

18   knowledge, yes.

19    Q.     Okay.  Wonderful.

20           I am going to scroll through very

21   quickly to interrogatory number 6.  And if you

22   could please review interrogatory number 6 and

23   your answer, and I'll be happy to scroll when you

24   reach the bottom of the page.

25    A.     (Document review.)  Could you go ahead

Page 168

1                        Tinny Suri

2    and scroll down for me, please?  Go back up a

3    little more.  I just want the bottom part.

4        Q.     (Scrolling.)

5        A.     Perfect.  (Document review.)

6               Could you go ahead and scroll down,

7    please?

8        Q.     (Scrolling.)

9        A.     (Document review.)

10              Okay.  Is that enough or do you want me

11   to keep reading?

12       Q.     (Scrolling.)

13       A.     (Document review.)

14              Now we're at Experian.  Okay.

15       Q.     Okay.  And then we go through and we

16   have a list of witnesses here.

17       A.     Sure.

18       Q.     Which is all fine.  But mainly the

19   purpose of that interrogatory was to determine

20   what information you allege is inaccurate.

21   Again, we're just talking about the Wells Fargo

22   Bank account being reported as a paid charge-off;

23   correct?

24       A.     Correct.

25       Q.     Do you have anything else to add?

```
1                         Tinny Suri

2              MS. BOLOS:  Objection, form.

3       A.     I don't.

4       Q.     Do you know specifically how

5   TransUnion's reporting of the Wells Fargo account

6   as a paid charge-off specifically affected your

7   credit?

8              MS. BOLOS:  Objection, form.

9       A.     I think that -- I mean between -- and I

10  think we view all three agencies as different

11  numbers.  And I think TransUnion -- some of my

12  creditors have used TransUnion as that number of

13  700, as you saw from the Wyndham mortgage.  And I

14  think I addressed that earlier where I could have

15  had favorable rates, other things could have

16  occurred for having a little more privilege and

17  having a better rate.  Having a better score

18  would have provided me better rates financially.

19             So I think those are the things I

20  covered earlier that are part of the cause and

21  effect of getting that lower score.

22      Q.     Okay.  You mentioned Wyndham.  Was that

23  what we looked at as Exhibit 23 is what you're

24  referring to?

25      A.     Correct.
```

1                          Tinny Suri

2        Q.      And that's on the screen now; correct?

3        A.      Correct.

4        Q.      Okay.  It says Informative Research at

5    the top, PreClose Monitoring Report.  To your

6    knowledge, are you aware of what credit reporting

7    agency produced this document to Wyndham?

8        A.      I do not.

9        Q.      Okay.  As part of your claims against

10   TransUnion, are you saying that TransUnion failed

11   to provide you a copy of your consumer disclosure

12   at any time?

13       A.      When you say "consumer disclosure," you

14   mean my consumer report?

15       Q.      Yes.  I'm sorry.  I use the term

16   "consumer disclosure" for what's provided

17   directly to you for your own personal purposes.

18       A.      No.  Upon request, I don't have an

19   issue that you did not provide it to me if I

20   requested it, no.

21       Q.      Wonderful.

22               Moving through here, okay, I'm going to

23   put on the screen here, I believe, what's Exhibit

24   -- Exhibit 25, I believe, is the correct number.

25   And it appears to be a June 28th, 2020 online

1                    Tinny Suri

2    dispute from you to TransUnion.

3              Is that your understanding of it --

4              MS. BOLOS:  Objection, form.

5    Q.    -- from your review of it?

6    A.    That's one of the ones I explained

7    earlier, yes, that I did an online dispute as

8    well.

9              (EXHIBIT 25, ONLINE DISPUTE AND

10             CORRESPONDENCE WITH TRANSUNION,

11             6/28/2020, WAS IDENTIFIED.)

12   Q.    This would be the online dispute;

13   correct?

14             MS. BOLOS:  Objection, form.

15   A.    Pardon?

16   Q.    This would be your online dispute;

17   correct?

18   A.    Correct.

19   Q.    Partway down the page under a dotted

20   line it says Tradeline Disputes, and it

21   identifies an account number and a name, but it

22   says "no name."  This is the dispute of that

23   Wells Fargo Bank account that we've been

24   discussing today; is that correct?

25   A.    Correct.

1                        Tinny Suri

2      Q.     Okay.  In the comments section at the

3   bottom the last sentence says:

4                  "We have documents showing

5                  all payments paid in

6                  full."

7      A.     Uh-huh (positive response).

8      Q.     Did you provide any documents to

9   TransUnion with your online dispute?

10     A.     So I don't recall because I believe I

11  just provided everything I had.

12            But let me just address this:  The

13  online is very cumbersome to operate, and I had

14  to do it three times before I even had room to

15  write anything in there.

16            So I don't remember is the best of my

17  knowledge.  I couldn't tell you.  I know all the

18  hard copies I did mail.

19     Q.     All right.  Is the date of this online

20  dispute, June 28th, 2020, or June 27th, 2020 --

21  it's got two dates on there -- does that appear

22  to be an accurate date of when you made this?

23            MS. BOLOS:  Objection, form.

24     A.     That's what it says and that's when I

25  did it.  I would say that's accurate.

                              Tinny Suri

1

2       Q.    Did you send an online dispute or

3   something similar to that to anyone else in late

4   June 2020?

5       A.    I don't believe I did.  I think I was

6   trying to resolve this one first.

7       Q.    Okay.  What did you want TransUnion to

8   do when you sent this online dispute?

9       A.    To confer with Wells Fargo for the

10  inaccuracy in reporting, my initial reasons for

11  the dispute, and to make the correction.

12      Q.    And what correction -- what specific

13  correction were you looking for?

14      A.    To change the charge-off on the Wells

15  Fargo account to paid in full, to remove the

16  negative mark.

17      Q.    So just so I'm clear, you wanted it to

18  say paid in full?

19      A.    Yes.

20      Q.    And no reference to a charge-off

21  whatsoever?

22      A.    That is correct.  Because it was

23  incorrect, to my knowledge.

24      Q.    Did you receive a response from

25  TransUnion to your online dispute?

```
 1                    Tinny Suri

 2      A.    I did.

 3      Q.    All right.  On this next page that's

 4 dated June 27th, 2020, it looks like a document

 5 from TransUnion to you stating that your dispute

 6 was received and they are processing it.

 7      A.    Uh-huh (positive response).

 8      Q.    Do you recall receiving this document?

 9      A.    Sure do.

10      Q.    All right.  Let me move on to the

11 document.  Now, here as part of this exhibit we

12 see a document dated June (sic) 17th, 2020, again

13 addressed to you at your ███████████████████

14 address.

15      A.    Are you saying June or July?  This is

16 July.

17      Q.    July 17th, 2020.  And we're including

18 your re-investigation results.

19            Do you recall receiving this document?

20      A.    I do.

21      Q.    Okay.  I'll scroll down to -- I think

22 it's page 6 of the PDF, which identifies the

23 investigation results specifically.  And again,

24 this shows Wells Fargo Bank.  And it's reporting

25 a zero balance, paid in full, with a charge-off.
```

1                    Tinny Suri

2           Is that correct that it's reporting

3    that?

4    A.    Uh-huh (positive response).

5    Q.    Does it show at any point in this

6    document any late payment history on your

7    account?

8           MS. BOLOS:  Objection, form.

9    A.    Not on this one.  But I believe I have

10   an earlier document that doesn't show it fully

11   paid off.  But I don't recall.  But it does show

12   on this one that there's no late payments.

13   Q.    Okay.  What did you do when you

14   received this document?

15          MS. BOLOS:  Objection, form.

16   A.    I reviewed it and I disagreed with the

17   charge-off.  So I think at that point -- I don't

18   remember, I don't recall when I mailed the hard

19   copies in of everything to argue the fact that

20   here's a copy of the reaffirmation letter saying

21   that this was a mistake, to investigate it with

22   Wells Fargo.  And I think that's the next steps.

23   Q.    Okay.  How did you feel when you

24   received this document to the extent you recall?

25   A.    I think how anybody would feel.  A

1                          Tinny Suri

2    little pissed off.  I mean upset.  I mean nothing

3    has changed, and I felt like nobody was doing

4    anything.  So yeah.

5       Q.    Okay.  So what do you feel TransUnion

6    should have done in response to this online

7    dispute?

8       A.    I don't know what your inner workings

9    are, as I mentioned earlier to the folks at

10   Experian.  I don't know what your investigation

11   -- how you investigate, what it entails.  I can't

12   address that.  I mean it could have been a little

13   more detailed of why, but there was no why.  It

14   was just we talked to the creditor, they reported

15   it correctly, and this is how we reported it;

16   basically the gist of how I get this from all

17   three agencies.

18              So I can't address how you should have

19   investigated it and how that affected me.

20      Q.    As you sit here today, can you describe

21   to me what you believe a reasonable

22   re-investigation of your dispute by TransUnion,

23   what it would have entailed?

24              MS. BOLOS:  Objection, form.

25      A.    I'm not an investigator.  I'm not a

                          Tinny Suri

1

2    forensic person who would accept forensic online

3    information and be able to collectively make a

4    decision and dispute it.  So I couldn't answer

5    that question.  I don't know.

6         Q.    So in your complaint, which we looked

7    at, you claim that TransUnion didn't conduct a

8    reasonable re-investigation; is that accurate?

9              MS. BOLOS:  Objection, form.

10        A.    I'm not claiming -- no.  I'm not

11   claiming anything.  I'm assuming by my own

12   personal belief.  But I'm not claiming anything

13   that you did or didn't do.  It's just based upon

14   my own assertion from what I see that's still

15   there and the lack in the response, very minimal.

16   So I just have to take my own guess.  That's all

17   I'm doing.

18        Q.    Okay.  So the allegation is based on

19   your guess because the information was not

20   updated to paid in full without the charge-off

21   mark?

22        A.    That is correct.

23        Q.    Did you ever dispute the Wells Fargo

24   account with TransUnion by telephone?

25        A.    I believe I've called.  I don't

1                    Tinny Suri

2  remember what the conversations entailed because

3  there were a lot of phone calls between a lot of

4  agencies and Wells Fargo. So right now it's been

5  a while. It's been over a year. So I couldn't

6  tell you and recall all those conversations. But

7  I know I tried calling, yes.

8      Q.    Okay. Look at your screen now. I

9  believe this is Exhibit 26. It is an August 1st,

10 2020 correspondence from TransUnion to you at

11 your Maple Valley Drive address.

12     A.    Uh-huh (positive response).

13            (EXHIBIT 26, CORRESPONDENCE FROM

14             TRANSUNION, 8/1/2020, WAS

15             IDENTIFIED.)

16     Q.    Again, enclosing re-investigation

17 results.

18            Do you believe this may have been in

19 response to your telephone call with TransUnion?

20            MS. BOLOS: Objection, form.

21     A.    I couldn't answer that. I don't know.

22     Q.    Do you recall receiving this document?

23     A.    I believe I did receive this document.

24     Q.    Okay. And I'll scroll down again to

25 the Your Investigation Results section, page 4 of

1                    Tinny Suri

2    the document.  Again, it's Wells Fargo Bank

3    reporting the account paid in full was a

4    charge-off with a zero dollar balance.

5              Having seen this now, do you believe

6    this may have been in response to your telephone

7    call with TransUnion?

8        A.    So you're showing charge-off, not paid

9    in full, on this report.  And you're asking if

10   that triggered the phone call to TransUnion?

11       Q.    No.  If this was possibly in response

12   to your phone call to TransUnion.

13       A.    Oh, I don't remember.  I don't know.

14       Q.    Okay.  When you made your phone call to

15   TransUnion, you also called other agencies; is

16   that what you said?  Is that accurate?

17             MS. BOLOS:  Objection, form.

18       A.    I believe -- I don't remember who I

19   called.  I know it was TransUnion, but I may have

20   called Equifax.  But I don't think I had called

21   Experian yet.

22       Q.    Okay.  Do you recall what you said to

23   TransUnion when you called them?

24       A.    No.  I can't remember that

25   conversation.  But it had to be on the lines of

1                    Tinny Suri

2   the things that we're discussing today.

3       Q.    Okay.  We're going to look at another

4   set of documents here.  This will be Exhibit 27.

5   And I will upload all of these to the chat at the

6   next break.  I'll put this before you.

