# ATTACHMENT 2

Deposition Transcript

Of Debra Suri

Held On November 22, 2021

*(Redacted Pursuant to F.R.Civ.P. 5.2)*

1

2

THE UNITED STATES DISTRICT COURT

3

EASTERN DISTRICT OF MICHIGAN

4

5

TINNY SURI,                          )
6                                    )
              Plaintiff,     )No.2:21-cv-
7                            )10866-LJM-C1
                             )
8            vs.             )
                             )
9  EQUIFAX INFORMATION       )
   SERVICES, LLC; EXPERIAN   )
10 INFORMATION SOLUTIONS, INC.; )
   TRANS UNION, LLC; and     )
11 WELLS FARGO BANK, N.A.,    )
                             )
12            Defendants.    )
   ----------------------------

13

14

15

16

17        REMOTE DEPOSITION OF DEBRA SURI

18

19        Monday, November 22, 2021

20

21

22

23

24  Reported by:
    LISA M. MURACO
25  JOB NO. 202606

1

2

3

4                    Monday, November 22, 2021

5                    10:00 a.m.

6

7

8        Deposition of DEBRA SURI, held VIA

9   ZOOM, before LISA M. MURACO, a Notary

10  Public of the State of New York, New

11  Jersey, Florida.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2   A P P E A R A N C E S:

3   (VIA VIDEOCONFERENCE)

4

5       LYNGKLIP & ASSOCIATES,

6       CONSUMER LAW CENTER, PLC

7       Attorneys for Plaintiff

8           13751 W Eleven Mile Road

9           Oak Park, Michigan 48237

10      BY:   IAN LYNGKLIP, ESQ.

11

12      TROUTMAN PEPPER HAMILTON SANDERS LLP

13      Attorneys for Defendant Wells Fargo Bank,

14      N.A.

15          222 Central Park Avenue

16          Virginia Beach, Virginia 23462

17      BY:   MARK KUNDMUELLER, ESQ.

18

19

20      JONES DAY

21      Attorneys for Experian

22          150 W Jefferson Avenue

23          Detroit, Michigan 48226

24      BY:   CALLIE BARR, ESQ.

25

1

2    A P P E A R A N C E S (CONTINUED):

3    (VIA VIDEOCONFERENCE)

4

5

6         SCHUCKIT & ASSOCIATES, P.C.

7         Attorneys for Trans Union

8              4545 Northwestern Drive

9              Zionsville, IN 46077

10    BY:   WILLIAM HUSE, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    D. Suri
 2    D E B R A   S U R I,
 3         called as a witness, having been duly sworn
 4         by a Notary Public, was examined and
 5         testified as follows:
 6    EXAMINATION BY
 7    MR. KUNDMUELLER:
 8         Q.    Good morning.
 9         A.    Good morning.
10         Q.    My name is Mark Kundmueller and I
11    represent one of the defendants in this matter,
12    Wells Fargo Bank.
13               And have you ever had your
14    deposition taken before?
15         A.    I have not.
16         Q.    Okay.
17               So let me just explain the process a
18    little bit.
19               This is just our opportunity to find
20    out some information -- find out what you know.
21               MR. LYNGKLIP:  Mark.
22               MR. KUNDMUELLER:  Yes, sir.
23               MR. LYNGKLIP:  I'm sorry to
24         interrupt.  I just thought we should get
25         our appearances on the record before you
```

                          D. Suri

1        start.  I apologize for interrupting.

2                MR. KUNDMUELLER:  Okay.

3                MR. LYNGKLIP:  I was trying to raise

4        my hand so I didn't have to actually

5        interrupt.  If you don't mind, I'll go

6        first if that's okay.

7                MR. KUNDMUELLER:  Sure.

8                MR. LYNGKLIP:  Sure.

9                Hi, Ian Lyngklip here on behalf of

10       the plaintiff, Tinny Suri.  I'm going to be

11       representing Ms. Suri in her deposition

12       this morning as well.

13               MR. KUNDMUELLER:  Okay.  Mark

14       Kundmueller on behalf of Wells Fargo Bank

15       NA, one of the defendants in this matter.

16               MR. HUSE:  William Huse on behalf of

17       TransUnion LLC.

18               MS. BARR:  Hi, I'm Callie Barr on

19       behalf of Experian Information Solutions.

20               MR. LYNGKLIP:  Thank you,

21       Mr. Kundmueller.  I appreciate it.

22               MR. KUNDMUELLER:  No problem.

23    BY MR. KUNDMUELLER:

24       Q.    So as I was saying, Ms. Suri, this

                              D. Suri

1    is just our chance to find out what information

2    you might know about some of things that are at

3    issue here.

4

5              So it's not meant to be a marathon

6    or anything stressful.

7              If there's any time today when you

8    want to take a break or stop for a while,

9    please just let me know, okay?

10        A.    Okay.

11        Q.    All right.

12              And since it's our chance to find

13   out some information, our main goal here is to

14   take care of our court reporter.  She's got

15   the -- she's the important one with the

16   difficult job here and she has to take down

17   everything we say.

18        A.    Okay.

19        Q.    And so I wanted to make sure, just

20   to get some ground rules out, that you do like

21   you've been so far, wait until -- if I ask a

22   question, wait until I've completely finished

23   the question before you answer.

24              And I will try to do my best to make

25   sure that I don't ask another question until

D. Suri

1
2    you completely finished your answer, okay?

3        A.    Yes.

4        Q.    As you've been doing so far, you've

5    been doing great, please make sure you give a

6    clear verbal response because she's working

7    hard to take everything down, and can't see

8    when you nod or shake your head.  It's got to

9    be out loud and if you can, avoid things like

10   uh-uh or uh-uh, because those are very

11   difficult to get down accurately, okay?

12       A.    Understood.

13       Q.    And if there's any time I ask a

14   question that doesn't make sense or you don't

15   understand, please stop me, ask me to clarify

16   or reread the question, okay?

17       A.    Yes.

18       Q.    And if you go ahead and answer the

19   question, can I assume then that you understood

20   the question?

21       A.    Yes.

22       Q.    Okay.

23             Are you currently taking any

24   medications or drugs that could somehow affect

25   your testimony, for example, your memory or

```
 1                        D. Suri
 2    your ability to hear the questions this
 3    morning?
 4         A.    No.
 5         Q.    Do you have any impairments,
 6    difficulty hearing, anything like that, that
 7    could affect your ability to hear and
 8    understand the questions this morning?
 9         A.    No.
10         Q.    Okay.
11               Can you please state your full name
12    for the record.
13         A.    Debra Lee Suri.
14         Q.    Have you ever been gone by any other
15    names?
16         A.    Yes.  My maiden name is Debra Lee
17    Reed, R-E-E-D, and my first marriage, Debra Lee
18    Lang, L-A-N-G.
19         Q.    What's your date of birth?
20         A.    ███████████████.
21         Q.    And what is your current address?
22         A.    █████████████████████████████,
23    █████████████.
24         Q.    Excuse me.
25         A.    Excuse me.
```

```
                                                    Page 10
 1                      D. Suri

 2        Q.    No problem.

 3              How long have you lived at that

 4    address?

 5        A.    It's going on six years, I believe.

 6    Or just six years.

 7        Q.    Do you recall exactly when you moved

 8    to that address?

 9        A.    June of -- let's see, six years from

10    '21.  So was it 2016, 2015.

11        Q.    Okay.  2015.

12              And where did you live prior to

13    that?

14        A.    We lived in ███████████████████.

15        Q.    And what was the address there?

16        A.    I don't recall.  I know it was

17    █████████████████████████████████████

18    ██████.  But I'm not a hundred percent sure.

19        Q.    Okay.

20        A.    I'm sorry.  I don't remember little

21    details like that.

22        Q.    That's perfectly okay.

23              Are you currently married?

24        A.    Yes.

25        Q.    What is your spouse's name?
```

1                      D. Suri

2      A.      Tinny Asmat Suri.

3      Q.      And when did you get married?

4      A.      March 1st, 2003.

5      Q.      Okay.

6              And you've been continuously married

7   since that time?

8      A.      Yes.

9      Q.      Okay.

10             Congratulations.

11     A.      Thank you.

12     Q.      All right.

13             What's the highest level of

14   education you've had?

15     A.      An associate's degree in business.

16     Q.      And where did you obtain that

17   degree?

18     A.      Well, I -- I actually obtained it

19   through two colleges.  Oakland University.  I

20   started out in nursing as an RN, but decided

21   that wasn't for me.  So I continued on in OCC.

22   Oakland Community College.

23     Q.      Okay.

24             And when did you graduate with that

25   degree?

1                        D. Suri

2        A.     Well, I had taken part-time classes

3   for about six years.  So I believe it was 19 --

4   it would be 2000 -- no.  I'm sorry.  I'm trying

5   to think.

6               I think it was 1992 or '3.

7        Q.     Okay.

8               Are you presently employed?

9        A.     No, I retired about ten years ago.

10       Q.     Did you do anything to prepare for

11   your deposition today?

12       A.     I looked over the paperwork from

13   Wells Fargo.  I looked over the summons for

14   this meeting.  Trying to remember dates.  And

15   not good at that.  And just trying to refresh

16   my memory on what's occurred since we received

17   the letter that did not approve the credit card

18   that I had applied for.  That's when it all

19   began.

20       Q.     Okay.

21               We will -- what -- when you say you

22   reviewed the Wells Fargo documents, what were

23   those?

24       A.     Well, as far as the letter of -- the

25   letter of -- I'm trying to think of what you

Page 13

                              D. Suri

1

2    call it.  Just let me think.  Can I look?

3        Q.    Well, sure.  If you want to tell me

4    what you are looking at, please.

5        A.    Well, we were reaffirming -- our

6    reaffirmation of the debt for the Wells Fargo

7    credit card for our LeafGuard service.

8        Q.    Okay.

9        A.    So I looked that over.

10       Q.    Okay.

11             So we will -- we will look at that

12   document in a little bit here.

13       A.    Okay.

14       Q.    Was there anything other than that

15   document that you just described?  Was there

16   anything else that you looked at in preparation

17   for today?

18       A.    The subpoenas for the meeting today.

19   I just read through them.

20       Q.    Okay.

21             Now, is it your understanding that

22   there's a credit card account with Wells Fargo

23   that's at issue in the litigation?

24       A.    Yes.

25       Q.    Do you recall what specific type of

D. Suri

1

2    account that was?

3         A.    I had applied for a Menards -- now

4    wait.  You are talking about the -- the Wells

5    Fargo?

6         Q.    Correct.  The Wells Fargo account.

7         A.    Yes, I know I had filed bankruptcy

8    and my attorney had asked if we wanted to

9    include that account into the bankruptcy

10   lawsuit and I said no, that we would continue

11   to make payments with my husband's help.

12        Q.    Before we get there, was -- was this

13   a home project Visa account?

14        A.    It was, yes.

15        Q.    And Wells Fargo was the lender on

16   this account?

17        A.    Yes.

18        Q.    When did you open that account?

19        A.    I think it was June of 2018.

20        Q.    Was there anyone else on the account

21   with you?

22        A.    Yes, my husband was a cosigner.

23        Q.    What was the purpose for obtaining

24   that card, for opening that account?

25        A.    That was so we could put the

1                     D. Suri

2    LeafGuard system on our home, and it was a

3    no-interest account with minimum payments, so

4    119 a month, I believe.

5         Q.    When you the say LeafGuard system

6    for your home, what exactly was that?

7         A.    It's something they put on your

8    gutters so the leaves do not accumulate inside

9    the gutter.  It's like a screen and then you

10   don't have to clean your gutters.  We live in

11   the woods, so it was a nice addition.

12        Q.    I'm going to share my screen here

13   for a second.

14        A.    Okay.

15        Q.    And let me see if I can --

16             MR. LYNGKLIP:  It's not up yet,

17   Mark.

18             MR. KUNDMUELLER:  Yup, one second.

19   Okay.

20             (Document review.)

21             MR. KUNDMUELLER:  Let's try this.

22   Can you see that?

23             THE WITNESS:  I see Exhibit 1.

24             MR. KUNDMUELLER:  Okay.  Perfect.

25             (Suri Exhibit 1, leaf filter

1                        D. Suri

2        contract, remotely introduced and provided

3        electronically to the reporter.)

4    BY MR. KUNDMUELLER:

5        Q.    Have you seen this document before?

6        A.    Yes.  And I wanted to correct

7    something I said earlier.  I just thought about

8    it.  I think it was around 2015 that we got the

9    leaf filter.  It was when -- right after we

10   moved in.  So I was incorrect where I said

11   2018.

12       Q.    Okay.

13             So have you -- I'm going to have

14   this marked as Exhibit 1 for the deposition.

15             Is this the leaf filter contract

16   that you had with the -- well, who is it with?

17       A.    Well, it would be with Wells Fargo.

18   Well, the leaf filter was the company, but the

19   credit card they offered was the Home Projects

20   credit card through Wells Fargo.

21       Q.    So is it fair to say the homes

22   project credit card was used to pay the company

23   that put the leaf filter product up on the

24   house?

25       A.    Correct.

```
 1                         D. Suri

 2          Q.    Okay.

 3                And is this your signature?

 4          A.    Yes.

 5          Q.    At the bottom of page 1 of

 6    Exhibit 1?

 7          A.    Yes.

 8          Q.    Okay.

 9                And the date is June 11, 2015.

10                Does that meet with your

11    recollection?