7            This appears to be a correspondence

8   from you, sir, to TransUnion dated July 24th,

9   2020.

10           (EXHIBIT 27, CORRESPONDENCE TO

11           TRANSUNION, 7/24/2020, WAS

12           IDENTIFIED.)

13      A.    Uh-huh (positive response).

14      Q.    Does this document look familiar to

15  you?  And I'm happy to scroll through and show

16  you all the attachments as well if you'd like.

17      A.    No.  It looks familiar.  I think this

18  is the one I mailed out.  I'm not sure if I

19  mailed it or faxed it.  I forgot.

20      Q.    Just so it's easier to see, I'll just

21  scroll through very quickly.  Page 2, it looks

22  like that's the letter from Wells Fargo to

23  Ms. Sauerbrei.  I apologize if I misstate it.

24  Your payment history with Chase, LeafFilter

25  contract, the affirmation agreement page, other

1                      Tinny Suri

2   bankruptcy court documents, and then a priority

3   mail addressed to TransUnion and the PO box in

4   Chester, Pennsylvania.

5        A.    Uh-huh (positive response).

6        Q.    So you do recall sending this dispute?

7        A.    I do.

8        Q.    And it's dated July 24th, 2020.

9              Is the date of that document correct?

10       A.    Correct.

11       Q.    Other than the fact that it includes a

12   correspondence to Wells Fargo, did you send

13   something like this -- something similar to this

14   to anyone else approximately at this time?

15             MS. BOLOS:  Objection.

16       A.    No.  Outside of Wells Fargo receiving

17   all the documents, no.  It was TransUnion.

18       Q.    Okay.  Can you tell me why you didn't

19   send it to Experian or Equifax at this time?

20       A.    Well, first, I wanted to make sure that

21   I could dispute with one agency and try to

22   rectify this between Wells Fargo.  And once that

23   was cleared on TransUnion, then I could approach

24   the other two.

25       Q.    Okay.  Did you prepare this document

                        Tinny Suri

1    yourself?

2         A.    It was for me, yes.

3         Q.    Did anyone help you prepare it?

4         A.    Not at this time, no.

5         Q.    And to summarize the purpose of this

6    document, it was to change the reporting of the

7    Wells Fargo Bank account to simply "paid in

8    full"?

9              MS. BOLOS:  Objection, form.

10        A.    It was to help dispute the findings, to

11   correct them based upon the information I

12   provided so it could be updated to "paid in

13   full."

14        Q.    Okay.  We'll go through and -- I know

15   we've already described most of these attachments

16   with counsel for Wells Fargo earlier today.  Can

17   you tell me why you did not provide these

18   documents to TransUnion earlier?

19        A.    Earlier when you said upload them

20   online?

21        Q.    Or in response to a telephone call or

22   any other time you thought about possibly

23   disputing it.

24        A.    Because I believe I was trying to --

Note: Line numbers in the image appear as 1-25 but the answer "It was for me, yes." is line 3.

```
 1                    Tinny Suri

 2   and I can't recall -- but I believe I was trying

 3   to get this fixed directly with Wells Fargo first

 4   to report it accurately, to my knowledge, before

 5   I got involved with the bureaus.

 6        Q.    Okay.  As part of TransUnion's

 7   re-investigation of this dispute, do you think it

 8   was reasonable for TransUnion to have contacted

 9   Wells Fargo and provided them the entirety of

10   this dispute letter, including all these

11   documents?

12             MS. BOLOS:  Objection, form.

13        A.    I don't know how to answer that

14   question.  I don't know how you communicate with

15   the creditors in an investigation like this, so I

16   don't know how to address it.  I would assume

17   that -- I'm assuming, without any prior knowledge

18   of the operations, that you communicated -- you

19   had some type of communication.

20        Q.    Okay.  Would you have hoped that

21   communication would have included TransUnion

22   providing all of these supporting documents to

23   Wells Fargo?

24        A.    Sure.

25        Q.    Did you receive a response to this
```

1                    Tinny Suri

2   dispute letter from TransUnion?

3       A.    I don't remember.  I may have because I

4   received quite a few things.  But you may have a

5   copy.  If you want to share that, I can confirm.

6       Q.    Okay.  I will scroll down towards the

7   end of this exhibit.  This is an August 11th,

8   2020 letter to you at your Maple Valley Drive

9   address again talking about reading your

10  re-investigation results.

11            Do you recall receiving this document?

12      A.    Yeah.  It looks like all the same three

13  ones I received before all canned in the same

14  way.  But yes, I did receive it.

15      Q.    Okay.  And this is page 4 of that

16  section, page 28 overall of this PDF.  It has the

17  specifics of the re-investigation results.

18            Again, zero dollar balance, paid in

19  full with a charge-off.

20            On this copy, which I believe shows

21  your pay history -- and I'll make it a little

22  larger for you because I need it a little

23  larger -- through June of 2020.  Does it show any

24  late monthly payment history on this report?

25      A.    It doesn't.  It looks like it got

1                    Tinny Suri

2   updated.

3      Q.    Okay.  What did you do when you

4   received this copy?

5      A.    Same thing.  I looked at it, I see

6   charge-off, negative on my report that could make

7   an effect on my future.  But yes, I wasn't happy.

8   I mean I'm glad that you filled in all the

9   squares because it wasn't there before.  But the

10  charge-off was still there.

11     Q.    All right.  In just a moment we're

12  going to go to the February 2021 correspondence

13  that's referenced in your complaint.  But before

14  we get to that, and excluding that letter, can

15  you recall any other time that you contacted

16  TransUnion to dispute information about your

17  Wells Fargo account?

18     A.    Outside of what you presented for me,

19  the direct contacts I've had, I know that my

20  legal team -- I know they've submitted things.

21  Outside of that, I have no other knowledge.

22     Q.    When you say your legal team submitted

23  something, are you talking about what's

24  identified as Exhibit 12 we talked about earlier

25  day?

```
 1                    Tinny Suri
 2     A.    Yeah.   That was submitted by our legal
 3 team -- by the legal team, yes.
 4     Q.    Okay.   How much input did you have into
 5 creating this dispute letter?
 6           MS. BOLOS:   Objection, form.   And I
 7 think that creeps into attorney/client privilege,
 8 Will.  He already told you he reviewed it and
 9 signed it.
10           MR. HUSE:   It doesn't actually have a
11 signature.  So I don't know if he said that.
12           MS. BOLOS:   Well, that one is -- I
13 don't think that's the one produced from us.
14           MR. HUSE:   No.   It's from Wells Fargo.
15 But I don't know how they would have had a copy
16 of it.
17           MS. BOLOS:   Well, I think this went
18 through -- and I think Experian was showing it in
19 their exhibit -- the mailing service mailed it
20 out.  So I don't know what happened to the
21 letters once they went to the mailing service.
22 It looks like maybe they stripped out the
23 signature.  And I'm pretty sure this letter was
24 dated when Mr. Suri signed it.  And if we haven't
25 produced to you the version of his that is signed
```

```
1                    Tinny Suri
```

2  by him, then I can make sure to get that over to

3  you at the end of the week.

4           MR. HUSE:  No.  I think I have it.  I

5  just need to find it here.

6           Let's see if this is it, Exhibit 28.

7           (EXHIBIT 28, CERTIFICATE OF SERVICE

8            DECLARATION OF MAILING TO TRANSUNION,

9            2/9/2021 - SURI 000690-0731, WAS

10           IDENTIFIED.)

11          MS. BOLOS:  Well, his version of that

12  detailing that was sent to the CaseMail mailing

13  service is Suri 460 to 462, and it has a

14  signature and date on it.

15          MR. HUSE:  Okay.  Because what I have

16  here -- and we'll just mark it as Exhibit 28 --

17  is a certificate of mailing on behalf of Mr. Suri

18  to TransUnion at the 555 West Adams Street

19  location in Chicago.  And that includes the same

20  letter with an e-signature.

21          MS. BOLOS:  Yes.

22     Q.    So this would be a copy of your

23  dispute; correct, sir?

24     A.    Correct.

25     Q.    Your last mail dispute -- and I'll pull

1                         Tinny Suri

2    it back up, again Exhibit 27 -- it's loading

3    here -- you mailed yourself.  It was sent to

4    TransUnion's Chester, Pennsylvania PO box.  And

5    you received a response to that dispute, as we

6    discussed; correct?

7         A.    I believe so.  If that's the one that I

8    mailed, yes.

9         Q.    Yes, it is.

10             Do you recall getting -- do you know

11   why this dispute letter, the one from 2021, was

12   sent to a Chicago, Illinois address and not the

13   Chester, Pennsylvania address?

14        A.    I do not, no.

15        Q.    Okay.  Did you receive a response to

16   this dispute?

17        A.    You know what, I don't remember.  I

18   don't recall.  But I'd have to look and see.

19        Q.    Okay.  And the purpose of this dispute

20   was, again, to dispute the Wells Fargo Bank

21   account, as we've discussed today?

22        A.    Yes.

23        Q.    All right.  On here -- do you have any

24   other documents that show TransUnion reported

25   inaccurate information about you?

                         Tinny Suri

1

2      A.    No.  I think I presented everything and

3  our team presented everything that you have, so

4  everything I have.

5      Q.    Okay.  You mentioned earlier today

6  about a rejection from a Menards credit card.

7      A.    That is correct.

8      Q.    Let me see if I can find it here very

9  quickly.

10          And was that with Capital One?

11     A.    That is correct.

12     Q.    Let's see if you can see this document

13  here, this document that we'll mark as

14  Exhibit 29.

15          Is this the Capital One correspondence

16  to you on June 17th, 2020, denying your Menards

17  credit card account?

18     A.    That is correct.

19          (EXHIBIT 29, LETTER TO TINNY SURI FROM

20          CAPITAL ONE, 6/17/2020, WAS

21          IDENTIFIED.)

22     Q.    Is this denial letter, dated June 17th,

23  2020 -- is that an accurate date for when you

24  received the denial?

25          MS. BOLOS:  Objection, form.

Page 190

1                   Tinny Suri

2     A.    Yes.  I mean thereafter.  It was dated

3  2020, but soon after I received it in the mail,

4  sure.

5     Q.    Okay.  So presumably -- do you recall

6  when you actually made the application?

7     A.    No, I don't remember.

8     Q.    All right.  The last sentence of the

9  paragraph before "Sincerely, Capital One Customer

10 Care Team," it states that Capital One:

11               "... will send you a

12               written statement of the

13               specific reasons for

14               denial within 30 days of

15               receiving your request."

16               Did you ever contact Capital One for

17 the specific reasons why you were denied this

18 credit card?

19    A.    No.

20    Q.    All right.  Let's go back to

21 Exhibit 24, Exhibit 24, which are your

22 interrogatory responses.  We're going to go down

23 to interrogatory 13, which asks you to identify

24 each specific law that you claim TransUnion

25 violated.

1               Tinny Suri

2          If you can go ahead and read number 13

3  and its response, and let me know when I need to

4  scroll forward and when you're done, please.

5     A.    (Document review.)  Go ahead and scroll

6  down, please.

7     Q.    (Scrolling.)

8     A.    (Document review.)  Okay.

9     Q.    Okay.  Is this an accurate -- your

10  answer in response to this interrogatory number

11  13, is that an accurate depiction of all of your

12  claims in this matter against TransUnion?

13          MS. BOLOS:  Objection, form.

14     A.    Yes.

15     Q.    Do you have any other claims you would

16  like to add at this point in time?

17          MS. BOLOS:  Objection, form.

18     A.    If there's no other claims stipulated

19  in this document, then I don't have anything else

20  to add.

21     Q.    All right.  We're getting very close to

22  moving on, fortunately for everyone here.