12          A.    That's correct.

13          Q.    Okay.

14                I don't believe there's -- and

15    Mr. Suri did not sign this particular contract;

16    correct?

17          A.    It looks like he did not.

18          Q.    Okay.

19                And this is for the -- your current

20    home on                  ; correct?

21          A.    Yes.

22          Q.    Okay --

23          A.    Yes.

24          Q.    I'm going to show you what I marked

25    as Exhibit 2 today.
```

1                          D. Suri

2                  (Suri Exhibit 2, application for the

3          credit card from Wells Fargo to finance the

4          LeafGuard system, remotely introduced and

5          provided electronically to the reporter.)

6    BY MR. KUNDMUELLER:

7          Q.    Can you please identify this

8    document for me.

9                  And I know this is -- it always

10   seems like such an odd question to identify a

11   document, but again, we're preparing a

12   transcript.  So we want to make it clear what

13   we've looked at if someone comes in and reads

14   it later.

15                 So I'm going to scroll through this

16   Exhibit 2.

17                 (Document review.)

18         Q.    Can you identify what that document

19   is?

20         A.    Yes.  It's an application for the

21   credit card from Wells Fargo to finance our

22   LeafGuard system.

23         Q.    And is this your signature at the

24   bottom of the page?

25         A.    Yes.

D. Suri

1

2       Q.     And is this your husband's signature

3    next to that?

4       A.     Yes.

5       Q.     And what date did you sign the

6    document?

7       A.     June 11th of 2015.

8       Q.     Did you voluntarily sign the

9    document?

10      A.     Yes.

11      Q.     Did you review the application

12   before signing?

13      A.     Briefly.  I mean, my husband and I

14   both looked it over.

15      Q.     Okay.

16             And this is the application for the

17   home project Visa card account with Wells

18   Fargo?

19      A.     Yes.  And the gentleman did explain

20   the terms very thoroughly to us.  So we

21   understood.

22      Q.     When you say the gentleman, who was

23   that?

24      A.     Well, the salesman that sold us the

25   leaf system.  I'm sorry.  I don't recall his

```
1                        D. Suri
2    name.
3        Q.    And that was someone who worked for
4    Wells Fargo or was it someone who worked for
5    the leaf filter company?
6        A.    The leaf filter company.
7        Q.    Along with this application, were
8    there any additional documents setting out the
9    terms of your agreement with Wells Fargo?
10       A.    I'm sorry sir, I don't remember.
11       Q.    I'm going to put up what I've marked
12   as Exhibit 3.
13             (Suri Exhibit 3, terms of the credit
14        card agreement with Wells Fargo, remotely
15        introduced and provided electronically to
16        the reporter.)
17   BY MR. KUNDMUELLER:
18       Q.    Have you -- let me scroll through
19   this slowly here.
20             (Document review.)
21       Q.    Have you seen this document before?
22       A.    It looks familiar.  It looks like a
23   standard explanation for credit card terms.  As
24   I said, this has been six years ago, so I
25   really didn't go over this part.
```

```
 1                        D. Suri
 2       Q.    Okay.
 3             Is it fair to say that it purports
 4    to be the terms of your credit card agreement
 5    with Wells Fargo?
 6       A.    Yes.
 7       Q.    By signing the application did you
 8    agree to the terms of this contract?
 9       A.    Yes.
10       Q.    If we look down where it's -- you
11    see the -- there are some page numbers here
12    that say Suri 900.  If we go down to page Suri
13    901.
14             And I can move up to where it says:
15    The parties to this agreement.
16             Do you see that paragraph here?
17       A.    Yes.
18       Q.    Okay.
19             It says:  This agreement is made
20    between Wells Fargo Financial National Bank,
21    where it's referring to we, us, and our, and
22    each account holder whether primary or joint,
23    you and your.
24             Is that accurate?
25       A.    Yes.
```

1                          D. Suri

2          Q.     So in this case you and your would

3     refer to who?

4          A.     Myself and my husband, Tinny.

5          Q.     Now, I would like to turn to what is

6     marked as page 6 of the agreement.  It's Suri

7     902.

8                 If you'll look here, the contract

9     states -- there's a paragraph labeled:

10    Default.

11                Do you see that?

12         A.     Yes.  Now part of it is cut off

13    because of the windows.

14         Q.     Oh, I'm sorry.

15         A.     If you could maybe move it to --

16    yes, that's perfect.

17         Q.     Is that better?

18         A.     No.

19         Q.     Or is that cut off again?

20         A.     Maybe minimize it a little bit.

21         Q.     Yeah.

22         A.     That's good, good.

23         Q.     Would that work.

24                Can you see that?

25         A.     Yes, I see the default.

1                          D. Suri

2          Q.      Okay.

3                 Now, it states:  Your account will

4    be in default if any of the following occur.

5    And then there's a series of bullet points.

6          A.      Yes.

7          Q.      Do you see -- what's the last bullet

8    point state?

9          A.      You file for bankruptcy.

10         Q.      Okay.

11                So you agree at the time you opened

12   the account, the account will be in default if

13   you as the -- defined in the agreement, filed

14   for bankruptcy; correct?

15         A.      Yes.

16         Q.      Have you filed for bankruptcy?

17         A.      I did.

18         Q.      When did that happen?

19         A.      Oh, back.  I think I filed around

20   March of 2018.  It took a couple of months to

21   process the paperwork.  So I believe it was

22   finalized in maybe May of 2018.

23         Q.      Did your husband file for bankruptcy

24   as well?

25         A.      No.

1                          D. Suri

2       Q.     Did your husband know that you were

3  going to file for bankruptcy?

4       A.     Yes.

5       Q.     Did he agree with your decision?

6       A.     Yes.

7       Q.     What event occurred in your life to

8  lead you to file for bankruptcy?

9       A.     My husband had just left a company.

10  And he had signed a noncompete agreement with

11  that company.  And he went to a new company,

12  and they basically had told him it's no problem

13  if you sold this certain product there, and

14  then they ended up suing him for a noncompete

15  agreement.

16      Q.     So I'm sorry, I'm not sure I follow.

17           So because your -- because Mr. Suri

18  was sued on a noncompete related to his job,

19  you filed for bankruptcy?

20      A.     Yes, the attorney fees to defend

21  ourselves, I believe -- I'm not exactly sure --

22  had risen to about a hundred thousand.  We had

23  to hire an attorney.  They had told us the

24  probability was really good that we would win

25  the case, but it would cost another hundred

```
 1                      D. Suri
 2   thousand plus.
 3             So we decided that we would settle
 4   and I would file bankruptcy because we could
 5   not pay our bills after paying out all of that
 6   money to defend ourselves.
 7        Q.    Okay.
 8             But only -- but you were the only
 9   one to file for the bankruptcy?
10        A.    Yes.  Because we needed someone that
11   had some credit in case we ran into
12   difficulties financially.  That could borrow
13   money or whatever needed to be done, get a car,
14   refinance our home.
15             And believe me, it wasn't a -- it
16   wasn't an easy decision and it was very
17   difficult.
18        Q.    I'm going to show you what I've
19   marked as Exhibit 4.
20             (Suri Exhibit 4, petition for
21        bankruptcy, remotely introduced and
22        provided electronically to the reporter.)
23   BY MR. KUNDMUELLER:
24        Q.    I'm going to scroll through it.
25             It's 53 pages.  So I won't.  If you
```

1                          D. Suri

2    would like me to scroll through the entire

3    thing I can, but can you see the first page?

4              MR. LYNGKLIP:  I'm sorry to

5         interrupt you.  That is not being showing

6         as being shared on your screen.  So all we

7         got is a very small little icon at the top

8         of the screen showing the document.  It

9         can't really be read or identified from

10        that, so if you want to share it and show

11        it to her, you are going to need to hit

12        that share my screen thing so she can see

13        what that is.

14             MR. KUNDMUELLER:  Okay.  It should

15        have still been sharing.

16             MR. LYNGKLIP:  I -- yeah.  If you X

17        out of the document, it may have taken your

18        screen there.

19             MR. KUNDMUELLER:  Okay.

20             MS. BARR:  Just for the record,

21        Mark -- this is Will Huse -- I can see it

22        clearly.

23             MR. KUNDMUELLER:  Okay.

24             MR. LYNGKLIP:  You can?

25             Because I'm just getting -- I just

D. Suri

1

2          got a screen with Ms. Suri on it.  So

3          there's something different showing up on

4          my screen.

5               MR. KUNDMUELLER:  How is that?

6               MR. LYNGKLIP:  No, I'm still just

7          seeing Ms. Suri.  Sorry.  And like I said,

8          the -- the document is sitting at the top

9          above Ms. Suri's head.  It's only about an

10         inch by an inch and a half.

11              MR. KUNDMUELLER:  I'm going to stop

12         sharing for a second and then I will try it

13         again.

14              MS. BARR:  I can see it just fine.

15              THE WITNESS:  And I do as well.

16              MR. LYNGKLIP:  Okay.  Can you share

17         your screen again, Mark?

18              MR. KUNDMUELLER:  I am right now.

19              MR. LYNGKLIP:  Got it.  Thank you.

20         I appreciate that.

21              MR. KUNDMUELLER:  No problem.

22    BY MR. KUNDMUELLER:

23         Q.    Ms. Suri, can you identify what this

24    document is?

25              (Document review.)

1                          D. Suri

2        A.      Yes, my petition for bankruptcy.

3        Q.      Okay.

4                And if you can see the Court's head

5   on the bottom here, what date was this filed?

6        A.      April 3rd of 2018.

7        Q.      And that.  Does this appear to be,

8   from what you can see here and what you can

9   recall, an accurate copy of your petition for

10  bankruptcy?

11       A.      I'm sure it is.

12       Q.      Did you file for -- what chapter of

13  bankruptcy did you file under; do you recall?

14       A.      Oh, goodness.  I don't recall.

15       Q.      If you look here on -- on page 3 of

16  the document.

17       A.      Mh-hm.

18       Q.      The Chapter 7 is checked.

19               Does that refresh your recollection

20  at all?

21       A.      Yes.

22       Q.      So was it your understanding that

23  you filed under Chapter 7 of the bankruptcy

24  code?

25       A.      Yes.