23          I'm going to move up to

24  interrogatories, I think, 4 and 5.  And these,

25  interrogatory request numbers 4 and 5, as you'll

```
 1                    Tinny Suri

 2   see when I get there, talk about credit

 3   applications made and the harm that you allege

 4   occurred because of TransUnion's reporting.

 5            You can go ahead and read number 4.

 6   I'll scroll down when you're ready.

 7      A.    (Document review.)  Can you scroll

 8   down, please?

 9      Q.    (Scrolling.)

10      A.    (Document review.)  Okay.

11      Q.    (Scrolling.)

12      A.    Okay.

13      Q.    Do you understand, sir -- I'll take a

14   quick stop here.  You have identified things on

15   this chart on page 5, documents identified as

16   regular inquiries and documents or things

17   identified as promotional inquiries.

18            MS. BOLOS:  Objection, form.  Oh, go

19   on.

20      Q.    Are you seeking to recover -- that's

21   fine.

22            Are you seeking to recover for on any

23   damages based on any promotional inquiries listed

24   in this chart?

25            MS. BOLOS:  Objection, form.
```

1                         Tinny Suri

2      A.     Can you be specific?  I'm not familiar

3  with the promotional inquiries subject matter.

4      Q.     Okay.  As a general rule, regular

5  inquiries are -- well, inquiries occur when

6  someone requests a copy of your consumer credit

7  information.

8      A.     Correct.

9      Q.     A regular inquiry typically occurs when

10  a consumer actively applies for credit.

11      A.     Uh-huh (positive response).

12      Q.     Or sometimes seeks employment.

13            Promotional inquiries are like the

14  letters you get repeatedly in the mail, I'm sure.

15  It says we're here from Happy Money,

16  Incorporated, saying:  Hey, you've been

17  preapproved for a credit card, but you never

18  applied for it.  And in those situations the

19  promotional inquiries don't usually get a copy of

20  your credit report, just your name and address if

21  you fit certain demographics.

22            With that in mind, are you seeking any

23  damages based on any promotional inquiries?

24      A.     I don't believe so.

25      Q.     Okay.  So we'll go through and let you

1                    Tinny Suri

2    read the last three lines of number 4 here.

3         A.    (Document review.)

4         Q.    Okay.  I'll go through -- if you'll

5    read number 5 and its answer, which is the

6    remainder of page 8, please.

7         A.    (Document review.)  Okay.

8         Q.    In your review of interrogatories 4 and

9    5 and their answers, would you say that those

10   responses are accurate?

11             MS. BOLOS:  Objection, form.

12        A.    Yes.

13        Q.    All right.  Then let's go through some

14   of your individual reports here -- or individual

15   credit applications.  I think we already

16   discussed your Wyndham application earlier.  That

17   was Exhibit Number 23 which had the Informative

18   Research report at the top.

19             Is that correct to the best of your

20   recollection?

21             MS. BOLOS:  Objection, form.  Can you

22   just bring it up on the screen?  I can't even

23   keep track of this.

24        Q.    Can you see that?

25        A.    Yes.

1              Tinny Suri

2      Q.    So is this Informative Research report

3   provided to Wyndham Capital that we've already

4   discussed and you discussed with Ms. Barr for

5   Experian, is that the basis for your allegations

6   for damages resulting from a Wyndham application?

7              MS. BOLOS:   Objection, form.

8      A.    Number one, Informative Research, I

9   don't know who they are.  It looks like a

10  third-party provider.  But I would guess that

11  this affected my opportunity to get a better rate

12  based upon my credit score.  Yes, it made a cause

13  and effect, I agree.

14     Q.    So you did get the -- you did get the

15  credit you sought.  Do you know how the -- and

16  forgive me if you've already answered this.  Do

17  you know how your rate may have changed

18  specifically?

19             MS. BOLOS:  Objection, form.

20     A.    I believe all of you, everyone here,

21  has a copy of the response from Wyndham directly

22  that my credit score would have been affected or

23  I would have had favorable rates if it was above

24  700 or 720 or 740.  I can't recall unless you

25  pull up the document.  But they said there was an

```
 1                    Tinny Suri
 2  effect, yes.
 3      Q.    Okay.  Let's go through here then.  We
 4  have here what we'll mark as Exhibit 30.   I
 5  believe this is loanDepot.com Statement of Credit
 6  Denial, Termination or Change dated April 9,
 7  2021.
 8            Do you recall having seen this document
 9  before, sir?
10            MS. BOLOS:  Objection, form.
11      A.    I have not.
12            (EXHIBIT 30, STATEMENT OF CREDIT
13             DENIAL, TERMINATION OR CHANGE FROM
14             LOANDEPOT, 4/9/2021, WAS IDENTIFIED.)
15      Q.    Okay.  Are you seeking to recover
16  damages for any sort of credit denial or credit
17  change for a loanDepot -- is this loanDepot?   I
18  want to make sure I'm right -- yeah,
19  loanDepot.com application?
20            MS. BOLOS:  Objection, form.
21      A.    I didn't go with loanDepot, so I
22  couldn't answer that question.  So no.
23      Q.    No, you're not seeking it.  Okay.
24  Wonderful.
25            What we'll do is Exhibit 31, which is a
```

```
 1                      Tinny Suri

 2   March 26, 2020 Huntington National Bank

 3   production, which states -- do you recall

 4   applying for credit with Huntington Bank in March

 5   of 2020?

 6        A.    Yes.  That was my home equity loan.

 7   Yes.

 8                (EXHIBIT 31, CORRESPONDENCE FROM

 9                 HUNTINGTON NATIONAL BANK, 3/26/2020,

10                 WAS IDENTIFIED.)

11        Q.    Okay.  And your credit store at the

12   time from TransUnion says 772; is that correct?

13   Or is it correct that it says that on this

14   document?

15        A.    It's correct it says that.  I don't

16   know what my credit score was back then.

17        Q.    Do you have any reason to believe that

18   Huntington National Bank provided a false credit

19   score on this document?

20        A.    Of course not.

21        Q.    Did you get -- you said this was for

22   your loan refinance?

23        A.    Home equity loan.

24        Q.    Home equity loan.  I apologize.

25        A.    Or personal line of credit.  I'm sorry.
```

1                    Tinny Suri

2     Q.    Personal line of credit.  Okay.

3           So on this personal line of credit did

4  you receive the credit you were seeking?

5     A.    Yes.

6     Q.    Do you believe that you were provided

7  with worse terms than you otherwise would have

8  if --

9     A.    That information was not divulged to

10 me.

11    Q.    Okay.  Are you seeking any damages

12 related to this specific personal line of credit

13 application?

14          MS. BOLOS:  Objection, form.

15    A.    No.

16    Q.    All right.  And if you need a break,

17 please -- we've been going for a little bit --

18 don't hesitate to ask.  I'll be happy to take one

19 with you.  But I'm getting very close to being

20 finished here.  It's hard to see my screen,

21 though.

22          We'll go to Huntington Bank, June 2nd,

23 2021.  We'll mark this as Exhibit 32.

24          (EXHIBIT 32, HUNTINGTON - YOUR CREDIT

25           SCORE AND THE PRICE YOU PAY FOR

1                    Tinny Suri

2            CREDIT, 6/2/2021, WAS IDENTIFIED.)

3      Q.    Do you recall, sir, what credit

4   application this was for?

5      A.    A personal line of credit.

6      Q.    Another personal line of credit?

7      A.    So let me explain real quickly.  When

8   you have a personal line of credit -- on my first

9   mortgage of this home, when you refi, that

10  personal line of credit goes away.  You have to

11  reapply for a second -- a new one.

12            And so that's what I did here.  And the

13  rate was a little higher than before.  And I

14  declined the loan.

15     Q.    Okay.  So this is the one that you

16  declined.  All right.

17            It lists here your TransUnion credit

18  score of 737 as of June 2nd, 2021.  Do you have

19  any reason to believe that Huntington

20  inaccurately reported that credit score on this

21  document?

22     A.    If it's from them, I would assume

23  that's correct.

24     Q.    Okay.  Here on the top of page 2 it

25  says Understanding Your Credit Score.

1                        Tinny Suri

2       A.      Uh-huh (positive response).

3       Q.      It says:

4                       "Key factors that

5                   adversely affected your

6                   credit score."

7               We see here revolving balance to

8    revolving high credit ratio is too high, too many

9    accounts with balances, loan balance to loan

10   amount ratio is too high, excessive amount owed

11   on revolving accounts, and number of inquiries

12   affected your score.

13              Do you see anything on this document --

14   and I'm happy to go through all of these pages

15   with you -- where it identifies any kind of

16   charge-off or delinquent account as a basis for

17   your credit score?

18              MS. BOLOS:  Objection, form.

19      A.      I don't see the reasoning why -- they

20   provide an explanation of rates or anything else.

21   But no, I don't see that.

22      Q.      Okay.  So how do you -- on what do you

23   base your assertion that the rate changed because

24   of TransUnion's reporting of your Wells Fargo

25   account as a paid charge-off?

```
 1                    Tinny Suri
 2            MS. BOLOS:  Objection, form.
 3      A.    I don't know how to address that -- or
 4 answer that question.  So I mean based upon what
 5 I see and being denied a card and based upon my
 6 credit score, the reason for the drop and having
 7 a mark on my credit and trying to clean this and
 8 fix it I think made an effect.  But why it varied
 9 in the credit scores so now it's even lower, I
10 can't answer that.
11      Q.    Okay.  And even though Huntington
12 explained on the top of page 2 factors that
13 affected your credit score, even though it
14 doesn't identify any delinquency, you still
15 believe that the delinquency affected this
16 application?
17      A.    That would be my best assumption, yes.
18      Q.    All right.  We'll go to this next
19 Huntington letter, which is Exhibit 33, dated
20 June 7th, again to you.  And it identifies the
21 reasons why they still have not made a final
22 decision on your application?
23      A.    Uh-huh (positive response).
24            (EXHIBIT 33, NOTICE OF INCOMPLETE
25             APPLICATION AND REQUEST FOR ADDITIONAL
```

```
1                    Tinny Suri
2            INFORMATION FROM HUNTINGTON, 6/7/2021,
3            WAS IDENTIFIED.)
4     Q.    Is that because you decided to decline
5  proceeding with this application?
6     A.    No.  Actually they did come back to me,
7  and it was a higher rate.  And I declined it.
8  And it probably resulted in this.
9     Q.    Okay.  So you did not complete your
10 application because of the higher rate?
11    A.    Correct.
12    Q.    All right.  We'll do Exhibit 34.
13            I swear I'm almost done.  And again, if
14 you would like a break, I'm happy to take one.
15            (EXHIBIT 34, LETTER FROM COLOMBO &
16             COLOMBO, 8/4/2021, WITH ATTACHED
17             DOCUMENTATION FROM FELDMAN KIA,
18             WAS IDENTIFIED.)
19    Q.    Exhibit 34, it's a subpoena response
20 from Colombo and Colombo on behalf of Feldman
21 Kia.  Is Feldman Kia, sir, where you recently
22 purchased or leased your Kia for your wife?
23    A.    That is correct.
24    Q.    All right.  Did you also make an
25 application in 2017 with Feldman Kia?
```

Page 203

```
 1                    Tinny Suri
 2     A.    Seven cars from there.  So you'll find
 3 quite a bit, yes.
 4     Q.    Okay.  So the 2017 application, that
 5 was approved.
 6           Is that application at all part of the
 7 basis for your claims for damages against
 8 TransUnion?
 9           MS. BOLOS:  Objection, form.
10     A.    I don't -- I don't know how to answer
11 that because I believe the charge-off was in
12 2018.  So this was 2017.
13     Q.    All right.  So we'll scroll down here.
14 That's still 2017.
15           Here we go.  July 11th, 2020
16 application with Kia Motors Finance.  It says
17 that was approved.
18           Were you in fact approved by Kia Motors
19 Finance in July of 2020?
20     A.    Sure.
21     Q.    Okay.  And it appears here this is your
22 credit application.  I assume it's all accurate.
23     A.    Uh-huh (positive response).
24     Q.    And is that your signature on page 9 of
25 this application?
```

                            Tinny Suri

1

2      A.     It is.

3      Q.     And then the last page we have your

4   Grand River credit -- Feldman Kia Grand River

5   Avenue credit score and the price you paid for

6   Kia -- for credit.  And it lists your TransUnion

7   credit score as 720.

8             Do you believe as of July 11th, 2020,

9   Feldman Kia had any reason to mislead you as to

10  what your TransUnion credit score was?

11     A.     I would say not.  They're not legally

12  required to provide it, but it's something I can

13  see.

14     Q.     So you have not seen this document to

15  date?

16     A.     They don't share the credit number with

17  anyone.

18     Q.     Okay.  Do you believe your application

19  with Feldman Kia in 2020 was adversely affected

20  by your Wells Fargo Bank account?