```
 1                    D. Suri
 2      Q.    Okay.
 3            Did you list the account with Wells
 4  Fargo on this petition?
 5      A.    Yes.  I believe so.  I know I gave
 6  my attorney a list of all of my creditors.  So
 7  I'm sure Wells Fargo was on it.
 8      Q.    I'm looking at a section here on
 9  page 19.  This is a list of unsecured claims.
10            Was your credit card with Wells
11  Fargo, was that secured by a lien in any
12  property?
13      A.    No.
14      Q.    So it would be -- if it's on here,
15  it should be listed under the unsecured claims;
16  right?
17      A.    I believe so, yes.
18      Q.    Okay.
19            If we go to -- here we have -- here
20  we have a Wells Fargo account.
21            Is it your understanding that this
22  would be the leaf filter account?
23      A.    Yes.
24      Q.    Okay.
25            And it lists a balance of $4,172.
```

1                          D. Suri

2              Is that the correct amount that was

3      left to pay on that account at the time you

4      declared bankruptcy?

5          A.    Where are you seeing that amount?

6          Q.    I see the -- right here.

7          A.    It's not on my screen.

8          Q.    Oh, I'm sorry.

9          A.    It's the -- cut off.  The right side

10     of my screen is cut off, so I can't read

11     anything beyond.

12         Q.    Is that better?

13         A.    No, I do not see an amount.

14         Q.    How about now?

15         A.    Is it on the right side of the page?

16         Q.    It is on the right side of the page.

17         A.    No.  It's blocked by all the

18     windows.

19               Can you minimize it?

20         Q.    Sure, yes.

21         A.    There we go, yes, $4,172.

22         Q.    Okay.

23               And this is the remaining balance on

24     the Wells Fargo account we discussed?

25         A.    As of date of the contract.  But I

D. Suri

1

2     did continue -- I never missed a payment.  So

3     that number, of course, has been changing as

4     the bankruptcy suit went along.  Unless they

5     told me not to keep paying it, but I never

6     missed a payment.  So I don't think, you know,

7     I ever skipped paying my monthly fee.

8          Q.     Okay.

9          A.     But as of that date, yes, I believe

10    it's correct.

11         Q.     Did Wells Fargo take any action as a

12    result of the bankruptcy filing?

13         A.     Well, I mean, I signed the

14    reaffirmation and I never heard from Wells

15    Fargo.  I just kept making my monthly payments.

16         Q.     Okay.

17         A.     The only thing that I had received

18    from my attorney was the reaffirmation form.

19    My understanding was -- I told her it was not

20    to be included in the bankruptcy lawsuit.  And

21    she said, okay, sign this page and then you

22    just continue to make monthly payments until

23    it's paid off.

24         Q.     Okay.

25                And what was the purpose for not

Page 32

                          D. Suri

1

2    including that in the bankruptcy?

3         A.    Well, it was -- we could afford to

4    make that payment with my husband's help.  And

5    we just felt that that was a large amount that

6    we could afford to pay.  And since he was on

7    the agreement, we decided we would just pay it

8    off.

9         Q.    Okay.

10        A.    And it was part of the home and

11   we -- we just felt it was the right thing to

12   do.

13        Q.    Okay.

14              I'm going to show what I've marked

15   as Exhibit 5.

16              Now, during the course of your

17   dealings with Wells Fargo with this account --

18              MR. KUNDMUELLER:  It's telling me I

19        am not sharing my screen anymore.

20              MR. LYNGKLIP:  We're not seeing it

21        yet, Mark.

22              MR. KUNDMUELLER:  Yeah.

23              MR. LYNGKLIP:  There we go.

24              (Suri Exhibit 5, statement from

25        Wells Fargo, remotely introduced and

1                         D. Suri

2          provided electronically to the reporter.)

3              MR. KUNDMUELLER:  It somehow kicked

4          me out of share screen.

5     BY MR. KUNDMUELLER:

6          Q.    During the course of your dealings

7     with Wells Fargo did you get monthly statements

8     from Wells Fargo?

9          A.    No.  And also -- I'm sorry -- I'm

10    getting a window that says "launch meeting."

11    Should I hit that tab?  Because now my -- where

12    your documents were it's just saying "launch

13    meeting."

14         Q.    No, it shouldn't be doing that.

15         A.    Because I see you.

16             MR. LYNGKLIP:  Mark, it looks like

17         you are sharing the screen of your Web

18         browser.

19             MR. KUNDMUELLER:  Right.

20             MR. LYNGKLIP:  You shared the wrong

21         screen.

22             THE WITNESS:  There.  Thank you.

23             MR. KUNDMUELLER:  It kicked me off

24         of share screen and then I tried to share

25         the -- this one here.

1                        D. Suri

2              MR. LYNGKLIP:  Yeah, it probably

3        went to the window instead of the screen.

4              MR. KUNDMUELLER:  It did.

5              How is that?

6              THE WITNESS:  Perfect.

7   BY MR. KUNDMUELLER:

8        Q.    Can you see where it says Exhibit 5?

9        A.    Yes.

10       Q.    Okay.

11             This is still better than everyone

12   traveling across the country for the

13   deposition.

14             MR. LYNGKLIP:  Agreed.

15   BY MR. KUNDMUELLER:

16       Q.    All right.

17             I'm going to show you what I marked

18   as Exhibit 5.

19             Can you -- scroll through here

20   slowly.

21             Can you identify this document and

22   what it purports to be?

23             (Document review.)

24       A.    Yes, it looks like a statement.

25       Q.    Okay.

1                             D. Suri

2              Do you recall ever having received

3    statements like this from Wells Fargo?

4        A.    I think I did in the beginning, but

5    then I went paperless.  And I would just -- I

6    knew how much I had to pay and I paid it.

7    And -- the -- I tried to go on the Wells Fargo

8    website and by that time the card had expired

9    and I could not pull up any documents.

10       Q.    When you say by that time, do you

11   mean at the time you declared -- you filed for

12   bankruptcy?

13       A.    At the time that we found out that

14   it was on my husband's credit report.

15       Q.    When was that?

16       A.    That was back in -- after the

17   Menards card was not approved back in June of

18   2020.  Because by that time he had pulled up

19   his credit reports to check and see why his

20   credit score had dropped and then we had seen

21   the charge-off.

22       Q.    Okay.

23             But as far as -- well, let's look at

24   this statement here, Exhibit 5.

25             What's the time period of -- of this

1                          D. Suri

2    statement?

3         A.    I -- the date's a little bit cut

4    off, but I see April 7, 2000 --

5         Q.    Here.  Is that any better?

6         A.    No, actually it's worse.

7         Q.    It's actually worse.

8         A.    I need it minimized.

9         Q.    There.  Is that better?

10        A.    Yes, perfect.

11        Q.    Okay.

12        A.    April 7, 2018.

13        Q.    Okay.

14              Now, the April 7, 2018, that says

15   it's the payment due date; correct?

16        A.    Correct.

17        Q.    Okay.

18              And the -- the billing cycle dates

19   are February 10, 2018, through March 13, 2018?

20        A.    Yes.

21        Q.    Okay.

22              And the statement provides -- states

23   what the balance remaining on the account is;

24   correct?

25        A.    Yes.

1                          D. Suri

2        Q.      Okay.

3                And that would be $3,187?

4        A.      Yes.

5        Q.      Okay.

6                And at this point in March of 2018,

7    there's still available credit on the account;

8    correct?

9        A.      Yes.

10       Q.      Okay.

11               The only time you actually took

12   money from this account was the initial

13   purchase of the leaf filter system; correct?

14       A.      Yes.

15       Q.      Okay.

16               But at least as of this point, which

17   is prior to your bankruptcy filing there was

18   still an available line of credit; correct?

19       A.      Yes.

20       Q.      Okay.

21               I'm going to show you what we've

22   marked as Exhibit 6.

23               (Suri Exhibit 6, statement from

24        March of 2018 to April of 2018, remotely

25        introduced and provided electronically to

1                          D. Suri

2          the reporter.)

3     BY MR. KUNDMUELLER:

4          Q.    Can you see that?

5          A.    It looks like the same screen.

6          Q.    Okay.

7                Is this also --

8                MR. LYNGKLIP:  I have the same

9          screen still as well.

10               MR. KUNDMUELLER:   Oh.

11               (Document review.)

12    BY MR. KUNDMUELLER:

13         Q.    How is that?

14         A.    I see, again, the right side is cut

15    off.  Oh, Exhibit 6?

16         Q.    If I minimize it, is that a little

17    better?

18         A.    Yes.

19         Q.    Okay.

20               Scroll down.

21         A.    Perfect.

22         Q.    Can you identify this document for

23    me?

24               (Document review.)

25         A.    It looks like the last payment that

```
 1                        D. Suri
 2    was made on the account to bring it to a zero
 3    balance.
 4         Q.    What is the -- can you see what the
 5    date of the -- for the billing cycle is here?
 6         A.    March of 2018 to April of 2018.
 7         Q.    The -- did you pay off your account
 8    at that point?
 9         A.    Yes, I paid it off in full.  I even
10    called Wells Fargo and they confirmed that
11    there were no late fees.  Everything was paid,
12    it was zero balance.
13         Q.    Right.
14               But did this occur in -- in March or
15    April of 2018 at the time you were filing for
16    bankruptcy?
17         A.    No.  That's what I was looking at
18    that date.  And I was a little confused.
19         Q.    Okay.
20         A.    Because I continued to pay on that
21    after my bankruptcy.
22         Q.    Right.  Okay.
23               If you look here, where it says
24    available credit?
25         A.    Yes.
```

Page 40

1                          D. Suri

2        Q.      Is there any available credit now?

3        A.      No.

4        Q.      Okay.

5                So this would be the next billing

6    cycle --

7        A.      Okay.

8        Q.      -- after you declared bankruptcy is

9    that accurate?

10       A.      I filed for bankruptcy April 3rd of

11   2018.  The reaffirmation was signed May 7 of

12   2018.

13       Q.      Correct.

14       A.      So what was your question again?

15       Q.      This is for the billing cycle of

16   March 14th to April 6th, 2018.

17               So this is after you filed for

18   bankruptcy, but prior to the reaffirmation

19   agreement; correct?

20       A.      That is correct.

21       Q.      Okay.

22               And as of this point you no longer

23   have any available credit from Wells Fargo

24   according to this statement; is that correct?

25       A.      Yes.

1                          D. Suri

2        Q.    Okay.

3              And it lists the previous balance on

4    the account as still being $3,187; correct?

5        A.    Yes.

6        Q.    Okay.

7              Do you recall ever having received

8    this statement?

9        A.    Yes.

10       Q.    If you look here in the center of

11   the page right here.

12       A.    Yes.

13       Q.    Can you tell me what this line right

14   here states?

15       A.    The charge-off?  The charge-off

16   account, principals $3,067.54.

17       Q.    Okay.

18             So is it your understanding that as

19   of the date of this statement, April 6, 2018,

20   that Wells Fargo had charged off the account?

21       A.    Yeah, I assume so.  That's what it

22   looks like, yes.

23       Q.    Do you know what it means --

24             MR. LYNGKLIP:  Mark.

25             MR. KUNDMUELLER:  Yes, sir.

```
1                    D. Suri
2           MR. LYNGKLIP:  I'm sorry, I just
3       want, if you can, just identify that by
4       document number for us.
5           MR. KUNDMUELLER:  Oh, certainly.
6           This is -- this page here is Wells
7       Fargo Suri 879.
8           MR. LYNGKLIP:  Thank you.
9  BY MR. KUNDMUELLER:
10      Q.    Okay.
11          When it says:  Charge-off, do you
12  have any understanding of what that means,
13  Ms. Suri?
14      A.    Oh, I'm assuming that they are -- it
15  means that we are not going to pay the balance.
16  Like they're forgiving the debt or, like,
17  we're -- we're not making the payments.  They
18  are writing it off.
19      Q.    Okay.
20      A.    I'm not a hundred percent sure what
21  it means exactly.  It looks to me like they're
22  assuming it's part of the bankruptcy.  And that
23  is not the case.
24      Q.    Okay.
25          So -- but -- is it your
```

```
 1                    D. Suri
 2    understanding that it's in an internal
 3    accounting statement on Wells Fargo's part?
 4        A.    Yes, it's a procedure of taking care
 5    of that balance, I believe.
 6        Q.    Okay.
 7              I'm going to move on to Exhibit 7.
 8              (Suri Exhibit 7, correspondence from
 9         Wells Fargo, remotely introduced and
10         provided electronically to the reporter.)
11    BY MR. KUNDMUELLER:
12        Q.    Can you see what I've marked as
13    Exhibit 7?
14        A.    No.
15        Q.    No.
16        A.    Not yet.
17        Q.    It stopped sharing.  There.
18              How is that?  Okay.
19        A.    Yes.
20        Q.    Now we'll minimize it so none of it
21    is cut off for you.
22        A.    Thank you.
23        Q.    You can scroll through this.
24              Can you identify -- tell me what
25    that document appears to be?
```

1                         D. Suri

2                 (Document review.)

3        A.      Wells Fargo received our bankruptcy

4    notice.

5        Q.      So this is a correspondence from

6    Wells Fargo to -- is it addressed to you?

7        A.      It looks like it's addressed to my

8    husband.

9        Q.      Do you recall ever having seen this

10   document before?

11       A.      No.

12       Q.      What's the date of the document?

13       A.      April 6, 2018.

14       Q.      So this would have been just after

15   you filed your petition for bankruptcy;

16   correct?

17       A.      Yes, I filed April 3rd.

18       Q.      And this is informing you that Wells

19   Fargo received notice of that bankruptcy;

20   correct?

21       A.      Yes.

22               MR. LYNGKLIP:  Objection as to form.

23   BY MR. KUNDMUELLER:

24       Q.      If you could look at the second

25   bullet point here in the letter.

1                        D. Suri

2                 What does that state?

3       A.    Well, part of it is cut off again.

4       Q.    Is that any better?

5       A.    No.  Good.  Perfect.

6       Q.    Is that any better -- okay?

7       A.    Which bullet point?

8       Q.    Second.

9       A.    If the account is a line of credit

10   then it will be restricted as to additional

11   advances and/or closed.

12      Q.    Okay.

13              So is it your understanding that

14   after you filed for bankruptcy Wells Fargo

15   restricted any further advances on the account?

16      A.    Yes.

17      Q.    And it's your understanding that

18   Wells Fargo closed the account?

19      A.    I understand that as of this moment.

20   I never received that letter.  So I understand

21   that now.  And I get the mail.  There's -- I

22   would have gotten this.

23      Q.    And this one was addressed to

24   Mr. Suri?

25      A.    Yes.

Page 46

D. Suri

1

2     Q.    I'm going to have you look at what

3  I've marked as Exhibit 8.

4              (Suri Exhibit 8, letter, subject

5        bankruptcy notice receives, remotely

6        introduced and provided electronically to

7        the reporter.)

8  BY MR. KUNDMUELLER:

9     Q.    Can you identify this document for

10 me?

11    A.    I don't see it.

12    Q.    Sorry.  There we go.

13          How is that?

14    A.    Yes.

15    Q.    Okay.

16    A.    Okay.

17          MR. LYNGKLIP:  Again, Mark, would

18      you be kind enough to identify it by the

19      document numbers as well.  I know it's

20      going to be an exhibit later, but it will

21      help us follow.

22          MR. KUNDMUELLER:  Sure.  Sure.

23          This is -- this is one we've

24      produced to you.  This is Wells Fargo Suri

25      Document 716.

```
 1                    D. Suri
 2          MR. LYNGKLIP:  Okay.
 3          Would you mind giving us the number
 4   of the last document you showed as well,
 5   please?
 6          MR. KUNDMUELLER:  Sure.
 7          MR. LYNGKLIP:  And give the exhibit
 8   number, because that's going to be on the
 9   record and we won't be able to correlate it
10   otherwise.
11          MR. KUNDMUELLER:  This one is
12   Exhibit 8.  The prior one was Exhibit 7.
13          And hold on one moment.  I closed
14   that one already.
15          MR. LYNGKLIP:  Okay.  Sure.
16          (Document review.)
17          MR. KUNDMUELLER:  One second.  Let
18   me pull that one back up.
19          And I'm showing Exhibit 7 once again
20   and --
21          MR. LYNGKLIP:  Yup, okay.
22          MR. KUNDMUELLER:  -- I have it
23   labeled Wells Fargo Suri 717.
24          MR. LYNGKLIP:  Thank you
25   Mr. Kundmueller.
```

1                           D. Suri

2    BY MR. KUNDMUELLER:

3         Q.    Okay.

4               I'm back on what we've marked as

5    Exhibit 8.

6               Could you please, if you would,

7    identify what this document is?

8         A.    Can you go up a little bit?

9         Q.    Can you see that all right?

10        A.    I can't see the top of the page.  I

11   just wanted to see what the top of the page

12   said.

13        Q.    How is that?  Can you see it now?

14        A.    No.

15        Q.    No.

16              How is that?

17        A.    No.

18        Q.    Oh.

19        A.    I can see:  Subject bankruptcy

20   notice received.

21        Q.    Yeah, one second.  Let me -- for

22   some reason it is saying "screen sharing

23   paused."

24        A.    Mh-hm.

25        Q.    It keeps falling off.

1                          D. Suri

2                  How is that?

3      A.      Yes, I can see that.

4      Q.      Okay.

5                  To whom is this letter addressed?

6      A.      That is addressed to my attorney for

7   the bankruptcy case.

8      Q.      Okay.

9                  Did your attorney for the bankruptcy

10  case ever forward this letter to you?

11     A.      I don't remember seeing this.

12     Q.      Okay.

13     A.      The only thing I remember seeing is

14  the reaffirmation from Wells Fargo.  I had no

15  other communication that I received in the mail

16  or from my attorney.

17     Q.      But you would agree that this letter

18  at least states, as with the previous exhibit,

19  that the account as a line of credit will be

20  restricted as to additional advances and/or

21  closed; correct?

22     A.      I see that, yes.

23     Q.      Okay.

24                 I would like to share what we've

25  marked as Exhibit 9.