21     A.     I can't answer that.  I don't know what

22  levels that they use or how they gauge what

23  interest rate on your lease or purchase of a car

24  based upon what your credit score is.  So I don't

25  know how to answer that question.

```
1                    Tinny Suri

2      Q.    Sir, are you seeking damages related to

3  this application?

4            MS. BOLOS:  Objection, form.

5      A.    Again, I can't answer that because I

6  don't have knowledge of how that will affect my

7  rate.

8      Q.    All right.  Not having knowledge of how

9  it may affect your rate, then do you have any

10 specific understanding of how your rate may have

11 changed?

12     A.    I don't understand.  I mean I don't

13 know -- based upon your credit score, what I

14 understand, as much financing that we've all

15 done -- but based on the credit score, yeah, it

16 depends on what risk level that you land at and

17 what the rates are at that point as to what

18 they're able to offer you.  So I don't know how

19 that affected me diversely or negative or

20 positive.  I don't know.  I can't answer that.

21     Q.    Okay.  I'm going to put one more

22 exhibit on, and that's going to be the last new

23 exhibit I have today.

24           MS. LYONS:  We'll hold you to it, Will.

25           MR. HUSE:  I'll do my absolute best.
```

```
 1                    Tinny Suri
 2  I'm not aware of anything else.
 3            (EXHIBIT 35, CORRESPONDENCE FROM
 4            SYNCHRONY FINANCIAL, 8/13/2021,
 5            WAS IDENTIFIED.)
 6       Q.    This is a response to a subpoena served
 7  by your counsel to Synchrony Bank in 2021.  And
 8  I'm going to go down here to page 4 of this PDF.
 9  Again, it's Exhibit 35 for Synchrony.  It's a
10  CareCredit Rewards card ending in 1637.  And it
11  shows an increased credit limit.
12            Are you seeking damages related to this
13  CareCredit credit card being increased -- having
14  it increased?  I'm sorry.
15            MS. BOLOS:  Objection, form.
16       A.    No.  I mean this is -- we spend a lot
17  of money on our dog.
18       Q.    I understand.
19            We also have as part of this production
20  a JCPenney card where on July 7th, 2021, your
21  credit limit was increased on that card.
22       A.    Okay.
23       Q.    Are you seeking any damages related to
24  the increased credit on your JCPenney card with
25  Synchrony Bank?
```

```
 1                      Tinny Suri

 2            MS. BOLOS:  Objection, form.

 3     A.    Not really.  I mean this is very small

 4  limit credits, but that's fine.

 5     Q.    Okay.  Do you know who provided your

 6  consumer report in relation to the JCPenney

 7  credit increase, if one was provided at all?

 8     A.    I don't know.

 9     Q.    Are there any other credit applications

10  that you can think of today that you believe

11  TransUnion's reporting adversely affected?

12            MS. BOLOS:  Objection, form.

13     A.    I don't recall.  And I don't think I

14  have any more credit applications I've applied

15  for since all this occurred.

16     Q.    All right.  We're done with that.  We

17  will slide back to Exhibit 24, the

18  interrogatories.  We'll go to interrogatory

19  number 10.  If you could read interrogatory

20  number 10 which has to do with your allegations

21  of financial damages and its response.  I'll be

22  happy to scroll through and move it up as you

23  need, please, sir.

24     A.    (Document review.)  Go ahead and scroll

25  down to the end, sir, please.
```

1                    Tinny Suri

2       Q.     (Scrolling.)

3       A.     Okay.

4       Q.    Is this answer -- and I'll scroll down

5   to the next page to show that was your full

6   answer -- is that a complete and accurate

7   response about your financial damages?

8             MS. BOLOS:  Objection, form.

9       A.    Yeah, I would say so.

10      Q.    Do you have any other allegations in

11  support of your financial damages that you would

12  like to add at this time?

13            MS. BOLOS:  Objection, form.

14      A.    No.

15      Q.    All right.  Let's look at interrogatory

16  number 11.

17      A.    (Document review.)  Okay.

18      Q.    (Scrolling.)  And there's your full

19  answer.

20      A.    (Document review.)  All right.

21      Q.    Is the answer to interrogatory number

22  11 as written here full and complete as you sit

23  here today?

24      A.    Yes.

25      Q.    Part of our discussions here today have

```
 1                    Tinny Suri

 2   been about potential emotional distress and

 3   stress and other issues you've dealt with today

 4   that you're seeking to recover for.

 5            How much of your alleged emotional

 6   distress do you believe you can attribute to

 7   Wells Fargo?

 8            MS. BOLOS:  Objection, form.

 9   A.     I think, as a whole -- I'm not

10   individualizing this -- as a whole, I think

11   everything encompassed into one box has created a

12   lot of -- the stress and anxiety.

13            As I mentioned before, I take pride in

14   what I do and what I have and my credit and how

15   hard I've worked to achieve these goals, based

16   upon some of the history that you already know

17   about me, from nothing to where I'm at today.  It

18   becomes stressful when you find out with all that

19   hard work and something like this, a black mark

20   on your credit report, and then you realize that

21   -- you feel like all the entities aren't working

22   together -- and again, that's my assumption; I

23   don't know how you do things -- it has created

24   stress.  It's hard to sleep sometimes because

25   it's on my mind.  And when things are on your
```

1              Tinny Suri

2  mind and as type A as I am to get to where I'm

3  at, it's hard to let things go.  So yes, it does

4  create stress.

5              And with my health, open heart surgery,

6  five bypasses, and type 2 diabetic and just had

7  retina surgery on my right eye, detached, yeah,

8  it causes stress, which is not good for health,

9  either.

10             I hope -- I tried to answer that as

11  best as possible.  But yes.  Even a $3,000

12  writeoff, with the great credit that I have, I'm

13  pretty pissed off.  So let's just say that.  And

14  stressed, yes.

15    Q.    Okay.  Are you able to proportion the

16  amount of stress to the parties individually?

17             MS. BOLOS:  Objection, form.

18    A.    No.  I'm not putting blame on one.  I

19  think this whole thing, like I said, is in one

20  box and it needs to be fixed.  And that's the

21  best thing that I can probably provide as an

22  answer.  But not an individual list.

23    Q.    Okay, sir.  Can you tell me what your

24  annual income was for 2019?

25             MS. BOLOS:  Objection.  Why is that

```
 1                    Tinny Suri

 2   relevant?  I didn't see that you pointed to any

 3   denial that raised an issue with his income.

 4             MR. HUSE:  There was lots of the

 5   applications that we showed today that said

 6   amount of balance to credit used, you know,

 7   affected his credit score.  And therefore his

 8   annual income would affect his ability to pay off

 9   those debts.

10             MS. BOLOS:  Balance to credit used is

11   not -- it's a different analysis.  It's about the

12   credit that was offered and how much of it he's

13   using.  None of them said your income is an

14   issue.

15             MR. HUSE:  Also he included some credit

16   applications which included some income

17   information.  It all goes to his

18   creditworthiness.

19             MS. BOLOS:  I don't agree.  But I've

20   stated my objection.

21             Mr. Suri, you can go ahead and answer.

22   A.    So, yeah.  In 2019 I made $200,000.

23   Q.    Okay, sir.  And how much did you make

24   in 2020?

25             MS. BOLOS:  Objection.  It's not
```

1                        Tinny Suri

2   relevant.  But go ahead and answer.

3        A.     In 2020, because of COVID, I want to

4   say 145.  Everybody's salaries got lowered.  But

5   yes.

6        Q.     Okay.  When did you first decide to

7   reach out to an attorney in this matter?

8        A.     After lack of response from my

9   inquiries.  So however -- you know, they were

10  pursued and all my things submitted between Wells

11  Fargo, TransUnion, and everyone else and I got

12  frustrated, I looked for a consumer protection

13  attorney and found them.

14       Q.     Okay.  You said "lack of response."  We

15  did see that you received responses from

16  TransUnion.

17       A.     Let me rephrase that.  So lack of --

18  well, everything I received was canned.  So it

19  was identical.  So it didn't really emphasize on

20  what the reasons were, but outside of the canned

21  responses.

22              Frustration, lack of acknowledgement

23  between the phone calls to take it serious -- for

24  me.  That's me saying this.  And then at that

25  point I decided to look for an attorney.

```
 1                      Tinny Suri
 2      Q.    Okay.  Do you remember roughly when
 3  that was, what month and year?
 4      A.    Oh, it was last year.  And I don't
 5  remember the month.  I would assume by August,
 6  I'm guessing.  Because by the time I received
 7  back the TransUnion in, I think, July, August, by
 8  that time frame I retained the services of my
 9  attorney, my law firm.
10      Q.    Okay.  Are you seeking to recover your
11  attorney's fees in this matter?
12            MS. BOLOS:  Objection, foun -- sorry.
13  Objection, form.
14            THE WITNESS:  Do I answer that?
15            MR. HUSE:  Yes, sir.
16            MS. BOLOS:  You can answer what you're
17  seeking, what you want out of the lawsuit, sure.
18      A.    Yes.
19      Q.    All right.  Have you paid any
20  attorney's fees to date?
21            MS. BOLOS:  Objection, form.
22            THE WITNESS:  Answer that?
23            MS. BOLOS:  You can answer, Mr. Suri.
24      A.    I have not.
25      Q.    Okay.  Do you know how much you've
```

```
 1                    Tinny Suri

 2  incurred in fees to date?

 3           MS. BOLOS:  Objection, form.  That's

 4  not relevant here.  We're not in a fee petition

 5  situation.  The attorney's fees are not going to

 6  be disclosed.

 7           Mr. Suri, don't answer that question.

 8           And Will, if you keep down this road,

 9  we can end this right now.

10           MR. HUSE:  Well, I do think I'm

11  entitled to it based on what he said.  But I'll

12  go ahead and move on.

13           MS. BOLOS:  Thank you.

14       Q.    Let me go back to the interrogatories.

15  We'll go to interrogatory number 17.  Mr. Suri,

16  if you could read number 17 and its response and

17  let me know when you're finished, please.

18       A.    (Document review.)  Okay.

19       Q.    This interrogatory is asking you

20  whether or not you've received any kind of

21  payments or benefits related to this lawsuit.

22  That's not seeking settlement that you may have

23  already obtained from any of the parties, but I

24  don't believe any parties have settled to date.

25  It's more seeking any kind of insurance or such
```

Page 215

                          Tinny Suri

1
2    type payments from any bank because of any errors

3    that they've otherwise determined.

4              Is your response here accurate as

5    written?

6    A.    Yes.

7    Q.    Do you have anything else to add?

8              MS. BOLOS:  Objection, form.

9    A.    No.

10   Q.    All right.  We'll scroll up to

11   interrogatory 12.  This will be my last four or

12   five questions.  If you could review

13   interrogatory number 12 for me, sir, and its

14   response.

15   A.    (Document review.)  Okay.

16   Q.    (Scrolling.)

17   A.    (Document review.)  Okay.

18   Q.    (Scrolling.)

19   A.    (Document review.)  Okay.

20   Q.    Okay.  Can you describe to me what you

21   believe is a willful violation of law?

22             MS. BOLOS:  Objection, form.

23   A.    I can't address that because I'm not an

24   attorney, number one.  So I don't know what the

25   laws are pertaining to this answer.  And I'd have

1                        Tinny Suri

2   to defer that to my attorney.

3       Q.    Okay.  So as you sit here today, you're

4   not aware of any information that you believe

5   supports a claim of a willful violation of the

6   FCRA by TransUnion?

7            MS. BOLOS:  Objection, form.

8       A.    Again, I can't answer that.

9       Q.    As you sit here today, is there any

10  other information, other than what we've already

11  discussed, that you believe is relevant to your

12  lawsuit against TransUnion?

13           MS. BOLOS:  Objection, form.

14      A.    No.

15           MR. HUSE:  Okay.  I have no further

16  questions.  Thank you very much for your time,

17  sir.