```
 1                          D. Suri
 2                  (Suri Exhibit 9, letter dated
 3              April 9, 2018, remotely introduced and
 4              provided electronically to the reporter.)
 5     BY MR. KUNDMUELLER:
 6         Q.     Is that visible to you?
 7         A.     It's the same.
 8                  MR. LYNGKLIP:  Mark, I think you've
 9              shared the -- you're sharing these as
10              documents so that when you're switching to
11              different documents the new screen is not
12              coming up.  So if you are opening these as
13              a separate screen, you got to shut that
14              down and reopen a new one.
15                  MR. KUNDMUELLER:  Let me -- I
16              apologize for the hiccup here.
17                  (Document review.)
18                  MR. KUNDMUELLER:  Now I have seemed
19              to have lost you.  Hang on.
20                  MR. LYNGKLIP:  Mark, maybe this is a
21              good time for a break?
22                  MR. KUNDMUELLER:  This may be a good
23              time for a break.  I believe here -- okay.
24              Got it.
25                  Agreed.  Let's take a short break.
```

```
 1                    D. Suri

 2              MR. LYNGKLIP:  Okay.  Thank you.

 3              MR. KUNDMUELLER:  Five minutes.

 4              (Recess is taken.)

 5    BY MR. KUNDMUELLER:

 6         Q.    Ms. Suri, are you ready to go?

 7         A.    I am ready.

 8         Q.    And just wanted to remind you you

 9    are still under oath and we're going to pick

10    back up with what I have marked as Exhibit 9.

11              Can you -- can you see this okay?

12         A.    I can read Exhibit 9.  So far

13    nothing has loaded.  Here we go.

14         Q.    I'm going to scroll down.

15              And can you identify what this is

16    for me, please.

17         A.    It's from Wells Fargo.  And I'm a

18    little confused because it says:  We have

19    closed the account because we have been

20    notified the owners of this account has filed

21    bankruptcy.  Okay.  All right.

22              It's just a letter stating that

23    Wells Fargo has received notice that I have

24    filed bankruptcy.

25         Q.    Okay.
```

                          D. Suri

1                    What's the date of this letter?

2    A.     The date is April 9, 2018.

3    Q.     And that's approximately six days

4    after you filed your bankruptcy petition?

5    A.     Yes.

6    Q.     And it concerns the account ending

7    in 9309?

8    A.     Correct.

9    Q.     Is that your understanding that

10   that's the leaf -- the credit card account that

11   we've been talking about for the leaf filter

12   system?

13   A.     Yes.

14   Q.     Okay.

15          And I may have asked this before, is

16   that the only account that you had with Wells

17   Fargo at this time?

18   A.     Yes.

19   Q.     Okay.

20          And as you said, this states that

21   the account has been closed because the owner

22   of the account has filed bankruptcy; correct?

23   A.     Yes.

24          MR. LYNGKLIP:  Mr. Kundmueller, one

1                          D. Suri

2         more time.  If you could identify it by the

3         Bates number.  Thank you.

4              MR. KUNDMUELLER:  Certainly.  It's

5         Wells Fargo Suri 376.

6              I've marked it as Exhibit 9 here

7         today.

8              MR. LYNGKLIP:  Thank you, sir.

9    BY MR. KUNDMUELLER:

10        Q.    Ma'am, do you recall receiving a

11   copy of this letter from Wells Fargo?

12        A.    No.

13        Q.    Would you agree that in April of

14   2018 Wells Fargo advised you and your husband

15   that it had closed the account?

16        A.    No.  I don't remember this letter at

17   all.

18        Q.    Okay.

19              I'm going to show you what we've

20   marked as Exhibit 10.

21              (Suri Exhibit 10, reaffirmation

22         agreement, remotely introduced and provided

23         electronically to the reporter.)

24   BY MR. KUNDMUELLER:

25        Q.    Can you identify this document for

```
1                        D. Suri
2    me, please.
3         A.    Yes, that's the reaffirmation
4    agreement that I signed, I believe.
5         Q.    Okay.
6               Let me -- I will scroll through.
7               (Document review.)
8         A.    Yes, I recall this document.
9         Q.    Okay.
10              And on page 2 of the document here,
11   is this your signature?
12        A.    Yes.
13        Q.    And what -- if you recall, what is
14   the importance of this particular document?
15        A.    What I understood it to be was that
16   we will continue to pay the credit card as
17   agreed upon; that it was not going to be part
18   of our bankruptcy lawsuit.
19        Q.    And when you say "we," is Mr. Suri a
20   party to this agreement?
21        A.    Yes, we share everything.
22        Q.    But Mr. Suri --
23        A.    He agreed -- I'm sorry.
24        Q.    It's okay.
25        A.    We discussed if we wanted to include
```

```
1                         D. Suri
2    it in the bankruptcy and we decided not to.
3         Q.    Okay.
4               But is Mr. Suri -- Mr. Suri is not a
5    filer in the bankruptcy; correct?
6         A.    He is not.
7         Q.    And he did not -- we will scroll
8    down here.
9               Is this your signature on page 8 of
10   the agreement?
11        A.    Yes.
12        Q.    And what's the date on which you
13   signed it?
14        A.    May 7, 2018.
15        Q.    Okay.
16              And there's no signature of the
17   co-borrower on this; correct?
18        A.    No.
19        Q.    And it's signed on behalf of Wells
20   Fargo as well --
21        A.    Yes.
22        Q.    -- is that correct?
23        A.    Yes.
24        Q.    Pardon me.
25              And what's the date on which Wells
```

```
 1                    D. Suri
 2   Fargo signed the agreement?
 3        A.    On May 22, 2018.
 4        Q.    At the time you signed the
 5   reaffirmation agreement, is it accurate to say
 6   that Wells Fargo had already closed the
 7   account?
 8        A.    I --
 9             MR. LYNGKLIP:  Objection to form.
10        Foundation.
11             Sorry.  You can go ahead and answer,
12        ma'am.  I'm sorry.
13        A.    I was not aware that -- I was not
14   aware that it was closed.  I think there was a
15   little miscommunication between my attorney and
16   myself.
17        Q.    At the time you signed the
18   reaffirmation agreement, Wells Fargo had
19   already charged off the account; correct?
20        A.    Yes.
21             MR. LYNGKLIP:  Objection to form and
22        foundation, again.  Sorry.  Go ahead.
23             THE WITNESS:  Do I answer?
24             MR. LYNGKLIP:  Yes, please go ahead
25        and answer.
```

1                          D. Suri

2        A.     Yes.

3        Q.     I'm going to turn to page 3 of the

4    reaffirmation agreement.  In the reaffirmation

5    agreement you stated that you agreed that the

6    account would not be included in your

7    bankruptcy.

8              Can you explain what that means to

9    you?

10       A.     That we were going to pay the

11   agreed-amount per month until it was paid off.

12   I didn't think there was a problem with it.  I

13   didn't know that the payments had changed.  I

14   just thought we would just go on as -- as we

15   were.  Because the way -- I'm not blaming my

16   attorney, but the way she made it sound is she

17   said, "Just sign this paper.  It means that

18   it's not going to be included in the

19   bankruptcy."

20             So I just assumed that it would

21   still be our creditor and we would continue to

22   make the payments as we have been making.

23       Q.     And what amount of payments had you

24   been making prior to the bankruptcy?

25       A.     I believe they were 119 a month.

1                      D. Suri

2        Q.     Okay.

3        A.     Sometimes I would pay a little more

4    because I wanted to get it paid off.

5        Q.     Okay.

6               And on -- this is -- we have

7    different page numbers from different sources

8    here.  It says page 3 at the top here, but if

9    we look at the bottom of the page just to make

10   sure we are identifying this correctly, it says

11   5 of 12 in the Court's header down here

12   regarding -- from when this was filed with the

13   bankruptcy court.

14              But on this page here, does it set

15   out what the payment schedule for the account

16   should be?

17       A.     It does.

18       Q.     And what is that?

19       A.     24 payments of 127.81.

20       Q.     Okay.

21              And did you then make payments of

22   127.81 after entering into this agreement?

23       A.     I did not.  I would have if I had

24   known.  We had the money, but I just didn't --

25   I didn't read it thoroughly, I guess.

1                        D. Suri

2        Q.     What amount of payments did you

3    make?

4        A.      I made the regular payments that

5    were on the original credit card application.

6    I believe they were 119 a month.   And as I

7    stated, I did make -- some payments were a

8    little bit more.

9        Q.     Okay.

10              And eventually you did pay the

11   account off in full?

12       A.     Yes.

13       Q.     Do you recall when that occurred?

14       A.     The payoff date?   No, I have -- I

15   have the document, but not with me.

16       Q.     Okay.

17       A.      But it was on time.   There were no

18   late fees, no interest charges.   I actually

19   called Wells Fargo and they confirmed it was

20   paid in full.

21       Q.     Okay.

22              I'm going to show you what I've

23   marked as Exhibit 11.

24              (Suri Exhibit 11, statement from

25       Wells Fargo Home Projects credit card,

Page 60

```
1                    D. Suri
2         remotely introduced and provided
3         electronically to the reporter.)
4    A.    Okay.
5    Q.    Can you see that okay?
6    A.    I see it -- I see the Exhibit 11.
7  It's loading.
8    Q.    Okay.
9    A.    Yes, I see it.
10   Q.    Okay.
11         Can you identify this document for
12 me, please.
13         (Document review.)
14   A.    It is a statement from Wells Fargo
15 Home Projects credit card.
16   Q.    Can you tell me what the date of the
17 statement is?
18   A.    I'm looking.  Oh, March -- it's very
19 tiny.
20   Q.    I'm sorry.
21   A.    I'll put on my glasses.
22   Q.    I'm trying to make sure everything
23 shows up on the screen.  Sorry.
24   A.    Perfect.  March 31, 2020.
25   Q.    Okay.
```

1                          D. Suri

2              And that was the statement closing

3    date; correct?

4    A.    Okay, yes.

5    Q.    Okay.

6              And at this point the -- for --

7    under the payment information, at this point it

8    states that the new balance is zero?

9    A.    Yes.

10   Q.    Is that accurate?

11   A.    Yes.

12   Q.    Okay.

13             So sometime before March 31, 2020,

14   is when you had paid off the account in full?

15   A.    Yes.

16   Q.    Okay.

17             Do you recall ever having received

18   this statement?

19   A.    No.  As I stated, I believe I was

20   paperless.

21   Q.    Okay.

22   A.    But as I stated, I did make a phone

23   call to make sure the balance due was correct,

24   and that I would have it paid in full.

25   Q.    Okay.

1                        D. Suri

2             In --

3             MR. KUNDMUELLER:  Ian, this is --

4        this document is Suri Document 897.

5             MR. LYNGKLIP:  Okay.  Great.  Thank

6        you.

7   BY MR. KUNDMUELLER:

8        Q.    If you look here, on this -- I'm

9   going to represent that this is a document that

10  was produced to Wells Fargo in this case.

11       A.    Okay.

12       Q.    If you look here on the bottom, it's

13  addressed to you and to Mr. Suri, and that is

14  your -- that was your address at the time;

15  correct?

16       A.    Correct.

17       Q.    Okay.

18             The balance over here to the left is

19  circled and there's an asterisk there.

20             Is -- does that -- is that

21  something -- that notation that you would have

22  made on this or Mr. Suri would've made on this?

23       A.    I don't know.  I -- as I stated, I

24  never got statements from Wells Fargo.  I might

25  have in the very beginning, but as all my other

1                          D. Suri

2    accounts, I go paperless.

3         Q.    Okay.

4         A.    So I don't know if that was faxed to

5    my husband at a later date and he circled it.

6    I did not circle that.

7         Q.    Okay.

8                But -- as of this date, as of the

9    date of this statement, you'll agree that the

10   account had been paid in full, as you agreed

11   with Wells Fargo; correct?

12        A.    Yes, it looks like that I paid the

13   balance that was more than my monthly payment.

14   I think I had seen 300-and-some dollars to make

15   it a zero balance.  So if you go up, I think I

16   saw a payment was 300.  A little bit further

17   up.  Yeah, 337.44.

18        Q.    Okay.

19               So the -- your final payment to get

20   the account closed out or get the balance paid

21   off was 337.44?

22        A.    Yes.

23        Q.    Okay.

24               Since April of 2018, have you made

25   any joint applications with Mr. Suri for any

Page 64

                          D. Suri

1

2    types of loan or credit or refinance, anything

3    of that nature?

4         A.    No -- well, we refinanced.   And

5    the -- the name on the mortgage is my

6    husband's, but as his wife I had to sign the

7    documents.

8         Q.    Okay.

9         A.    But I am not on the title.   The same

10   as our cars.  I am not -- I can't.  I mean I

11   filed bankruptcy.  I have no credit.

12        Q.    Okay.

13             So you have not made any -- any

14   joint applications for credit at any time since

15   the bankruptcy?

16        A.    No.  I made one application in my

17   husband's name, but he was aware of, to

18   Menards.

19        Q.    Okay.

20        A.    We have an agreement that -- I mean,

21   we share everything, bank accounts and, you

22   know, if -- if I need to open a credit card

23   under his name, we discuss it, and I -- it's

24   okay.

25             But that's -- I have not filed for