18           THE WITNESS:  Thank you.

19           Just out of curiosity --

20           MS. BOLOS:  We're still on the record,

21  Mr. Suri.

22           THE WITNESS:  Oh.

23           MS. BOLOS:  Yeah.  But let's take a

24  break.  Sarah, I know you're next.  Can we come

25  back at 4?

```
 1                    Tinny Suri

 2            MS. LYONS:  That works.

 3            MS. BOLOS:  Awesome.  Thank you.

 4            THE COURT REPORTER:  Great.  Thank you.

 5            (A RECESS WAS TAKEN FROM 3:44 P.M.

 6             TO 4:00 P.M.)

 7            MS. BOLOS:  So just a housekeeping

 8   thing, everybody.  I'm tracking that it's 4 p.m.

 9   right now, so we're six hours into this dep.  And

10   I think when you peel off the breaks -- there

11   was a total of one hour of breaks.  So we're five

12   hours of deposition time.  I have 30 minutes

13   worth of questions for Mr. Suri.  So please be

14   mindful that we're going to hit the seven-hour

15   mark at 6 tonight.

16            MS. LYONS:  Okay.

17                    EXAMINATION

18   BY MS. LYONS:

19       Q.   Hi, Mr. Suri.  My name is Sarah Lyons.

20   I'm an attorney with the firm Seyfarth Shaw, and

21   I represent Equifax in this matter.

22       A.   How are you doing, Sarah?

23       Q.   Great.  Thanks.

24            So you're aware that Equifax is a

25   consumer reporting agency; correct?
```

1                          Tinny Suri

2        A.     Yes.

3        Q.     I'm going to have you take a look at

4   what I believe was previously marked as

5   Exhibit 15 in this case, the complaint in this

6   action.

7        A.     Okay.

8        Q.     Can you see my screen?

9        A.     I can.

10        Q.     So I'd like you to take a look at

11   paragraphs 39 through 45 with the heading Factual

12   Allegations Relative to Equifax.

13        A.     Okay.

14        Q.     Can you confirm that these factual

15   allegations, as listed in the complaint, form the

16   basis of your claims against Equifax?

17             MS. BOLOS:  Objection, form.

18        A.     I would say yes.

19        Q.     Are there any other facts not listed in

20   paragraphs 39 through 45 of the complaint that

21   support your allegations against Equifax?

22             MS. BOLOS:  Objection, form.

23        A.     Outside of what I just read or anything

24   else on the document that states otherwise, I

25   would say this is accurate.

1                    Tinny Suri

2      Q.    If you look at paragraph 41 -- I'm

3    sorry -- if you look at paragraph 40, the

4    complaint says:

5                    "That disclosure of

6                 Mr. Suri's file contained

7                 inaccurate credit

8                 information relating to

9                 the WFB account."

10               Can you confirm what the inaccurate

11   credit information the complaint refers to is?

12     A.    Yes.  The charge-off for the Wells

13   Fargo account.

14     Q.    I believe you testified earlier with

15   Mr. Gettings that you agree that the account was

16   charged off by Wells Fargo; is that correct?

17               MS. BOLOS:  Objection, form.

18     A.    Yes, by disagreement.  But that's what

19   it was, charged off.

20               MS. LYONS:  I'd like to mark

21   Exhibit 36.

22               (EXHIBIT 36, DISPUTE TO EQUIFAX,

23                 EIS-SURI-0001-45, WAS IDENTIFIED.)

24     Q.    This is what will be marked as

25   Exhibit Number 36.  It's a document Bates stamped

1                           Tinny Suri

2    EIS-Suri-0001 through 45, I believe.

3              Do you recognize this document?

4              MS. BOLOS:  Objection, form.

5        A.    Sure.

6        Q.    Did you prepare this document?

7        A.    No.  My attorneys did.

8        Q.    If I represented that this was a

9    dispute submitted on your behalf and received by

10   Equifax, would you agree with that?

11       A.    Yes.

12       Q.    So what account were you disputing with

13   this written dispute?

14       A.    The Wells Fargo account listed here

15   with the last four numbers ███.

16       Q.    What was the basis of your dispute?

17       A.    Inaccurate reporting on the charge-off.

18       Q.    How did you believe that it should have

19   been reported?

20       A.    Paid in full.

21       Q.    Did you receive a response to this

22   dispute?

23       A.    I'm sorry?

24       Q.    Did you receive a response to this

25   dispute?

1                    Tinny Suri

2       A.    I may have.  I don't recollect.  I

3   can't remember.

4       Q.    I'm going to mark Exhibit Number 37.

5             (EXHIBIT 37, EQUIFAX RESULTS,

6              EIS-Suri-000059-0064, WAS IDENTIFIED.)

7       Q.    Do you recognize this document, what's

8   been marked as Exhibit 37?

9       A.    I may have.  I don't recollect, but I

10  may have received it.

11      Q.    Do you have any reason to doubt that

12  you received it?

13      A.    No.  I think I may have.

14      Q.    So what I believe you see on the screen

15  is the results of Equifax's re-investigation into

16  the Wells Fargo account; is that correct?

17            MS. BOLOS:  Objection, form.

18      A.    Yes.

19      Q.    And you believe the charge-off status

20  is inaccurate?

21      A.    Yes.

22      Q.    What about paid charge-off?

23      A.    It's still a charge-off.

24      Q.    Did you ever dispute -- strike that.

25            Did you ever submit any other disputes

1                    Tinny Suri

2   to Equifax regarding the Wells Fargo tradeline?

3       A.    I don't recall.  I don't know.  I don't

4   think so.

5       Q.    So you never disputed before February

6   of 2021?

7       A.    I don't remember.  I don't recall if I

8   did submit some documents online.  You may want

9   to bring that up so I can at least review it and

10  decide if that was accurate or not.  But I don't

11  remember.

12      Q.    I'm going to mark as Exhibit 38 -- do

13  you recognize this document?  I'm sorry.  I'm

14  going to mark as Exhibit 38 a document entitled

15  Tinny Suri's Responses to Equifax Information

16  Services, LLC's Interrogatories.

17      A.    Yes.  I know this.

18      Q.    Did you assist in preparation of

19  responses to this document?

20      A.    Yes.

21            (EXHIBIT 38, TINNY SURI'S RESPONSES TO

22             EQUIFAX'S INTERROGATORIES, WAS

23             IDENTIFIED.)

24      Q.    I'm going to turn your attention to

25  interrogatory response number 3.

```
 1                      Tinny Suri
 2      A.    Uh-huh (positive response).
 3      Q.    Do you believe, sitting here today,
 4 that this is a true and correct -- true and
 5 complete representation of your communications
 6 with Equifax?
 7           MS. BOLOS:  Objection, form.  Can we
 8 actually read the question?
 9           MS. LYONS:  Sorry.
10           MS. BOLOS:  Thank you.
11      A.    (Document review.)  Okay.  You can
12 scroll down, please.
13      Q.    (Scrolling.)
14      A.    (Document review.)  Okay.  That's
15 pretty accurate.
16      Q.    What do you mean by "pretty accurate"?
17      A.    I mean it's accurate as far as the
18 things that occurred numerically listed on here.
19      Q.    Is there anything that was left out?
20      A.    I don't remember.  I mean I think this
21 is pretty accurate.  So anything else that I may
22 have missed I don't recall.
23      Q.    Have you received any settlement offers
24 from Equifax in this case?
25      A.    I don't remember.  I believe I may
```

```
 1                    Tinny Suri
 2  have.  I'm not sure.
 3     Q.    Are you aware that Equifax sent an
 4  offer of judgment to you on October 7th, 2021?
 5     A.    Okay.  Yeah, I do believe that.  I do
 6  remember.
 7     Q.    Without telling me what was said, did
 8  you discuss this offer of judgment with your
 9  attorney?
10     A.    I did.
11     Q.    Are you aware of the legal implications
12  of an offer of judgment pursuant to Rule 68 of
13  the Federal Rules of Civil Procedure?
14          MS. BOLOS:  Objection, form.
15     A.    I do not know.  I'm not an attorney, so
16  I do not know that.
17     Q.    Did you accept the offer?
18     A.    I did not.
19     Q.    Did you respond to the offer within 14
20  days of service of the offer?
21          MS. BOLOS:  Objection, form.
22          And Sarah, as his counsel, Mr. Suri
23  couldn't directly respond to you.  Are you asking
24  if his attorneys responded to the offer of
25  judgment or are you asking about his
```

```
 1                    Tinny Suri

 2   communications with his attorneys?

 3        Q.    Did your attorneys respond to the offer

 4   of judgment on your behalf within 14 days?

 5             MS. BOLOS: Sarah, I'm going to put

 6   another objection on the record here.  I'm not

 7   even sure that would be within Mr. Suri's

 8   knowledge.  And as his attorney, I can tell you

 9   that I'm pretty sure his attorneys did not

10   respond to Equifax's offer of judgment.  I don't

11   think we're required to.

12        Q.    Are you aware that by rejecting the

13   offer of judgment, you, the plaintiff, must pay

14   the costs incurred by Equifax after the offer was

15   made if the case proceeds to a final judgment

16   that is less favorable than the unaccepted offer?

17             MS. BOLOS:  Objection, form.

18        A.    No.

19        Q.    You're not aware of that?

20        A.    No.

21        Q.    What are you looking for to resolve

22   this case?

23             MS. BOLOS:  Objection, form.

24        A.    As I mentioned before, I don't know

25   what the terms or the legal ramifications of what
```

Page 226

```
 1                    Tinny Suri
 2  the judgments may be according to this type of
 3  case.  So I'm not really -- I mean outside of
 4  clearing my credit, all the other things outside
 5  of that, I'm not able to intelligently respond to
 6  that without knowing the law and what the
 7  judgments may be.
 8      Q.    What amount of money do you believe
 9  will make you whole?
10           MS. BOLOS:  Objection, form.
11      A.    Again, that I would have to leave to
12  the court system and the legal system to decide
13  there.  So I can't answer that as well.
14      Q.    So sitting here today, you have no
15  amount of money in your head that you would
16  accept to resolve this case?
17           MS. BOLOS:  Objection, form.
18      A.    No, I don't.
19      Q.    Let me just ask it a different way.
20           How much would it take for you to
21  settle this case right now if I said I had a
22  blank check from Equifax?
23           MS. BOLOS:  Objection, form.  And I
24  think you've already covered this ground, Sarah.
25      Q.    You can answer.
```

Page 227

1                          Tinny Suri

2      A.     Without confirming -- speaking to my

3 attorneys and the group and all that, I can't

4 answer that question.  I don't know.

5      Q.     How have the actions that you've

6 alleged against Equifax -- again referring back

7 to, I believe, paragraphs 39 through 45 in the

8 complaint -- affected you monetarily?

9              MS. BOLOS:  Objection, form.

10     A.     I believe I addressed that earlier with

11 all the other -- with the other two or three.  It

12 affected favorable rates, I would say personal

13 feelings of pride and hard work I put into this.

14 But mostly financially, the opportunity to obtain

15 a credit, even a credit card being denied.

16 That's pretty embarrassing.  And it affects me

17 emotionally as well.

18              But yeah, I think I covered that

19 earlier.  But the same context applies here.

20     Q.     So you're not able to specifically

21 proportion any of your damages to Equifax's

22 conduct?

23              MS. BOLOS:  Objection, form.

24     A.     Again, I can't answer that because I

25 don't know what agencies use what outside of

1                           Tinny Suri

2   what's already been shown.  I can't answer that.

3       Q.    You testified that the credit card

4   denial was embarrassing to you?

5             MS. BOLOS:  Objection, form.

6       A.    Sure, yes, it was.

7       Q.    Did you tell anyone about the credit

8   card denial?

9       A.    Sure.

10      Q.    Who did you tell?

11      A.    Just friends, people I know, family.

12      Q.    In connection with the Wyndham

13  refinance, you testified that you believe you

14  would have had a more favorable rate but for the

15  reporting on Equifax's credit report; is that

16  accurate?

17            MS. BOLOS:  Objection, form.

18      A.    I didn't say anything about Equifax's

19  credit and Wyndham.  But Wyndham was an example

20  that the lower credit score affected a possible

21  better rate.

22      Q.    Do you know what the possible better

23  rate would have been?

24            MS. BOLOS:  Objection, form.

25      A.    I think that's in the letter that

1                       Tinny Suri

2    Wyndham wrote, that I could have actually put the

3    percentage of points that I could have achieved

4    and the rate.

5         Q.     Have you done anything to mitigate your

6    damages in this case?