```
1                        D. Suri
2    anything since the Menards credit card.
3        Q.     Okay.
4               So when -- when did that happen?
5    When did you apply for the Menards card?
6        A.     Menards was June 17th of '20.  Well,
7    that's when we got the denial letter.  So
8    probably a month prior to that I had -- I had
9    applied online.
10       Q.     Okay.
11              So you -- what was the limit that
12   you were seeking?
13       A.     Actually, I don't remember what they
14   told me the limit was.  I believe it was 500,
15   but I'm not a hundred percent certain.
16       Q.     And what was the application for?
17       A.     It was for a Menards credit card.
18       Q.     Was there any particular purpose for
19   it or just a general card --
20              (Multiple speakers.)
21       A.     Yes, I was getting ready to lay
22   mulch in my gardens and they had a special that
23   if you had a credit card, you -- I believe it
24   was 10 percent off your purchase.  So it would
25   have saved me over $200, and I thought, well,
```

Page 66

                              D. Suri

1

2   if I pay it off at the end of the month, then

3   that's quite a savings.

4        Q.    Okay.

5              Other than -- and you said you

6   received a denial letter --

7        A.    Yes.

8        Q.    -- from Menards.

9              What was the reason for the denial?

10       A.    My husband's credit score.  At the

11   time it was only 668 when they denied it.  And

12   he had been well over the 700s.

13       Q.    Okay.

14             Is there any other instances in

15   which, that you know of, that either you or

16   Mr. Suri had been denied credit at any time

17   since your bankruptcy?

18       A.    No.

19       Q.    And you stated that you were able

20   to -- or that Mr. Suri was able to refinance

21   the purchase of your home?

22       A.    Yes, but at a higher interest rate

23   than we would have gotten if his credit score

24   was in the 700s, high 700s.

25       Q.    When --

1                      D. Suri

2        A.    I believe -- I'm sorry.

3        Q.    Go ahead.  I'm sorry.  I didn't mean

4   to cut you off.

5        A.    I believe he received a letter from

6   the bank stating that he did pay a higher

7   interest fee due to his credit score than he

8   would have, you know, gotten if his credit

9   score was as high as it was before.

10       Q.    Okay.

11       A.    And that would be Fifth Third Bank.

12       Q.    Okay.

13             That was going to be one of my

14   questions.

15             So this is the -- the home you are

16   currently residing in.  It's Maple -- it's your

17   current home that you were refinancing;

18   correct?

19       A.    Yes.

20       Q.    Okay.

21             And what was the date on which you

22   sought the refinancing?

23       A.    I don't recall.  My husband handled

24   the whole thing.

25       Q.    Okay.

1                        D. Suri

2                 Was it in 2020, 2021?  Do you have a

3     general idea?

4        A.     It was this year, 2021.

5        Q.     And the -- the new bank for the

6     refinance is Fifth Third?

7        A.     Yes.

8        Q.     Do you know what interest rate you

9     have on that loan?

10       A.     Not -- no, I don't remember.

11       Q.     Do you know how long the term of the

12    loan is?

13       A.     30 years.

14       Q.     Do you know what the balance due on

15    the loan is?

16       A.     No.  I believe it's high 300,000.

17    Like 380.  380,000.  But an accurate amount, I

18    do not know.

19       Q.     Okay.

20                 Did you -- or did Mr. Suri shop

21    around for other offers at the time?

22       A.     Yes.

23       Q.     Yes.

24                 Who else did he apply for

25    refinancing with other than Fifth Third?

D. Suri

1

2      A.      You would have to ask my husband.

3      Q.      Do you know -- you said you received

4  something stating that the interest rate would

5  have been lower had Mr. Suri's credit score

6  been better.

7              Do you know how much of a difference

8  in the interest rate that would have been?

9      A.      No.   My husband has that document.

10     Q.      Other than the Menards card and the

11  refinance, were there any other instances in

12  which you or Mr. Suri had been denied credit

13  since your bankruptcy?

14     A.      We traded in my lease.  We wanted to

15  buy a car, but due to his credit, he assumed we

16  would not get approved or we would get a high

17  interest rate.  So we leased.  And we've held

18  off, because we knew his credit was so low we

19  haven't really done anything.  We're just

20  sitting on it for now.

21     Q.      Okay.

22              So when you said you traded in your

23  lease, can you explain what you meant by that?

24     A.      Well, the lease was over.  It was a

25  three-year lease.

1                       D. Suri

2        Q.      What was it a lease for?

3        A.      My lease -- it was a lease for a

4   car.  A Kia Sonoma, I believe it was.

5        Q.      Okay.

6                And who was the lease with?

7        A.      Kia Finance.

8        Q.      And when you turned that vehicle in

9   can you explain what you did after that?

10       A.      Well, we decided not to buy a car,

11  so we leased another SUV through Kia.

12       Q.      Okay.

13               Did you have to apply for credit in

14  order to do that?

15       A.      No, I don't believe so.  Since it

16  was a lease again, you would have to ask my

17  husband the details.

18       Q.      Do you know -- is there any

19  difference in the cost of that lease based on

20  your husband's credit score?

21       A.      I don't know.

22       Q.      And the lease is in -- is in both of

23  your names or his name only?

24       A.      It's in my husband's name.

25       Q.      Is that the only vehicle that the

1                    D. Suri

2   two of you have?

3      A.    No, he had purchased a Kia also,

4   about six years ago.

5      Q.    And that's still his current

6   vehicle?

7      A.    Yes.

8      Q.    Okay.

9           MR. KUNDMUELLER:  Ian, I don't

10       believe I have anything else at the moment.

11           MR. LYNGKLIP:  Thank you,

12       Mr. Kundmueller.

13           Will, Ms. Barr, who wants to go next

14       and when do we plan on taking a break for

15       lunch if at all?

16           MS. BARR:  Whoever wants to go is

17       fine.

18           MR. HUSE:  I'm happy to go now and

19       power through.

20           I'm imagine I can get all of my

21       questions done before we need a bunch.

22           MR. LYNGKLIP:  Okay, great.  So we

23       will count on taking a break after you

24       finish your questions and before Ms. Barr

25       starts hers; right?

1             D. Suri

2             MR. HUSE:  Yes.

3    EXAMINATION BY

4    MR. HUSE:

5        Q.    All right.

6             Good morning, Ms. Suri.  My name is

7    is William Huse.  I'm counsel for TransUnion.

8    I just have, hopefully, only a few questions

9    for you here.

10             You were just discussing some

11    potential credit denials and refinance issues?

12        A.    Yes.

13        Q.    As far as the -- you mentioned a

14    Fifth Third Bank home refinance --

15        A.    Yes.

16        Q.    -- and you said there was a higher

17    interest rate than what your husband would've

18    gotten if his credit was higher.

19             My question to you is:  How do you

20    know that to be the case?  Were you involved in

21    a discussion about it?  Did you read a letter?

22        A.    My husband had told me that he had

23    received a letter from the lender that our

24    interest rate would have been a different rate

25    if his credit score was higher, and my husband

1                          D. Suri
2    does have that letter.  I have not read it.  I
3    have not seen it.
4          Q.    So your knowledge comes directly
5    from your husband's interpretation of that
6    letter?
7          A.    Yes, sir.
8          Q.    Okay.
9                You also mentioned a Capital One
10   Menards card a number of times?
11         A.    Yes.
12         Q.    I'm going to share my screen,
13   hopefully successfully.
14               Can you see the screen -- the letter
15   on the screen right now?
16         A.    Yes.
17               MR. HUSE:  Now, Ian, I will tell you
18         that obviously is this letter was addressed
19         to Mr. Suri.  It was produced by your
20         office during discovery, but there are no
21         Bates stamps on it.
22               MR. LYNGKLIP:  Oh, I'm sorry about
23         that.  Was it later produced with a Bates
24         stamp number on it?
25               MR. HUSE:  It may have been.  I

1                      D. Suri

2          don't know at this moment.  I'm sure it

3          probably was.

4               MR. LYNGKLIP:  Okay.  All right.

5          Thank you for that identification.

6               MR. HUSE:  But it is a June 17,

7          2020, letter from Capital One to Mr. Suri

8          at his Maple Valley Drive address.

9     BY MR. HUSE:

10         Q.    So, Ms. Suri, have you seen this

11    letter before?

12         A.    I have.

13              (Suri Exhibit 12, June 17, 2020,

14         letter from Capital One to Mr. Suri at his

15         Maple Valley Drive address, remotely

16         introduced and provided electronically to

17         the reporter.)

18    BY MR. HUSE:

19         Q.    Yes.  Exhibit 12, please.

20              You stated that your husband and you

21    were denied this credit card because of your

22    husband's credit score?

23         A.    Yes.

24         Q.    Okay.

25              Could you review the part of the

                              D. Suri

1

2    letter that goes between the salutation to your

3    husband and "Sincerely, Capital One," and tell

4    me if it provides a specific reason for the

5    credit denial?

6                    (Document review.)

7         A.    I do not -- well -- somebody -- can

8    you move the document up, Callie Barr?  There's

9    a window up from Callie.  Okay.

10                   So I'm assuming the credit score at

11   668 was not high enough to get the credit card,

12   a department store credit card.

13        Q.    Okay.

14                   So but the letter itself doesn't

15   give a specific reason why the card was denied.

16   It does say they will send you a statement of

17   specific reasons for denial within 30 days upon

18   receiving your request.

19                   Do you recall if either you or your

20   husband made such a request from Capital One?

21        A.    Okay.  Excuse me.  You froze.  I

22   couldn't hear that last sentence.

23        Q.    Okay.

24                   Hopefully the technology will

25   continue to work well.  It says that Capital

                        D. Suri

1    One will send you a written statement of

2    specific reasons for the credit denial within

3    30 days of receiving the consumer's request.

4           Do you know if either you or your

5    husband made such a request for the statement

6    of written -- written reasons for denial?

7        A.    Can you hear me?

8        Q.    I can hear you.

9        A.    Okay.  I did not -- I did not

10   contact them.  Whether my husband did or not, I

11   don't know.  But this is the point in time

12   where we knew something happened that we

13   weren't aware of.

14       Q.    Okay.

15           Are there any other credit denials

16   or credit applications that you're aware of

17   that we haven't already discussed today that

18   may have been affected by a -- the Wells Fargo

19   trade line?

20       A.    As I stated, we did not apply for

21   any other credit cards because of this denial.

22       Q.    Okay.

23       A.    So no, we did not apply for any

24   other credit cards after this denial.

Page 77

                              D. Suri

1

2       Q.     And no other car app -- car

3   applications or home refinances, other than

4   what we already discussed today?

5       A.     No.

6       Q.     Okay.  All right.

7              Could you tell me what your

8   understanding of your husband's claims in this

9   matter are?

10      A.     That -- my understanding is that the

11  bankruptcy -- the affirmation came at a date

12  later than -- than the final bankruptcy, but

13  yet it showed up on the credit reports prior to

14  the bankruptcy.

15             So the reaffirmation was filed

16  5/7/18 and that date is later than the date

17  that it showed up on the credit reports as a

18  charge off.  That's one thing that I don't

19  understand.

20             Another thing is that it's caused a

21  lot of stress, problems in our marriage.  Just

22  it hasn't been good.  I mean, the bankruptcy

23  alone was stressful.

24             And I guess, that's what we don't

25  understand.  Also the communication between the

Page 78

D. Suri

1

2     credit bureaus and Wells Fargo was very hard to

3     get any answers.  But basically he just wants

4     his credit score back.  And to have something

5     resolved on this charge-off.

6          Q.     Okay.

7                 So then to summarize, you believe

8     your husband's claims to be that he was damaged

9     by way of credit denials and other credit harm

10    and some emotional distress because of his --

11    how it affected his relationship with you based

12    on --

13         A.     Was --

14         Q.     -- based on Wells Fargo reporting

15    the -- its account that we've been discussing

16    today as charged off before it was legally

17    allowed to?

18         A.     Well, before the reaffirmation.  It

19    looks like on the credit report -- I'm not an

20    expert.  It looks like that we reneged on the

21    loan, like we didn't make the payments, that it

22    was part of the bankruptcy.  And that's what I

23    don't understand is why is it affecting his

24    credit when we paid the account off in full?

25         Q.     Have you ever seen a copy of your

1                    D. Suri

2    husband's TransUnion credit report that

3    included a reference to a bankruptcy?

4         A.    The TransUnion, I don't know which

5    one I have seen.

6         Q.    Okay.

7               I'm sorry.  I'm going to be jumping

8    around in my outline a little bit.

9         A.    That's okay.

10        Q.    Bear with me if some of these

11   questions don't seem related, because they not

12   are all, you know, right in line.

13        A.    Okay.

14        Q.    Have you ever been convicted of a

15   crime?

16        A.    No.

17        Q.    Have you ever been arrested for a

18   crime?

19        A.    Arrested, no.

20        Q.    Okay.

21              In your preparation for this

22   deposition, did you discuss this your

23   deposition with your husband?

24        A.    Yeah.  I asked if you guys were

25   nice.  And just what to expect.  You know, I

                              D. Suri

1    mean, I get nervous about things like this.

2    Basically, that's it.

3            I didn't ask him what he said or --

4    I mean, I have a pretty good understanding of

5    what's going on, but I don't know all of the

6    details.

7        Q.    Okay.

8            And he didn't direct you on how to

9    respond to any particular questions?

10       A.    No.

11       Q.    Okay.

12           Did you discuss your preparation

13   with anybody else other than your attorneys?

14       A.    No.

15       Q.    Okay.

16           Are you aware of any disputes of his

17   credit information that your husband has

18   submitted to TransUnion?

19       A.    Can you repeat that?

20       Q.    Are you aware of any disputes that

21   your husband submitted to TransUnion of his

22   credit information?

23       A.    Yes.

24       Q.    Okay.

1                  D. Suri

2          What can you tell me specifically

3   about his disputes?

4      A.    Well, he had -- he had called.  Now,

5   I'm not sure which credit union -- you know, I

6   know he had contacted all three.  And he had

7   faxed over papers and had made several calls.

8   And I'm not sure if it's your credit union or

9   whose credit union.

10          But I know a couple of them were not

11  getting back or they would deny his claim and

12  then he would have to call.  And so I know he

13  made several, several, several phone calls to

14  all three.  But I'm not sure of the dates or

15  what was said or done.

16      Q.    You are not sure specifically when

17  any of these calls was made to any particular

18  credit reporting agency?

19      A.    No.  I know right after we got the

20  denial letter from -- from Menards is when this

21  all began.  He got copies of all of the credit

22  reports.  He called Wells Fargo.  He made

23  several phone calls to them.  He followed up as

24  best he could.

25      Q.    Okay.