7                MS. BOLOS:  Objection, form.

8         A.     When you say "mitigate," in which way?

9         Q.     To make your damages less.

10        A.     I still don't understand what you're

11   asking me to say.  Have I done anything to lessen

12   the burden of my damages --

13        Q.     Yes.

14        A.     -- based on my credit reports?  I don't

15   know what else I can do besides try to resolve it

16   with everyone and my attorneys to help resolve

17   this.  But there's nothing else really I can do.

18               And by the way, I've paid down my

19   credit cards and some I've closed them.  So I've

20   tried to lower my liability.  But that's about

21   it.

22        Q.     What do you claim is the amount of your

23   statutory damages in this case?

24               MS. BOLOS:  Objection, form.

25        A.     Again, I don't know.  I can't answer

1                     Tinny Suri

2   anything -- come to dollar amounts without

3   consulting my attorney and understanding what the

4   law provides in these types of cases.

5       Q.    Have you suffered any other economic

6   losses caused specifically by Equifax's reporting

7   of the Wells Fargo account?

8       A.    I can't recall.  I don't know what the

9   effect is as a whole.  But no, I don't know.

10      Q.    So your damages in this case are

11  related to the Wyndham refinance rate and

12  embarrassment; is that correct?

13          MS. BOLOS:  Objection, form.

14      A.    That's correct.  But also it stopped me

15  from going after any additional credit because of

16  the liabilities placed by what's already existing

17  on a negative.  So why would I go apply for more

18  credit?  So yes, it also precluded me from

19  getting additional credit, personal.

20      Q.    What additional credit were you going

21  to seek?

22      A.    Property, additional property, other

23  things that I've done personally.  So I mean

24  outside of selling my home, I'm looking at other

25  opportunities financially and not asking for

```
 1                    Tinny Suri
 2  loans because it could affect the negative impact
 3  based upon what my credit rating is today amongst
 4  all the bureaus.
 5      Q.    Any other form of damages?
 6            MS. BOLOS:  Objection, form.
 7      A.    I think everything is pretty much
 8  listed.
 9      Q.    Have you been treated by a doctor for
10  any of your emotional damages?
11      A.    No.
12      Q.    And I believe you testified earlier
13  that you haven't seen a mental health counselor
14  in connection with your emotional distress; is
15  that fair?
16      A.    I have not.
17      Q.    If this case were to proceed to trial,
18  what would you ask the judge or jury to give to
19  you?
20            MS. BOLOS:  Objection, form.
21      A.    Again, that's something I don't know.
22  I don't know what I'm allowed, what the law
23  allows.  And I would consult with my attorney.
24  So I can't answer that.
25      Q.    So you filed this lawsuit and you don't
```

```
 1                    Tinny Suri

 2   have an idea of what you want to get out of it?

 3            MS. BOLOS:  Objection, form.

 4       A.    Resolution, whatever that is.  It's up

 5   to this point where I can't answer the question.

 6       Q.    Can you think of anything we haven't

 7   discussed relating to your claims against

 8   Equifax?

 9            MS. BOLOS:  Objection, form.

10       A.    No.  I think everything is in whatever

11   has been submitted in writing.  I think

12   everything it covers, we've covered it all.

13       Q.    So it's fair to say you've told me

14   everything that you believe supports your claims

15   against Equifax?

16            MS. BOLOS:  Objection, form.

17       A.    I believe so, yes.

18            MS. LYONS:  That's all I have for now.

19            MS. BOLOS:  So you're done unless

20   there's time left and you want to do cross, you

21   mean; right?

22            MS. LYONS:  Yes.

23            MS. BOLOS:  Okay.

24            Mr. Suri, do you want to take a

25   five-minute break, come back at 4:30?  And then I
```

                          Tinny Suri

1

2    think I only have about 30 minutes or so.  And

3    then we'll hopefully be done.

4              Does that sound good?

5              THE WITNESS:  Yeah.  I'm good.  We can

6    continue or we can come back in five minutes.

7              MS. BOLOS:  I need about five minutes.

8    So 4:30 for everybody?  I assume that's good.  I

9    don't know where the rest of them are.  All

10   right.  Thanks.

11             (A RECESS WAS TAKEN FROM 4:25 P.M.

12             TO 4:33 P.M.)

13                       EXAMINATION

14   BY MS. BOLOS:

15     Q.    Mr. Suri, I hope I won't keep us all

16   very long here.  I just have a few questions for

17   you.  Same rules apply, verbal responses.

18             Okay.  So we've heard a fair amount of

19   questions about damages here.  Did you rely on

20   your attorneys to determine your damages here?

21     A.    Yes.

22     Q.    And do you believe that your attorneys

23   did in fact assert damages on your behalf here?

24     A.    I'm sorry.  Can you rephrase that?

25     Q.    Yes.  Is it your understanding that

```
 1                      Tinny Suri
 2   your attorneys did assert damages on your behalf
 3   here?
 4             MR. GETTINGS:  Object to the form.
 5   Leading.
 6             You may answer.
 7      A.     Yes.
 8      Q.     Okay.  And in this context in this case
 9   and just going off of everything that's been
10   discussed today, do you know what the word
11   "damages" means?
12      A.     From a legal standpoint, it could be
13   pretty broad or specific.  I don't know because
14   I'm not an attorney.
15             But from a layman's standpoint, I
16   understand what damages mean.  Something to harm.
17   It could be harm you or self-harm or harm by some
18   other thing or people.
19             But outside of the legality, that's all
20   I understand.
21      Q.     Okay.  So to be clear, you don't
22   necessarily know what the statute at issue here
23   means by damages?
24      A.     That is correct.
25      Q.     Okay.  When you were denied the Menards
```

```
 1                    Tinny Suri
 2  card, how did -- strike that.  Let me rephrase
 3  it.
 4              How did the Menards credit card denial
 5  make you feel?
 6      A.    When I first read the letter, I thought
 7  it was a mistake.  I thought it was a mistake.
 8  So in reading the rest of the letter, I was
 9  pretty -- I mean I was angry.  I said:  How can I
10  be denied?  I have a great credit score and a
11  great credit.  And I was initially angry.
12              And then after the next step of finding
13  things out, I became more upset when I realized
14  what was going on with my credit and what has
15  happened, the black mark I had on my credit
16  report from Wells Fargo.
17      Q.    Okay.  And so when you received that
18  Menards credit denial, did you pull your credit
19  reports in relation to that denial?
20      A.    Yes, I did.
21      Q.    Okay.  And with respect to the
22  reporting at issue here, do you believe that
23  Wells Fargo reported the Wells Fargo account with
24  a charge-off status?
25      A.    Do I believe that Wells Fargo reported
```

1                         Tinny Suri

2    the status the way it is as a charge-off?

3        Q.    Uh-huh.

4        A.    Yes.

5        Q.    Okay.  And did you also -- or is it

6    your understanding that the Wells Fargo reporting

7    did not actually report your payment history for

8    a portion of time there was no monthly payment

9    history reported?

10            MR. GETTINGS:  Object to the form.

11   Leading.  Asked and answered.

12            You may answer.

13       A.    Yes.

14       Q.    And do you believe that it was accurate

15   for Wells Fargo to report the account with a

16   charge-off status?

17       A.    I do not believe it was accurate.

18       Q.    Did you miss a payment on the Wells

19   Fargo account?

20       A.    Never.

21       Q.    Do you believe that the charge-off

22   status is a negative notation on your credit

23   file?

24       A.    Yes.

25       Q.    Okay.  Did you at least once dispute

1                    Tinny Suri

2  with Wells Fargo the reporting as a charge-off

3  status?

4      A.    I did dispute that, yes.

5      Q.    Did you dispute at least once with

6  Equifax the reporting of the Wells Fargo account

7  with a charge-off status?

8      A.    Yes.

9      Q.    Did you dispute at least once the

10 reporting to TransUnion of the Wells Fargo

11 account with a charge-off status?

12     A.    Yes.

13     Q.    And did you dispute at least once to

14 Experian regarding the Wells Fargo account with a

15 charge-off status?

16     A.    Yes.

17     Q.    Did you expect with your disputes to

18 Wells Fargo that the charge-off status would have

19 been removed?

20     A.    Yes.  For my dispute, yes, I thought it

21 would be removed.

22     Q.    When you disputed the Wells Fargo all

23 of the times, is that what you wanted?  Did you

24 want Wells Fargo to remove the charge-off status?

25              MR. GETTINGS:  Object to the form.

1                    Tinny Suri

2    Leading.

3            You may answer.

4    A.    Yes.

5    Q.    Do you think you were clear in your

6    disputes to Wells Fargo that you wanted the

7    charge-off status removed?

8    A.    Very much so.

9    Q.    Do you think you supported your

10   disputes to Wells Fargo with documents to have

11   the charge-off status removed?

12   A.    Yes, yes.

13   Q.    In your disputes, whether one or more,

14   with Equifax, did you seek to have Equifax remove

15   the charge-off status related to the Wells Fargo

16   account?

17   A.    Yes.

18   Q.    Do you think your disputes to Equifax

19   clearly indicated you wanted the charge-off

20   status removed from the Wells Fargo account?

21   A.    Yes.

22   Q.    In your disputes to Experian, did you

23   ask them to remove the charge-off status from the

24   Wells Fargo account?

25   A.    Yes.

1                    Tinny Suri

2      Q.    And do you think that your disputes to

3  Experian in requesting that they remove the

4  charge-off status were clear?

5      A.    Yes.

6      Q.    And in your disputes to TransUnion, did

7  you ask them to remove the charge-off status

8  related to the Wells Fargo account?

9      A.    Yes.

10      Q.    And do you believe that your disputes

11  to Experian -- excuse me.  Strike that.

12           Do you believe that your disputes to

13  TransUnion clearly indicated that you wanted the

14  charge-off status on the Wells Fargo account

15  removed?

16      A.    Yes.

17      Q.    If Wells Fargo had removed the

18  charge-off status immediately following your

19  dispute, would you have been pleased with that

20  result?

21      A.    Yes.

22      Q.    And if Equifax had immediately removed

23  the charge-off status from the Wells Fargo

24  account, would you have been pleased with that

25  result?

Tinny Suri

1

2     A.     Yes.

3     Q.     And if Experian had immediately removed

4  the charge-off status from the Wells Fargo

5  account, would you have been pleased with that

6  result?

7     A.     Yes.

8     Q.     And if TransUnion had immediately

9  removed the charge-off status from the Wells

10  Fargo account, would you have been pleased with

11  that result?

12     A.     Yes.

13     Q.     To your knowledge, is Equifax still

14  reporting the Wells Fargo account with a

15  charge-off status?

16     A.     Yes.

17     Q.     To your knowledge, is Experian still

18  reporting the Wells Fargo account with a

19  charge-off status?

20     A.     Yes.

21     Q.     And to your knowledge, is TransUnion

22  still reporting the Wells Fargo account with a

23  charge-off status?

24     A.     Yes.

25     Q.     Do you think it's reasonable that

1                     Tinny Suri

2     Experian continues to report the Wells Fargo

3     account with a charge-off status?

4          A.    No.

5          Q.    Do you think it's reasonable that

6     Equifax continues to report the account, the

7     Wells Fargo account, with a charge-off status?

8          A.    No.

9          Q.    Do you think it's reasonable that

10    TransUnion continues to report the account, the

11    Wells Fargo account, with a charge-off status?

12         A.    No.

13         Q.    And sitting here today, do you believe

14    that Wells Fargo is still reporting the account

15    to Equifax, Experian, and TransUnion with a

16    charge-off status?

17         A.    Yes.

18         Q.    Do you think it's reasonable that Wells

19    Fargo continues to report the account with a

20    charge-off status?

21         A.    Reasonable?  No.

22         Q.    Let me just scroll down here one

23    second.

24               In your disputes to Wells Fargo about

25    the payment history, did you also dispute the

1                    Tinny Suri

2   payment history reporting and that it wasn't

3   reporting your payments after a certain period to

4   Wells Fargo?

5       A.    Yes.

6       Q.    Do you recall if you also disputed the

7   payment history to Equifax?

8       A.    Yes.

9       Q.    Do you recall if you also disputed the

10  payment history to Experian?

11      A.    Yes.

12      Q.    And do you recall if you also disputed

13  the payment history to TransUnion?