```
 1                    D. Suri
 2        A.    Several, several times, from my
 3   understanding.
 4        Q.    Did you help your husband write any
 5   credit disputes?
 6        A.    No.
 7        Q.    Do you know why your husband decided
 8   to hire an attorney in this matter?
 9        A.    Because we couldn't find any
10   resolution with the credit union -- the credit
11   report bureaus or Wells Fargo.
12        Q.    Okay.
13              Do you know how much attorneys fees
14   your husband has incurred in this matter?
15        A.    I know about what the attorneys have
16   accumulated, which is around 200,000, I think,
17   but I'm not absolutely sure as of now.
18        Q.    Did you ever attempt to contact
19   Wells Fargo on behalf of your husband with
20   respect to the reporting of the Wells Fargo
21   account?
22        A.    No.
23        Q.    Did you ever attempt to contract
24   anybody yourself on behalf of your husband?
25        A.    No.
```

                              D. Suri

1

2      Q.      Okay.

3              Do you know when your husband first

4    obtained legal counsel?

5      A.      No.  I know it was a few months

6    after he struggled to try to get this solved on

7    his own, but I don't know the exact dates.

8      Q.      Can you give me an estimate?  Was

9    it, like, in August of last year?  Was it in

10   February of this year?

11     A.      I really -- I can't recall.

12     Q.      Okay.

13             You mentioned earlier that this

14   whole ordeal put a strain on you and your

15   husband's relationship.

16     A.      It was -- it was -- that was part of

17   it.  I mean, it put a strain on a lot of

18   things, but because -- I mean, if you want me

19   to describe how he changed because of this and

20   other stressful things, I can do that.

21     Q.      I would love -- I would love if you

22   could do that for me.

23     A.      Okay.  Well, my husband is typical

24   male, not a big emotional sharer.  I have to

25   pull information from him.  He just kind of

1                    D. Suri

2    shut down.  I will call it a depression

3    although he wouldn't admit it.  My husband is

4    very prideful of his accomplishments, very

5    driven, and this really affected his sense of

6    self worth because of he has credit score.  He

7    always -- him and I both always took great

8    pride in our credit score.

9              It just was something that he'd say,

10   oh, look, I'm over this and my credit went up

11   ten points.  So he just basically -- this has

12   been three, four months ago, he just shut down.

13   He wasn't talking, eating, sleeping.

14             Very short with me.  And I just told

15   him, Listen, I can't live this way.  He had

16   gone through that couple of months.  I just

17   couldn't deal with it.  I know this had a part

18   in it.  I'm not saying it was all of it, but

19   he's very protective of me.

20             He doesn't want to share things that

21   are bothering him, but as his wife I could see,

22   you know, the little signs.  So, you know, it

23   did affect us financially and emotionally.

24   Q.    Okay.

25             Could you tell me what else you

```
 1                        D. Suri
 2    think may have been affecting your husband
 3    emotionally?
 4         A.    Well, I mean nothing that he
 5    couldn't normally handle.  But I think, you
 6    know, the bankruptcy, we were both dealing with
 7    that and the lawsuit.  We had savings we had to
 8    spend on that lawsuit.  We were barely making
 9    our bills.
10              So we were just coming out of that
11    and this happens.  And I think he just felt
12    defeated and then when he couldn't get any
13    answers from anybody and why -- I mean, he got
14    answers, but there was no explanation why.
15    Why -- why did it come back that this is true.
16    It's a charge-off.  It's on your credit report.
17    We can't remove it.
18              That's very disheartening to hear,
19    that you can't -- you don't have any control of
20    it.  And at that point our understanding was
21    we -- we reaffirmed the loan.  We made the
22    payments.  It's paid off.  It's zero balance.
23    Why is this on his credit report?  It was just
24    so frustrating that we couldn't get any answer
25    or have a resolution without hiring an
```

```
 1                    D. Suri
 2    attorney.
 3         Q.    Okay.
 4               In your answer, you've referenced
 5    the litigation.
 6               Are you referring to the
 7    noncompete --
 8         A.    Yes, yes.
 9         Q.    -- employment litigation?
10         A.    Exactly.
11         Q.    Would you have done things
12    differently in how you filed your bankruptcy,
13    if you had received different advice from your
14    bankruptcy counsel?
15               MR. LYNGKLIP:  Objection to the
16         form.  And foundation.
17               You can go ahead and answer.
18         A.    I would have, yes.  I would have
19    read things more carefully.  And not a hundred
20    percent put my trust in what she's telling me.
21               I signed the reaffirmation.  I
22    assumed the payments were the same.  I wish she
23    would have communicated more to me what that
24    reaffirmation meant.  I would have been more
25    careful about reading every single word,
```

1                    D. Suri

2   realizing that my payments would've been

3   higher.  I would have made those payments.  I

4   had the money.  We had the money.  It's not

5   like we did that on purpose.  It was a

6   miscommunication.  But we did --

7              (Multiple speakers.)

8       A.    -- it in full.

9       Q.    Right.

10             Yeah, I believe the difference was

11  something like $7 a month?

12      A.    Yeah.

13      Q.    So not a substantial sum of money.

14      A.    Why didn't I get something from

15  Wells Fargo saying, listen, you are not making

16  the full payment.  I had no communication.

17             So I know you are not with Wells

18  Fargo.  But that was confusing.

19      Q.    Okay.

20             Do you believe your bankruptcy

21  attorney should have provided you more

22  information about the effects -- the inclusion

23  of this account in your bankruptcy and then the

24  reaffirmation of this account could have on

25  both your and your husband's credit scores?

D. Suri

1
2      A.     Well, I think maybe she assumed that
3  I would read the whole thing.  I can't put the
4  blame on her.  I guess it was just an
5  assumption that everything was going forward as
6  we agreed to.  I do wish that she would have
7  said, Listen, it states here that your payments
8  are this a month and not what you agreed to.
9  It would have been nice, but she was a great
10 attorney.  It would have made things easier.
11 Would've prevented all of this, I believe.  But
12 it's not all of her fault.
13     Q.     Okay.
14            Well, would you put -- if you had to
15 proportion the blame out to everyone, would she
16 deserve some of the blame?
17     A.     I don't think she did it
18 intentionally, but as I said, I just wish she
19 would have communicated a little bit better.
20            Does that answer your question?
21     Q.     Yes.
22            During your discussions about this
23 litigation, and the issues going on with Wells
24 Fargo that you've had with your husband, was
25 there any time your husband seemed to be

```
 1                      D. Suri
 2   blaming one entity more than another?  Like,
 3   for example, did he said, If only Wells Fargo
 4   would've done this or if only Capital One had
 5   had better sense or anything like along those
 6   lines?
 7        A.    No.  I mean, at first we thought it
 8   was a glitch in my bankruptcy.  Because it had
 9   shown up as a charge-off and we didn't know
10   what a charge-off was.  You know, we didn't
11   notice it in the paperwork.  So no, I don't
12   think he placed the blame on anyone.  I think
13   that it was just more we thought there was no
14   communication between the four entities.
15        Q.    Okay.
16        A.    Well, I know the credit unions do
17   not, you know, really communicate with each
18   other.  But as far as, Wells Fargo, and all
19   three of the credit bureaus, I think that's
20   where we were a little frustrated.
21        Q.    Okay.
22              How do you know that the credit
23   bureaus don't communicate with one another?
24        A.    I don't know.  It just seemed like
25   that's -- the answers that we got, it just
```

```
 1                    D. Suri
 2   seemed like that -- it was just confusion all
 3   the way around.
 4        Q.    Okay.
 5             Do you know a rough dollar figure of
 6   how much you've financially been damaged -- and
 7   by you, I mean your husband and you, throughout
 8   this litigation?
 9        A.    No.
10        Q.    Okay.
11             Has your husband ever -- have you
12   and your husband ever discussed what you think
13   a reasonable resolution to this litigation
14   would be?
15        A.    No.  I know probably him and his
16   attorney, but I haven't had any part in that
17   discussion.
18        Q.    Okay.
19             And your husband has never said, you
20   know, if I got, you know, $75, I would be
21   really happy or if I got an apology, I would be
22   happy or if I got $73 million, I would be
23   happy?
24        A.    No.  We really haven't put a dollar
25   amount on this.
```

D. Suri

1

2      Q.    Do you know -- as you sit here

3  today, do you know what it would take for your

4  husband to settle his claims against the

5  parties in this matter?

6            MR. LYNGKLIP:  Objection.  Form.

7      Foundation.

8      A.    No.

9      Q.    Okay.

10           Do you have any knowledge of any

11 other fact that you think would be relevant to

12 your husband's claims against the (inaudible)

13 involved in this litigation?

14           MR. LYNGKLIP:  Again, objection.

15     Form and foundation.  Thank you.

16           Debra, you can go ahead and answer

17     that question if you know.

18           THE WITNESS:  Okay.

19     A.    Can you repeat the question?

20     Q.    As you sit here today, do you have

21 any other knowledge about any other facts that

22 you think would be relevant to your husband's

23 litigation?

24     A.    I just -- I know my husband.  As far

25 as the emotional side, I know that he can act

```
1                      D. Suri
2    like emotionally he's not stressed by this, but
3    just want to reiterate that he is very, very
4    upset.  That's all.  I mean, you know, it's a
5    financial thing and it's also an emotional
6    thing.  It affects us in both ways.
7              So I don't want you to think it's
8    just a monetarily thing.  It's been both.  And
9    that's all I would like to add.
10        Q.    Okay.
11             Has your husband sought any medical
12   care for his stress?
13        A.    Well, he's been going to the doctor.
14   The other night he -- I almost took him to
15   emergency because of his heart.  It just -- i
16   mean, it takes a toll.  It really does.  Just
17   when you're dealing with everyday stress and
18   then you have this on top of it, so.
19        Q.    Okay.
20             And your husband has a history of
21   heart problems --
22        A.    Yes.
23        Q.    -- he has had heart surgery.
24        A.    And he's a diabetic.
25        Q.    And both of things occurred prior to
```

Page 93