14      A.    Yes.

15      Q.    And assuming that Wells Fargo updated

16  the credit reporting to Equifax, Experian, and

17  TransUnion and inserted your payment history,

18  meaning they made the payment history accurate,

19  as you understand it, do you think that's enough

20  or that they should have also still removed the

21  charge-off status?

22           MR. GETTINGS:  Object to the form.  You

23  may answer.

24      A.    They should have removed the charge-off

25  status.

1                      Tinny Suri

2      Q.    And do you think that even if --

3  assuming Experian's credit file about you now

4  reflects accurate payment history, is that enough

5  or should they have also removed the charge-off

6  status?

7      A.    Removed the charge-off status.

8      Q.    And assuming that Equifax is now --

9  that your Equifax credit file now accurately

10  reflects your payment history, is that enough or

11  should Equifax have removed the charge-off

12  status?

13              MS. LYONS:  Object to form.

14      A.    Removed the charge-off status.

15      Q.    And assuming that TransUnion has

16  updated its credit file about you and is

17  accurately reflecting the payment history as you

18  understand it, is that enough or should

19  TransUnion have removed the charge-off status?

20              MR. HUSE:  Object to form.

21      A.    They should remove the charge-off

22  status.

23      Q.    So when you were disputing with Wells

24  Fargo -- whether it was in the phone calls or

25  written communications, letters or emails or

```
 1                     Tinny Suri

 2   faxes or chats, the whole gamut, the entirety of

 3   your dispute record with Wells Fargo -- when

 4   Wells Fargo would respond to you and tell you

 5   that the charge-off status was going to remain,

 6   how did that make you feel?

 7             MR. GETTINGS:  Object to the form.  You

 8   may answer.

 9        A.    I was very upset, very disappointed in

10   lieu of all the evidence I provided, including

11   the affirmation agreement.  Yes, upset.

12        Q.    Do you feel like you spent time

13   disputing to Wells Fargo material time?

14        A.    I spent a lot of time for that small

15   amount.  But yes.

16        Q.    Did the time you spent disputing to

17   Wells Fargo, was that otherwise time you would

18   have maybe spent with family or resting or some

19   other activity?

20             MR. GETTINGS:  Object to the form.

21   Leading.

22             You may answer.

23        A.    Yes.  And my job.

24        Q.    How many disputes do you think you

25   should have sent Wells Fargo to trigger them to
```

1                     Tinny Suri

2   correct the credit reporting?

3            MR. GETTINGS:  Object to the form.

4   Leading.

5            You may answer.

6      A.    Once but twice at a maximum.  But it

7   didn't happen.

8      Q.    Okay.  And how did it make you feel

9   when you -- covering all of your disputes with

10  Equifax, whatever number they were, one or more,

11  when they would respond or when you pulled your

12  credit file afterwards and saw that the credit

13  reporting wasn't corrected?

14     A.    How did I feel?

15     Q.    Uh-huh.

16     A.    I was very upset looking at that credit

17  score.

18     Q.    Right.  And for Experian -- with whom

19  you also disputed and, again, just assuming the

20  entire dispute record that you have with Experian

21  and assuming it was your understanding that

22  Experian received the dispute letter -- when you

23  reviewed your Experian credit file after the

24  dispute and saw that the credit reporting was not

25  corrected, how did that make you feel?

                          Tinny Suri

1

2      A.    Same.  Upset.

3      Q.    And then for TransUnion and your entire

4  dispute record as to TransUnion, when you pulled

5  your credit file and saw that TransUnion still

6  hadn't corrected the credit reporting, how did

7  that make you feel?

8      A.    Same thing.  Upset, disappointed.

9      Q.    Okay.  I just have a few more questions

10  actually.  One second.  Oh, okay.

11          I think any number of the attorneys on

12  this deposition today have shown you copies of

13  your dispute letters.  But let's start with

14  Experian.  They showed you the dispute letter

15  that had your name and your address in the

16  center.  And if you'll forgive me, I don't

17  remember what exhibit that is.  And it had an

18  address for Experian, I think it was Parkway,

19  Allen, Texas.

20          Do you recall the letter I'm

21  describing?

22      A.    I understand.  I remember.

23      Q.    Okay.  And then Experian also showed

24  you a certified mail receipt, and it was also for

25  that 701 Parkway address.

1                          Tinny Suri

2                  Do you recall seeing that today?

3      A.      Yes.

4      Q.      Okay.   And then Experian also showed

5  you -- I think it was a January 2021 disclosure

6  of your credit file.   When you pulled your credit

7  file from Experian, Experian showed you a copy of

8  it.   And they scrolled to the bottom and they

9  pointed to a PO box address.

10                 Do you recall that?

11     A.      I do.

12     Q.      Okay.   Going back to the letter that I

13  initially described, did you provide that mailing

14  address for Experian to your attorneys?

15     A.      I don't recall.   I don't know.

16     Q.      Do you remember at any point having --

17  you know, looking up Experian's mailing address

18  in 2021 in preparation for that dispute letter

19  yourself?

20     A.      I could have.   I may have.

21     Q.      And if I were to represent to you that

22  I put that address on that letter, do you think

23  that's an accurate statement?

24                 MR. GETTINGS:   Object to the form.

25  Leading.

                        Tinny Suri

1

2       A.      Yes.

3       Q.      Okay.  And if I were to represent to

4  you that after you signed that dispute letter, I

5  had it mailed by a third party, would you agree

6  that that's an accurate statement?

7       A.      Yes.

8       Q.      And then I think it may have been

9  TransUnion that also pointed to a dispute letter

10 from around the same time, February of 2021.  And

11 there was also an address for TransUnion at the

12 top left.  And if I were to represent to you that

13 I, as your attorney, put that address on that

14 letter to TransUnion, would you agree that that's

15 accurate?

16      A.      Yes.

17      Q.      And if I were to represent to you that

18 after you signed the letter, I had the letter

19 mailed on your behalf, would you agree that

20 that's correct?

21      A.      Yes.

22      Q.      At some point -- well, let me ask the

23 question.  Strike that.

24              Do you recall earlier this year at

25 some point going to a website

```
 1                     Tinny Suri

 2  www.annualcreditreport.com and trying to download

 3  your TransUnion credit file?

 4           Do you recall that?

 5     A.    I do.

 6     Q.    Do you recall that TransUnion -- well,

 7  strike that.

 8           Do you recall whether you were able to

 9  access your TransUnion credit file that day from

10  that website?

11     A.    I don't remember.  I believe I wasn't

12  able to download it.  But I don't remember.  It's

13  been a while.

14     Q.    If I were to represent to you that on

15  June 29th, 2021, you tried to download your

16  TransUnion credit file from

17  annualcreditreport.com and you were denied

18  access, would you believe that that was an

19  accurate statement?

20     A.    Sure.

21           MR. HUSE:  Objection.  Hey, that's

22  ridiculous.  You're saying:  If I were to

23  represent to you that someone may have violated

24  something and you did something you have no

25  recollection of, would you agree that happened?
```

```
1                    Tinny Suri
2   That's ridiculous.  That's a wholly objectionable
3   question.
4             MS. BOLOS:  We can give it to you if we
5   haven't already disclosed it.  It's what
6   happened.
7             MR. HUSE:  Well, I have documents I'll
8   be happy to discuss with him.  But he already has
9   said that he doesn't recall that, and now you're
10  telling him:  Isn't it true that's what happened?
11            MS. BOLOS:  No.  I asked him if I
12  represented to him that that's what happened,
13  would he agree, and he said yes.
14            MR. HUSE:  Right.  But he already said
15  he has idea.  He's just agreeing with you, his
16  attorney.  It's a wholly objectionable question.
17            MS. BOLOS:  Okay.  That's fine.  It's
18  not really a hill to die on, Will.  And if we
19  haven't given it to you, we will.  But I think at
20  some point you may have said "yea" when you
21  thought that you got him to tell you that he's
22  never been denied a copy of his TransUnion
23  report.
24            MR. HUSE:  Maybe so.  So what?
25            MS. BOLOS:  So I just want to make sure
```

1                    Tinny Suri

2    we're building an accurate record.

3              MR. HUSE:  Right.  He said he didn't

4    recall -- and what did he --

5              MS. BOLOS:  I'm going to continue.  I'm

6    not going to have you take up any more of my

7    time.  I gave you your time, and I'm going to

8    continue.

9              MR. HUSE:  You just talked about my

10   response to him.  You're telling him now that:

11   Hey, even though you said you weren't asserting

12   this claim, aren't you really trying to assert

13   this?

14             MS. BOLOS:  I'm not talking -- the

15   question is done.  He answered it, and you

16   objected over it.

17             MR. HUSE:  No.  It's a wholly improper

18   question --

19             MS. BOLOS:  And you brought it up.

20             MR. HUSE:  -- and I'll be asking

21   questions.  So that's fine.

22             MS. BOLOS:  Well, as soon as you let me

23   finish, and hopefully there's time for redirect.

24             MR. HUSE:  Well, I'll be moving -- if

25   you don't leave me time for redirect, I'll be

```
 1                    Tinny Suri
 2   moving --
 3            MS. BOLOS:  Not that I didn't leave
 4   you.  We can look at how much time all of you
 5   sucked up.  And I'm pretty sure I've been on here
 6   for 23 minutes.  I'd love to see you move for
 7   that.
 8            MR. HUSE:  And there's still plenty of
 9   time.
10            MS. BOLOS:  Okay.  Are you done?  Or we
11   can keep burning the time this way.
12            Are you done?  I just want to make sure
13   you're done.
14            MR. HUSE:  Go ahead and finish your
15   questioning.
16            MS. BOLOS:  Thank you.
17       Q.   Okay.  Mr. Suri -- actually I might
18   even be done here.  Let me just clarify.
19            Mr. Suri, I just want to make sure we
20   got this right.  You applied for a refi in either
21   March or April of 2021; is that correct?
22            MR. GETTINGS:  Object to the form.
23   Leading.
24       A.   Correct.
25       Q.   Okay.  And then in around June of 2021
```

1                    Tinny Suri

2   you separately applied for a new purchase

3   mortgage; is that correct?

4        A.    Yes.

5        Q.    Okay.  And why did you apply for a new

6   purchase mortgage in June of 2021?

7        A.    Well, number one, hot market.  Number

8   two, downsizing for my house.

9              MS. BOLOS:  Okay.  I think that is

10  actually all I have now.  So I at this point am

11  done.  And I think we can go back to everybody

12  else if they have another round of questions

13  here.

14                   EXAMINATION

15  BY MR. GETTINGS:

16       Q.    I'll be brief.  This is Dave for Wells

17  Fargo.

18             I've got on my list four questions,

19  although sometimes it gets expanded.

20             All right.  So I just want to make it

21  clear what you testified to earlier today.

22             You jointly agreed to the terms of the

23  Wells Fargo credit card agreement; correct?

24       A.    Correct.

25       Q.    You jointly agreed that your wife

1                         Tinny Suri

2    filing bankruptcy would be an event of default

3    under the credit card agreement; correct?

4              MS. BOLOS:  Objection, form.

5         A.    Based upon what was written -- what you

6    showed me subjective, yes.

7         Q.    And you jointly agreed with your wife

8    that she would file bankruptcy; correct?

9         A.    Yes.

10        Q.    So at the time your wife filed

11   bankruptcy, you were aware that that was an event

12   of default under the credit card agreement;

13   correct?

14             MS. BOLOS:  Objection, form.

15        A.    No, I wasn't.

16        Q.    At the time your wife filed bankruptcy,

17   you had everything in front of you to understand

18   that the filing of bankruptcy was an event of

19   default under the credit card agreement; correct?

20             MS. BOLOS:  Objection, form.

21        A.    I may have, yes.

22        Q.    Okay.  So based on what we just

23   discussed, what did Wells Fargo do wrong?

24             MS. BOLOS:  Objection, form.

25        A.    So going back, I think I answered this.

1                    Tinny Suri

2    The bankruptcy wasn't even finalized by anybody

3    or by any judge or approved until months later.

4    And Wells Fargo prematurely on April 4th or 6th,

5    whatever it was, defaulted on the loan.

6        Q.    So where in the Wells Fargo credit card

7    agreement does it say that the bankruptcy has to

8    be finalized and discharged before it's an event

9    of default?