```
1                    D. Suri
2    this litigation?
3         A.    Oh definitely, yes, yes.  It just --
4    you know, it adds -- stress really affects you
5    physiologically, so.
6         Q.    All right.
7              MR. HUSE:  That's all of the
8         questions I have so --
9              THE WITNESS:  Okay.
10              MR. HUSE:  -- thank you very much.
11              THE WITNESS:  Thank you, Mr. Huse.
12              MR. LYNGKLIP:  My understanding is
13         we are going to take a break for lunch,
14         everybody's going to get something to eat,
15         and Ms. Barr is going to resume at -- looks
16         like we are at 12:09 right now, so we're
17         good to come back at one o'clock straight
18         up, everybody?  Does that work?
19              (Recess is taken.)
20    EXAMINATION BY
21    MS. BARR:
22         Q.    Good afternoon, Ms. Suri.  I'm
23    Callie Barr.  I'm representing Experian and I?
24              (Multiple speakers.)
25         Q.    Hello.  I will work my best to keep
```

1                    D. Suri

2    this short.

3        A.    Okay.

4        Q.    Now, you've been married, you said,

5    for almost 18 years; is that right?

6        A.    18, going on 19.

7        Q.    Okay.

8              So you know each other well?

9        A.    Yes.  We're not only married.  We

10   are best friends, so that'll give you an idea.

11       Q.    So you would consider your

12   relationship to be a close relationship?

13       A.    Yes, I mean ups and downs, but

14   basically very, very good marriage.

15       Q.    And then does he share his feelings

16   with you?

17       A.    He does with a little prompting.  It

18   has to be the right time.  No distractions, but

19   yes, he does.

20       Q.    Okay.

21              So how do you know when something is

22   bothering your husband?

23       A.    He withdraws.  He doesn't sleep

24   well.  Comes to bed later.  His appetite is

25   less or he's eating the wrong foods, which he's

1                          D. Suri

2    supposed to not have sweets; he's diabetic.

3            When he's stressed he cooks, so I

4    gained about 15 pounds, but he -- I can just

5    tell because he gets very withdrawn and

6    preoccupies his mind with numbing things like

7    TV, you know, games on his iPad, social media.

8    Just withdraws, very quiet.

9        Q.    Okay.

10           And has your husband ever mentioned

11   specifically Experian as a cause of his stress?

12       A.    Combined with the other credit

13   bureaus.

14       Q.    So --

15       A.    Not specifically, just that one,

16   but.

17       Q.    Okay.

18           And what has he said about the

19   credit bureaus?

20       A.    Just he doesn't understand why he

21   cannot get that removed -- you know, the Wells

22   Fargo discharge write-off -- charge-off removed

23   from his credit reports.

24           You know, why is it so difficult to

25   try to get it resolved without getting an

```
 1                    D. Suri
 2   attorney involved?  I think that was his
 3   biggest frustration.
 4        Q.    Okay.
 5              And you attribute -- I mean, how --
 6   I'm going to say this again here.
 7              So is it accurate to say that he's
 8   upset because his account was charged off and
 9   neither of you expected that?
10        A.    We did not expect it to -- yeah, I
11   mean, we thought it would not even show up on
12   his credit report, for one, because I did do
13   the reaffirmation.  And again, we don't know
14   the legalities of these things.  I guess, there
15   was a little assumption that everything was
16   okay and it wasn't going to show up on his
17   credit report.  We were going to pay the credit
18   card in full.  No late payments.
19              And that was upsetting, that we had
20   found out that it did indeed affect his credit
21   score and it was on his credit report.
22        Q.    Right.
23              You said earlier that if there had
24   been better communication with your prior
25   attorney that all of this could've been
```

D. Suri

1    avoided; right?

2        A.    Well, I'm not blaming her.  I am one

3    that trusts other people and I don't really

4    depend on my own research.  I just listen and I

5    trusted her that -- I didn't look into what a

6    charge-off -- well, I didn't even know that

7    term then -- what a reaffirmation really was.

8        As far as I knew -- this is how I

9    understood it -- that she asked me:  Do you

10   want to include Wells Fargo in your bankruptcy?

11

12       I said, No.  We will pay that.  I

13   assumed everything would just go on normal, it

14   wasn't even in the lawsuit and the bankruptcy.

15   And it was.

16       So it -- that was what confused

17   Tinny and I the most and was so frustrating,

18   that we didn't understand what was happening.

19   Because we had paid it in full, never missed a

20   payment.

21       Q.    Are you saying that if you had

22   understood it better, then you wouldn't be in

23   the position you are right now?

24       A.    Correct.  I believe we would have

25   just paid it off.  We would have just paid it

1                          D. Suri

2     off then and there before I filed.

3          Q.    Okay.

4                Now, you had said that earlier his

5     credit score used to be in the 700s; is that

6     right?

7          A.    Yes.

8          Q.    Do you know, like, approximately

9     what that was or just in the 700s?

10         A.    No.  I know it was high 700s.  I

11    know -- I remember one was 77-something.  But

12    he would know better than I do.  But I know

13    that it dropped.  I know the lowest I've seen

14    is 668.

15         Q.    Okay.

16               I'm going to share with you -- this

17    was a document that was produced to us here.

18         A.    Okay.

19         Q.    Bear with me a minute.

20               I'm going to mark this as

21    Exhibit 13.

22               (Suri Exhibit 13, preclose

23         monitoring report, remotely introduced and

24         provided electronically to the reporter.)

25    BY MS. BARR:

Page 99

1                          D. Suri

2        Q.    We will go here if I can -- here we

3    are all right.

4              Now if you can --

5              MR. LYNGKLIP:  Ms. Barr.

6              MS. BARR:  Yes.

7              MR. LYNGKLIP:  Would you mind

8        identifying that number with the Bates

9        range if you've got it?

10             MS. BARR:  I'm scrolling down right

11       here.  It's Suri 004924.

12             Do you have it?

13             MR. LYNGKLIP:  Yes.  Thank you,

14       ma'am.

15   BY MS. BARR:

16       Q.    Okay.

17             Ms. Suri, if you can see over here

18   in the left corner?

19       A.    Mh-hm.

20       Q.    Wyndham Capital Mortgage; is that

21   right?

22       A.    Yes.

23       Q.    And is that who did your refinance?

24       A.    Yes.  They sold it to Fifth Third

25   Bank.

```
 1                          D. Suri
 2      Q.    Okay.
 3            And right here, can you read this?
 4   It says:  Preclose monitoring report.
 5            Do you see that?
 6      A.    Yes.
 7      Q.    Okay.
 8            And right here the date, March 25,
 9   2021?
10      A.    Yes.
11      Q.    I'm going to go now to page 3 which
12   is Suri 004926.  And about halfway down the
13   page it says:  Bureau score information.
14            Do you see that, Ms. Suri?
15      A.    Yes.
16      Q.    And what is Experian's score there?
17      A.    757.
18      Q.    757?
19      A.    Mh-hm.
20      Q.    Yes.
21            And the Equifax score?
22      A.    697.
23      Q.    Okay.
24            And the TransUnion score?
25      A.    700.
```

1                          D. Suri

2       Q.      Okay.

3               And then we're going to go here to

4   page 20.

5               And do you see this account WF Bank

6   NA?

7       A.      Yes.

8       Q.      And it says:  Paid charge-off.

9       A.      Yes.

10      Q.      Is this account that we've been

11  discussing this afternoon?

12      A.      Yes.

13      Q.      All right.

14              So we have here, right, a credit

15  score from Experian of 757 with this account on

16  that credit score; right?

17      A.      Yes.

18      Q.      So this would not be a score that

19  would be upsetting to your husband; is that

20  right?

21      A.      I don't know.

22      Q.      And then we're going to look at

23  Exhibit 12 now.  And it was already --

24              Do you remember this exhibit?

25      A.      Yes.

```
 1                          D. Suri

 2        Q.     Okay.

 3               And what is this?

 4        A.     This is the -- the credit card that

 5    I had applied for through Menards.  And it was

 6    where they were not approving it.

 7        Q.     Right.

 8               And -- do you see Experian anywhere

 9    on here?

10        A.     No.

11        Q.     This is --

12        A.     Okay.

13        Q.     And now I'm going to go to page 2.

14               Do you see Experian on here

15    anywhere?

16        A.     No.

17        Q.     Okay.

18               We are now going to look at -- give

19    me one minute.  We're going to -- this is going

20    to be Exhibit 14.

21               (Suri Exhibit 14, letter from Mariah

22          Farris, remotely introduced and provided

23          electronically to the reporter.)

24    BY MS. BARR:

25        Q.     Can you see this, Ms. Suri?
```

1                          D. Suri

2        A.      Yes.

3        Q.      This is going to be Suri 00907.

4                And can you tell me what this is?

5        A.      Well, could you go up a little to

6    the top?  Is this the very top, the archived,

7    Thursday?

8        Q.      Yes, yes, that's the very top.

9        A.      Mariah Farris, I believe, was our

10   mortgage broker.  700 was the score -- the

11   median score, okay, and they pulled from three

12   and they averaged out the three credit scores.

13       Q.      Okay.

14               And what was --

15       A.      Mh-hm.

16       Q.      What was Experian's score here?

17       A.      757.

18       Q.      Okay.

19               And then she writes in the third

20   paragraph, second line:  Anything above 740 is

21   going to give you the top-tier pricing of

22   interest rates.

23               Did I read that right?

24       A.      Yes.

25       Q.      Okay.

Page 104

```
 1                      D. Suri
 2              And Experian's score is higher than
 3     that, isn't it?
 4       A.    Yes.
 5       Q.    So when you testified earlier that
 6     your husband had emotional distress --
 7       A.    Yes.
 8       Q.    -- this reporting, can you say with
 9     any certainty that that's because of Experian?
10       A.    Not only because of Experian.
11       Q.    But can you say with any certainty
12     that it's because of Experian?
13       A.    Not Experian alone.
14       Q.    That's not the question.
15              So the question is:  Can you say
16     with any certainty that it's because of
17     Experian?
18       A.    I feel that if Experian's -- I don't
19     know how that affected Experian's credit score.
20     But I know if, like the letter stated, if it
21     was above 760, the credit score, you came in at
22     757, that they would have gotten lower interest
23     rate.  But no, I don't think it's only because
24     of Experian.
25       Q.    Okay.
```

```
1                         D. Suri
2              Do you -- Ms. Suri, we are going to
3    look at this again.  It's the second -- third
4    paragraph, second line, says:  Anything above
5    740 is going to give you the top-tier pricing
6    of interest rates.
7         A.    Mh-hm.
8         Q.    740; right?
9         A.    Right.
10        Q.    And then Experian's score at this
11   point in time was 757?
12        A.    Yes, and I see now that it says the
13   760 is the median score.  So I read that wrong.
14   I read that wrong.
15        Q.    That's fine.
16              So the question is:  Can you say
17   with any certainty here that his emotional
18   distress would be because of Experian?
19        A.    If you are asking me because of
20   Experian alone, no.
21        Q.    Well, Experian at all?
22              MR. LYNGKLIP:  Objection as to form.
23              You can go ahead and answer,
24   Ms. Suri.
25        A.    I can't answer that, honestly, that
```

Page 106

D. Suri

1

2   it didn't have any effect on his mental stress.

3        Q.    So you can't answer that it did have

4   an effect on his mental stress?

5        A.    Can't answer whether it did or

6   didn't.  That was not expressed to me by him.

7   I don't know that answer.

8        Q.    You had mentioned earlier about the

9   bankruptcy and the lawsuit and that that was --

10  and I think I have your quote here that that

11  was:  Not an easy decision and that was it was

12  very difficult.

13            Is that right?

14       A.    Yes.

15       Q.    And was that stressful for both of

16  you?

17       A.    Yes.

18       Q.    Can you describe that for me, the --

19  let me ask a better question.

20            Was that stressful for your husband?

21       A.    Yes.

22       Q.    And what were his symptoms?

23       A.    Well, basically, what I stated

24  before when he was upset.  He just doesn't eat,

25  doesn't sleep, withdraws.  He felt like a

                              D. Suri

1

2    failure.  You know, basically the symptoms he

3    always has when he's down and depressed.

4         Q.    And do you still see the effects of

5    that today?

6         A.    Oh, definitely, because it's just

7    like we went through one thing and it starts

8    all over with something else.  I'm not saying

9    one thing is worse than the other.  I'm just

10   saying it had the same effects.

11        Q.    Did -- did he tell you at any point

12   in time that the bankruptcy or the lawsuit was

13   affecting him emotionally?

14        A.    He -- he would not tell me that.

15   That's not something he would tell me unless I

16   pressured him to tell me.  I know from being

17   married to him that he doesn't have to tell me

18   that.  He was very ashamed that I had to file

19   bankruptcy.  But I did it willingly to help our

20   marriage, to help our financial situation.

21        Q.    Right.

22              But did you feel like he blamed

23   himself for that?

24        A.    In an indirect way because he had

25   worked for the company that filed the lawsuit.

Page 108

D. Suri

1

2      Q.     Tell me about your husband's job.

3   What's he do?

4      A.     He's a consumer electronics

5   president of sales for Fesco.  They work out of

6   New Jersey, and he works out of the house

7   remotely.  Very hard pressure, but he handles

8   it very well.  My husband is one that normally

9   could just turn off everything.  Like he shuts

10  his office door and when he's not bothered by

11  anything, he's -- he's really a multitasker,

12  very confident, strong man.  Normal -- normal

13  situations.

14     Q.     You said it was very high pressure.

15            Would you call it a demanding job?

16     A.     Demeaning.

17     Q.     Demanding.

18     A.     Oh.  Oh, yeah.  Well, it's a lot of

19  time on the phone.  A lot of, you know, Excel

20  spreadsheets, presentations, always a million

21  e-mails, text messages, even through to late at

22  night because they are out of New Jersey.  So

23  he's always had -- you know, sales is a very

24  high-pressure job, so, but like I said, he

25  always handles it usually very well.  He's very

1                    D. Suri

2    successful.

3         Q.    What does it mean to you for him to

4    handle it well?

5         A.    Not bringing it to me.  Not taking

6    it out on me.  Not being short, rude,

7    demanding.  I mean, he just -- he handles it,

8    he does it and then he just goes about his

9    evening.  He -- like I said, he likes to cook,

10   he likes to relax, we watch movies.

11             So that's why when he did kind of

12   shut down I knew that something was really

13   wrong, so.  He's not like me, where I'm just --

14   just almost crying, you know.  He handles -- he

15   handles -- I always tell him:  How do you

16   handle that?  How do you -- well, you know, we

17   will work it out.  I'll work it out, so.

18        Q.    So that's how you knew something was

19   wrong, but he never told you that, it's just

20   your assumption; is that right?

21        A.    Well, I mean he talked about how

22   frustrated he was with the situation.  So I

23   knew that part of it.  He -- like I said, I

24   really have to convince him to share what he's

25   feeling and he will share up to a point.  But

D. Suri

1
2     when it comes to really deep-seated emotions,
3     he's not one to share those.  He wants to
4     remain strong for me and not worry me.  And
5     he's told me that.
6          Q.    This would be similar to the
7     bankruptcy; is that right?
8          A.    Yeah.
9          Q.    With -- you recognized his -- how he
10    feels and --
11               (Multiple speakers.)
12         A.    Yes.
13         Q.    Does he talk about work with you?
14         A.    No, not unless I ask.
15         Q.    So --
16         A.    If he's -- you know, he just landed
17    a sale with Jessica Simpson, talked to her
18    mother.  He was proud of that, so he talked to
19    me about that, but as far as the details, no.
20         Q.    If there were issues at work, would
21    you know about it?
22         A.    No, not unless I noticed he was down
23    or I would ask:  Is everything okay at work.
24         Q.    Okay.
25         A.    And he will normally just respond:

```
1                     D. Suri
2    Oh, yeah, just the same old things, so.
3         Q.    So the symptoms that you mentioned
4    earlier and that you were seeing, it could be
5    related to his work; is that right?
6         A.    It could be, but nothing really -- I
7    mean, yeah, when the lawsuit came about he
8    showed stress.  But work right now is work.
9    There's no -- there's nothing really that's
10   bothering him with work right now.  Everything
11   is going well.  He's only worked for this
12   company since, I think, the end of last year.
13   He loves it.  They are working well with him.
14   He has no complaints.  If he does, he hasn't
15   shared them with me.
16        Q.    You said earlier you wouldn't really
17   know, right, unless he was showing these sort
18   of withdrawn symptoms?
19        A.    Exactly.  I mean, he gets
20   frustrated, but it's nothing that he doesn't
21   resolve.
22        Q.    Okay.
23              You talked about earlier -- well,
24   you had spoken with Mr. Huse about his health
25   conditions.
```

1                          D. Suri

2          A.     Mh-hm.

3          Q.     Can you explain those to me?

4          A.     Well, he -- he's been diabetic since

5     he was 28, 30.  Insulin.  Well, at first he was

6     on oral, then insulin.  Now he's had a

7     quadruple bypass six years ago, I think.  Don't

8     quote me on the years.

9                 So he has to check his sugar, you

10    know, periodically throughout the day, monitor

11    his diet.  He's had several eye surgeries

12    because of the diabetes and his sugar and his

13    vessels in his eyes.

14                High blood pressure a little bit,

15    borderline.  So, basically, those two things

16    are -- the diabetes and the heart disease are

17    the two major medical conditions.

18          Q.     Are those difficult for him to

19    manage?

20          A.     No.  I mean, he can manage them by

21    diet and less stress and exercise.  So no, I

22    don't think so.  I think that he's got it

23    managed pretty well, as far as as much as he

24    can do.

25          Q.     Are these conditions, I mean, are

Page 113

```
1                    D. Suri
2    they stressful for him?
3         A.    I -- it's just stressful as far as
4    it's a change of lifestyle.  You know, he makes
5    decisions every day what to eat, what not to
6    eat, how much exercise.  It's stressful that
7    way.  But, I mean, of course, a healthy person
8    wouldn't have any of that stress.  So I think
9    he's managing the best he can.  Yes, it can be
10   stressful, but he can handle it.  He's been --
11   he's dealt with it for years, so.
12        Q.    Right.
13              Now, you said recently that you had
14   taken him to the ER; is that right?
15        A.    Yeah, it was just like three or four
16   nights ago.  He was not feeling good.  He
17   thought he felt like he did when he had his --
18   he didn't have a heart attack, actually.  It
19   was the beginning of one.  So he said he felt
20   like that.  I was really concerned about him.
21              That was the last -- really the last
22   time that he's had any type of episode like
23   that.
24              We both had COVID, but we don't have
25   any long-lasting effects from that.
```

```
 1                       D. Suri

 2       Q.      Okay.

 3               What were those symptoms?

 4       A.      The COVID?

 5       Q.      Oh, I'm sorry.  Let me be more

 6  precise.

 7               What were those symptoms that he had

 8  when you took him to the hospital?

 9       A.      Before his heart condition, his

10  surgery, he was really dizzy, his blood

11  pressure dropped, so I gave him chewable baby

12  aspirin, water.  Just like he was going to

13  faint and he had chest pain the night before.

14       Q.      Fatigue?  Was he tired?

15       A.      Yes.

16       Q.      Do these cause loss of sleep?

17       A.      Did that cause loss of sleep?

18       Q.      Yeah, does he -- do you find his

19  medical conditions can cause loss of sleep?

20       A.      No.  I don't believe so.  That might

21  be a question to ask him because it hasn't been

22  conveyed to me that it does.

23       Q.      Is he on any medications?

24       A.      He is.

25       Q.      Do you know what those are?
```

Page 115

1                         D. Suri

2        A.    Well, I know he's on short- and

3   long-term insulin.  He is on -- I believe he's

4   on something -- I can't remember the name of

5   it -- to thin your blood.  I can't remember.

6   And he's on something for his skin condition.

7   He has, like, diabetic psoriasis a little bit

8   in spots.  He's on that.  And I think he's on a

9   very low blood pressure medicine.  I think it's

10  called a statin for his heart.

11       Q.    Any new medications recently?

12       A.    No.

13       Q.    And you said his bypass was six

14  years ago.

15             Is that right?

16       A.    I believe around that time.

17       Q.    Okay.

18             And he was diagnosed with diabetes

19  when he was around 28 or 30?

20       A.    Younger.

21       Q.    He's --

22             (Multiple speakers.)

23       A.    I'm sorry?

24       Q.    He's lived that for a while?

25       A.    Yes, yes.

                            D. Suri

1

2        Q.     How can you tell whether one thing

3   or another is causing your husband stress?

4        A.     The only way I can specifically

5   identify it what is new in his life that's

6   happening.  Or sometimes I ask him.

7        Q.     When did you start noticing his

8   symptoms with the bankruptcy?

9        A.     Probably at the beginning of the

10  lawsuit when he was served with the lawsuit,

11  because we were both in shock, so.

12       Q.     And when was that?

13       A.     I don't recall the exact date.

14       Q.     How about a year?

15       A.     Probably like three, four years ago.

16       Q.     So you've been living in a pretty

17  difficult situation for a while?

18       A.     Well, no.  I mean, after the

19  bankruptcy, after we got it and we settled out

20  of court and we made payments to the attorney,

21  things settled down.  We got caught up on the

22  bills.  After the bankruptcy we were able to

23  pay our bills and then he got a better job, so

24  things got better.  But they were -- they were

25  difficult during that time while we were going

```
1                        D. Suri

2    through it.

3         Q.    Right.

4              You said you can still feel the

5    effects of that today?

6         A.    I feel the effects.  And I -- and

7    this -- what we're going through now kind of

8    just reminds us that that's what started this

9    whole thing.  So, you know, if I -- if the

10   bankruptcy hadn't been done the way it was,

11   things would be less stressful right now.

12             MS. BARR:  I don't have any other

13        questions.  Thank you.

14             THE WITNESS:  Oh, thank you.

15             (Continued on the following page to

16        include jurat.)

17

18

19

20

21

22

23

24

25
```

Page 118

```
 1                    D. Suri

 2          MR. LYNGKLIP:  I have no questions.

 3     Thank you.

 4              I think that means we are done.

 5              (Proceedings concluded.)

 6              (Time Noted:  1:31 p.m.)

 7

 8

 9                   ---------------------

10                    DEBRA SURI

11

12    Subscribed and sworn to before me

13    this      day of              2021.

14

15    ---------------------------------------

16

17

18

19

20

21

22

23

24

25
```

1

2                     C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                              ) ss.:

6    COUNTY OF NEW YORK   )

7

8            I, LISA M. MURACO, a Notary Public

9    within and for the State of New York, New

10   Jersey, and Florida, do hereby certify:

11           That DEBRA SURI, the witness whose

12   deposition is hereinbefore set forth, was

13   duly sworn by me and that such deposition

14   is a true record of the testimony given by

15   such witness.

16           I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage; and that I am

19   in no way interested in the outcome of this

20   matter.

21           IN WITNESS WHEREOF, I have hereunto

22   set my hand this 6th day of December,

23   2021.

24   _____

25           LISA M. MURACO

```
 1
 2                    I N D E X
 3
 4   WITNESS                          PAGE
 5   DEBRA SURI
 6   MR. KUNDMUELLER                  5
 7
 8   MR. HUSE                         71
 9
10   MS. BARR                         93
11
12                 E X H I B I T S
13   DESCRIPTION                      PAGE
14   Suri Exhibit 1, leaf filter contract        15
15
16   Suri Exhibit 2, application for the         18
     credit card from Wells Fargo to finance
17   the LeafGuard system
18
19   Suri Exhibit 3, terms of the credit         20
     card agreement with Wells Fargo
20
21
     Suri Exhibit 4, petition for bankruptcy     25
22
23
24
25
```

Page 121

1
2      I N D E X   O F   E X H I B I T S (Cont'd.)
3    DESCRIPTION                                  PAGE
4    Suri Exhibit 5, statement from Wells          32
     Fargo
5
6
     Suri Exhibit 6, statement from March of       37
7    2018 to April of 2018
8
9    Suri Exhibit 7, correspondence from           43
     Wells Fargo
10
11
     Suri Exhibit 8, letter, subject              46
12   bankruptcy notice receives
13
14   Suri Exhibit 9, letter dated April 9,        50
     2018
15
16
     Suri Exhibit 10, reaffirmation              53
17   agreement
18
19   Suri Exhibit 11, statement from Wells        59
     Fargo Home Projects credit card
20
21
     Suri Exhibit 12, June 17, 2020, letter      74
22   from Capital One to Mr. Suri at his
     Maple Valley Drive address
23
24
25

1

2    I N D E X   O F   E X H I B I T S(Cont'd.)

3    DESCRIPTION                              PAGE

4    Suri Exhibit 13, preclose monitoring          98

     report

5

6

     Suri Exhibit 14, letter from Mariah          102

7    Farris

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:      SURI V EXPERIAN, et al.

    Dep. Date:      MONDAY, NOVEMBER 22, 201

4   Deponent:       DEBRA SURI

5                   CORRECTIONS:

6   Pg.  Ln.  Now Reads          Should Read        Reason

7   ___  ___  _____    _____    _____

8   ___  ___  _____    _____    _____

9   ___  ___  _____    _____    _____

10  ___  ___  _____    _____    _____

11  ___  ___  _____    _____    _____

12  ___  ___  _____    _____    _____

13  ___  ___  _____    _____    _____

14  ___  ___  _____    _____    _____

15  ___  ___  _____    _____    _____

16  ___  ___  _____    _____    _____

17  ___  ___  _____    _____    _____

18

19                              _____

20                              Signature of Deponent

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS____DAY OF_____, 2021.

23

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____



P.O. Box 30258
Salt Lake City, UT 84130

June 17, 2020

TINNY SURI

Re: Application Number 0200615200140
Merchant Name: Menards Big Card

Dear TINNY SURI:

Thank you for applying for a Menards Big Card account issued by Capital One, N.A. Unfortunately, we are
unable to approve your application at this time. To obtain specific information about this decision, please write to
us at Capital One, N.A., P.O. Box 98708, Las Vegas NV 89193-8708 or call us at 1-800-945-3500 within 60 days
of your receipt of this letter. We will send you a written statement of the specific reasons for denial within 30 days
of receiving your request.

Sincerely,
Capital One
Customer Care Team

**FAIR CREDIT REPORTING ACT**

Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below.
You have a right under the Fair Credit Reporting Act to know the information contained in your credit file at the consumer reporting
agency. The reporting agency played no part in our decision and is unable to supply specific reasons why we have denied credit to you.
You also have a right to a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive
this notice. In addition, if you find that any information contained in the report you receive is inaccurate or incomplete, you have the
right to dispute the matter with the reporting agency.

TransUnion
PO Box 1000
Chester,PA,19022
1-800-888-4213
www.transunion.com

**INFORMATION ABOUT YOUR CREDIT SCORE**

We also requested your credit score to make our credit decision. Your credit score is a number that reflects the
information in your credit report. Your credit score can change, depending on how the information in your credit
report changes. If you have questions about this specific credit score, please contact the consumer reporting
agency at the address or telephone number provided.

| Your Credit Score | 668 Date: June 15, 2020 |
| --- | --- |
| | Source: TransUnion |

© 2019 Capital One. Capital One is a federally registered service mark. All rights reserved.





P.O. Box 30258
Salt Lake City, UT 84130

June 17, 2020

TINNY SURI
Page 2

| Understanding Your Credit Score | |
|---|---|
| The range of scores | The score ranges from a low of 150 to a high of 950. |
| Key factors that adversely affected your credit score | DELINQUENCY<br>SMALL NUMBER OF CLOSED SATISFACTORY ACCOUNTS<br>PRESENCE OF DELINQUENT ACCOUNTS<br>NUMBER OF REVOLVING ACCOUNTS HIGHLY UTILIZED<br>NUMBER OF INQUIRIES |

**EQUAL CREDIT OPPORTUNITY ACT**

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.

SN851

© 2019 Capital One. Capital One is a federally registered service mark. All rights reserved.