10            MS. BOLOS:  Objection, form.

11       A.    I can't address that.

12       Q.    Why not?

13       A.    Because I don't know.  I didn't read

14   the whole agreement.  So I couldn't tell you the

15   answer to that.  And my conversation with the

16   attorney, that's different -- the other attorney

17   -- was much different than --

18       Q.    Well, you would agree that if the

19   contract says the filing of bankruptcy is an

20   event of default, your wife did that; correct?

21            MS. BOLOS:  Objection, form.

22       A.    Yeah.  Under my wife, not under me.

23   But yes.

24       Q.    And your wife is an account holder to

25   the credit card agreement; correct?

```
 1                    Tinny Suri

 2     A.     Understood.

 3     Q.     Correct?

 4     A.     Correct.

 5            MR. GETTINGS:  Okay.  Well, it wasn't

 6  four questions, but I'm officially done now.

 7            MR. HUSE:  Callie, just so we stay in

 8  order, do you have any followup questions?

 9            MS. BARR:  Yeah, just a couple.

10                    EXAMINATION

11  BY MS. BARR:

12     Q.     Mr. Suri, did you have any other

13  disputes that you brought to Experian besides

14  that February letter that we went over together?

15     A.     I don't believe so.  I think that was

16  it.

17     Q.     And did you read that dispute letter

18  before it was sent?

19     A.     Yes.

20     Q.     Did you sign it?

21     A.     Yes, I believe so.  Yes.

22     Q.     How did you sign it?

23     A.     With DocuSign.

24     Q.     Does your attorney's name appear

25  anywhere on that dispute letter?
```

1                    Tinny Suri

2      A.    I believe so.  I don't recall.  I don't

3  remember without having it in front of me.  But

4  it may.

5      Q.    I can pull it up if we want to take a

6  look at it.

7      A.    That's fine.

8      Q.    As you see, your name and address is

9  right here; is that right?  (Indicating.)

10     A.    That's fine.  Yes, I see it.

11     Q.    Great.  Thank you.  And Experian's

12 address right here?  (Indicating.)

13     A.    Yes.

14     Q.    We have the certification that it was

15 delivered on page 2.  Are you with me?

16     A.    Uh-huh (positive response).

17     Q.    And then here on your letter it says

18 "To whom it may concern."  We have your concerns.

19           Do you see your attorney's name on here

20 anywhere?

21     A.    No.  They did this on my behalf so --

22     Q.    But it doesn't say anywhere on here

23 that they did this on your behalf; is that right?

24     A.    It doesn't say it, but I know it.

25     Q.    Right.  Okay.  But that's not the

1                          Tinny Suri

2    question.  The question is just:  Their name is

3    not on here anywhere; is that right?

4        A.    It doesn't seem like it.  It's

5    something they did for me.

6        Q.    Okay.  But their name is not on here,

7    though; right?

8        A.    Correct.

9            MS. BARR:  That's it for Experian.

10   Thank you.

11                       EXAMINATION

12   BY MR. HUSE:

13       Q.    All right, Mr. Suri.  I only have a

14   couple quick questions.

15            Earlier today you said you did not

16   recall ever requesting your consumer disclosure

17   from TransUnion and not receiving it.  After --

18            MS. BOLOS:  Objection to form.

19            Oh, I'm sorry.  I thought you were

20   finished.

21   BY MR. HUSE:

22       Q.    After the rest of your deposition

23   testimony today, do you have any recollection of

24   requesting your consumer disclosure from

25   TransUnion and not receiving it?

1                    Tinny Suri

2      A.    So yes, I remember going to

3  annualreport.com to pull it.  But I forgot if I

4  did receive it or didn't receive it.  But I do

5  remember pulling it.  But after I got reminded, I

6  do believe that they denied it.  And I take a

7  copy, a screenshot, of everything so I can send

8  it to my attorney.  So she may have a record of

9  that.  But that's the best answer I can give you

10 because many things have happened between now and

11 then.

12     Q.    Okay.  Do you remember when that

13 happened?

14           MS. BOLOS:  Objection, form.

15     A.    I'm guessing in June, July, June.

16     Q.    Of which year?

17     A.    Well, like it could be a little further

18 because it was after I retained their services.

19 So it could have been after -- it was last year.

20 It was 2020, I believe.

21           Well, you know what?  I don't remember

22 which year.  Because, like I said, many things

23 have happened.  But I believe -- it could have

24 been this year.  I can't remember unless I see

25 the document.  There's so many things that

1                    Tinny Suri

2  happened in this case that I just don't remember.

3      Q.    Okay.  One second.  I'll put that

4  document up for you.

5      A.    You have it?

6      Q.    Can you see my screen now?

7      A.    I can.

8      Q.    Does this look like what you received

9  when you attempted to obtain your credit

10  report --

11      A.    Sure.

12      Q.    -- through annualcreditreport.com

13      A.    Correct.

14      Q.    Okay.  And the date on the bottom of

15  the screenshot appears to be June 29th, 2021 of

16  this year.

17      A.    I got June right.  But yeah.

18      Q.    Does that seem like the accurate date

19  for when this occurred?

20      A.    Yes, it does.

21      Q.    It says here that upon your request,

22  the system was not able to confirm your identity.

23           Does that seem like what you remember

24  happening?

25      A.    Sure.  If it's on here and that's my

Page 261

1                    Tinny Suri

2    screenshot and that's what it says, yes.  And I

3    must have a copy, yes.

4        Q.    It also says you can request your free

5    credit report by phone or by mail.

6              Did you do either of those?

7        A.    I don't recall.  I don't.

8        Q.    Are you asserting a claim against

9    TransUnion for their failure to provide you with

10   a copy of your consumer disclosure in response to

11   this request?

12             MS. BOLOS:  Objection, form.

13       A.    I don't think not receiving a credit

14   report that I'm filing a claim against

15   TransUnion, no.

16       Q.    Okay.  During your testimony with

17   Ms. Bolos, she asked you a number of questions

18   of did you think some of the defendants'

19   responses were reasonable and whether or not they

20   updated their reporting based on your request, in

21   which you said it was not reasonable.

22             I do believe I asked a number of

23   questions about TransUnion's reporting and

24   whether or not it was reasonable and their

25   re-investigations, if they were reasonable.  But

```
1                      Tinny Suri
2   I don't believe you answered those.
3            What would you believe a reasonable
4   re-investigation by TransUnion into your disputes
5   would have included?
6            MS. BOLOS:  Objection, form.
7       A.    So two different people asked me two
8   different questions in the same context.  But let
9   me explain.
10            Personally, I don't believe it was good
11  enough.  The charge-off should have been removed.
12  That's number one.
13            Number two, you did ask me this prior,
14  and I'll give you the same answer.  I do not know
15  what your investigation process entails, how deep
16  it goes, how much is involved.  So I can't
17  address that.  But the conclusion should have
18  been, in my view, the charge-off should have been
19  removed.  That's the best answer I can provide.
20      Q.    Okay.  So in your opinion, because the
21  re-investigation did not result in the charge-off
22  being removed, do you believe that the
23  re-investigation by TransUnion was unreasonable?
24      A.    If it wasn't removed, I would have to
25  assume yes.
```

Page 263

```
 1                      Tinny Suri

 2     Q.    Okay.  So do you know what the legal

 3  standard for reasonability is?

 4           MS. BOLOS:  Objection, form.

 5     A.    I do not.  Legal jargon I do not

 6  understand.

 7           MR. HUSE:  Okay.  No further questions

 8  from TransUnion.

 9           THE COURT REPORTER:  Are we finished?

10           MS. LYONS:  I have one or two.

11                   EXAMINATION

12  BY MS. LYONS:

13     Q.    Mr. Suri, earlier you testified that

14  you sent a dispute to Equifax; correct?

15     A.    Correct.

16     Q.    And it was just one dispute; correct?

17     A.    I believe so, yes.

18     Q.    Do you believe that Equifax's

19  re-investigation of your dispute was reasonable?

20           MS. BOLOS:  Objection, form.

21     A.    I think that's the same -- kind of the

22  same context I just answered that other question

23  with TransUnion.  In my eyes, if it's still there

24  as a charge-off, for me it was not reasonable.

25     Q.    What do you believe a reasonable
```

1                      Tinny Suri

2  re-investigation by Equifax would have entailed?

3           MS. BOLOS:  Objection, form.

4      A.    Again, as my last comment and

5  statement, I don't know what Equifax's internal

6  processes are for investigating.  And so in my

7  personal opinion, if that charge-off is still

8  remaining, I'm not satisfied with the outcome.

9      Q.    So in your personal opinion, any

10  reinvestigation that resulted in the charge-off

11  designation remaining on your credit file would

12  have been unreasonable; correct?

13           MS. BOLOS:  Objection, form.

14      A.    Yes.  Based on what was provided, yes.

15           MS. LYONS:  Nothing further.

16           MS. BOLOS:  I think that's it.  We're

17  done.

18           MR. GETTINGS:  Thank you, Mr. Suri.  We

19  appreciate your time.

20           THE WITNESS:  Thank you everyone.

21           MR. HUSE:  I'm going to put on the chat

22  really quickly that last document?

23           THE COURT REPORTER:  Do you want that

24  to be 39?

25           MR. HUSE:  Yes, please.

```
 1                    Tinny Suri

 2              (EXHIBIT 39, TRANSUNION UNABLE TO

 3               COMPLETE REQUEST - SURI 004916,

 4               WAS IDENTIFIED.)

 5              THE COURT REPORTER:  Ms. Bolos, do you

 6   want a copy of the deposition?

 7              MS. BOLOS:  An eTrans copy, please,

 8   yes.

 9              THE COURT REPORTER:  Sarah?

10              MS. LYONS:  I think we have a standard

11   order with TSG.

12              THE COURT REPORTER:  William?

13              MR. HUSE:  eTran, please.

14              THE COURT REPORTER: Callie?

15              MS. BARR:  I think we have a standard

16   order as well for Experian.  Just go with that.

17   But yeah.

18              MR. GETTINGS:  Just electronic PDF is

19   fine with us.

20              (A DISCUSSION WAS HELD OFF THE RECORD.)

21              (THE DEPOSITION OF TINNY SURI WAS

22               CONCLUDED AT 5:10 P.M.)

23

24
```

1                           Tinny Suri

2                  C E R T I F I C A T E

3

4          I do hereby certify that the foregoing

5    proceedings were taken down by me and transcribed

6    using computer-aided transcription and that the

7    foregoing is a true and correct transcript of

8    said proceedings.

9          I further certify that I am neither of

10   counsel nor of kin to any of the parties, nor am

11   I in anywise interested in the result of said

12   cause.

13          I further certify that I have earned the

14   certifications awarded by the National Court

15   Reporters Association of RPR,RMR,RDR,CRR,CRC,RSA.

16   DATED: NOVEMBER 30, 2021

17

18

19                   *Debra Isbell*

20   _____
     DEBRA AMOS ISBELL, CCR,RDR,CRR
21   NCRA (expires 12/31/2021)
                 Registered Professional Reporter
22               Registered Merit Reporter
                 Registered Diplomate Reporter
23               Certified Realtime Reporter
                 Certified Realtime Captioner
24               Realtime Systems Administrator

1                        Tinny Suri

2              CERTIFICATE OF WITNESS

3

4  SURI v. EQUIFAX, et al.  2:21-CV-10866-LJM-CI

5

6              I, TINNY SURI, do hereby certify that on

7  this _____ day of _____ 2021 I have

8  read the foregoing transcript and to the best of

9  my knowledge it constitutes a true and accurate

10 transcript of my testimony taken on oral

11 examination on November 16, 2021.

12

13

14

15

16

17                    _____

18                    TINNY SURI

19                    DATE: _____

20

21                    _____

22                    WITNESS TO SIGNATURE

23

24

1                        Tinny Suri

2                 CERTIFICATE OF CHANGE

3   SURI v. EQUIFAX, et al.   2:21-CV-10866-LJM-CI

4        Under penalty of perjury, I, TINNY SURI,
    declare that I have read the foregoing transcript
5   and hereby swear that my testimony therein was
    true at the time it was given and is now true and
6   correct, including any corrections  and/or
    amendments listed below:
7        Subscribed and sworn to before me this
    _____ day of _____ 20____.
8

9
                        _____
                        TINNY SURI
10
                        _____
11                      NOTARY PUBLIC

12  My Commission Expires:

13  PAGE   LINE              CHANGE            TO

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____