UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

TINNY SURI,

      Plaintiff,

 -vs-


EQUIFAX INFORMATION
SERVICES, LLC,
*Et al,*
      Defendants.

Case No. 2:21-CV-10866-LJM-CI
Hon. Laurie J. Michelson
Magistrate Judge: Curtis Ivy, Jr.

## PLAINTIFF'S RESPONSE TO WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT

1.    Admitted

2.    Denied

3.    Denied

4.    Denied

5.    Denied

6.    Admitted

For the reasons set forth in the brief below, the Mr. Suri requests that the Court deny Defendant's motion for summary judgment.

Respectfully Submitted,


By: /s/ *Ian B. Lyngklip*
Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES,
CONSUMER LAW CENTER, PLC
Attorney for Tinny Suri
13751 W. 11 Mile Road
Oak Park, MI    48237
(248) 208-8864
Ian@ConsumerLawyers.com

Dated: November 3, 2022

2

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN -- SOUTHERN DIVISION

TINNY SURI,

      Plaintiff,

  -vs-

EQUIFAX INFORMATION
SERVICES, LLC,
*Et al,*

      Defendants.

Case No. 2:21-CV-10866-LJM-CI
Hon. Laurie J. Michelson
Magistrate Judge: Curtis Ivy, Jr

**BRIEF IN SUPPORT OF**
**PLAINTIFF'S RESPONSE TO WELLS FARGO'S MOTION FOR SUMMARY**
**JUDGMENT**

### ISSUE PRESENTED

1.      *WFB reported that Mr. Suri's secured credit account had been charged off following the filing of his wife's separate Chapter 7 Bankruptcy. Was WFB's reporting of the account as uncollectable accurate for purposes of the FCRA, when Mr. Suri continued to making all timely payments, the account was reaffirmed, and the account was secured against the Suri's home?*

2.      *Mr. Suri repeatedly disputed the WFB reporting of his account as charged off. Were WFB's investigations of the disputes reasonable as a matter of law where any reasonable inquiries into the matter would have shown that the Suri account remained collectable, and WFB failed to follow its own procedures—and controlling guidelines— for charge offs of these types of accounts?*

## <u>Most Appropriate Authorities</u>

*Bibbs v. Trans Union LLC*, 43 F.4th 331 (3d Cir. 2022)

*Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012).

*Krueger v. Experian Info. Sols., Inc*., No. 20-2060, 2021 U.S. App. LEXIS 27699

(6th Cir. Sep. 13, 2021).

*Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619 (6th Cir. 2018)

*Seamans v. Temple Univ*., 744 F.3d 853 (3d Cir. 2014)

*Shaw v. Experian Information Solutions, Inc.*, 891 F.3d 749 (9th Cir. 2022).

*Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938 (6th Cir. 2020).

## <u>Statement of Material Facts ("SOMF")</u>

1.      Mr. Suri does not dispute this fact.

2.      Mr. Suri does not dispute this fact.

5.      Mr. Suri does not dispute this fact.

6.      Mr. Suri does not dispute this fact.

7.      Mr. Suri does not dispute this fact, but the WFB account ***was*** secured, R. 105-2 at PageID 2422; R. 105-2 PageID 2432 - PageID.2443 at §4

8.      Mr. Suri does not dispute this fact.

9.      Mr. Suri does not dispute this fact.

10.     Mr. Suri does not dispute this fact.

11.     Mr. Suri does not dispute this fact.

12.     Mr. Suri denies that the account was properly charged off under WFB's charge off policy (*WFB Charge Off Policy*, Exhibit 4 at p. WF_Suri000929) which required independent proof of uncollectability as a condition of charge off.

13.     Mr. Suri does not dispute this fact.

14.     Mr. Suri does not dispute this fact.

15.     Mr. Suri does not dispute this fact.

16.     Mr. Suri denies that the account was properly charged off under WFB's charge off policy (Exhibit 4 at p. WF_Suri000929) which required independent proof of uncollectability as a condition of charge off.

17.     Mr. Suri does not dispute that the payments were made. Mr. Suri was required to make the payments as set forth in the monthly statements, (R. 105-2 at PageID 2420-2421). WFB made no demand for payment after April 2018.

18.     Mr. Suri does not dispute this fact, but reports of historical data continue until deleted (Exhibit 2 at 6-10, FAQ 14(b)).

19.     Mr. Suri does not dispute this fact. (See also Trans Union Source Data, Exhibit 11 Account Rating, Pymt Pattern, and Date of First Delinquency Codes).

20.     Mr. Suri objects that Mr. Alaliwi has no personal knowledge of these facts.

21.     Mr. Suri objects that Mr. Alaliwi has no personal knowledge of these facts.

22.     Mr. Suri objects that Mr. Alaliwi has no personal knowledge of these facts.

23.     Mr. Suri does not dispute this fact.

24.    Mr. Suri does not dispute this fact.

25.    Mr. Suri does not dispute this fact.

26.    Mr. Suri does not dispute that WFB responded to the ACDV as described.

27.    Mr. Suri does not dispute this fact. The ACDV also states "Verify all Account

Information." (R. 104-8 at PageID 1761.)

28.    Mr. Suri does not dispute this fact.

29.    Mr. Suri does not dispute that WFB responded to the ACDV as described.

30.    Mr. Suri does not dispute this fact.

31.    Mr. Suri does not dispute this fact.

32.    Mr. Suri does not dispute that WFB responded to the ACDV as described.

## COUNTERSTATEMENT OF MATERIAL FACTS ("CSOMF")

33.    The cardholder agreement was secured against the gutter systems and the
Suri's home. (*WFB Credit Card Agreement*, R. 105-2 at PageID 2422; *Reaffirmation
Agreement*, R. 105-2 at PageID 2432 – PageID.2443 at §4; Exhibit 9 at p. 157;
*Rudisell v. Fifth Third Bank*, 622 F.2d 243, 251 (6th Cir. 1980).

34.    WFB requires independent confirmation of the collectability of a bankruptcy
account before charging the account off. Collectable accounts should not be charged
off. (*WFB Charge off Procedures*, Exhibit 4, at WF_Suri000929.)

35.    The security interest, Mr. Suri's continuing obligation to pay, his continued timely payments, and the reaffirmation rendered the account collectable for purposes of WFB's charge off policy. (Exhibit 4 at p. WF_Suri000929.)

36.    Mr. Suri was never delinquent on his account. (Exhibit 7 at 111-112.)

37.    Mr. Suri paid his account fully and did so on time without any delinquency. (R. 105 at PageID 2360.)

38.    Metro 2 is a standard for uniform reporting and interpretation of credit reporting data submitted to the major credit reporting agencies. (*2020 Metro 2 Guide*, Exhibit 2 at 2-1 – 2-3; *NCLC FCRA Manual* § 6.3.3.2; R. 24 at ¶33-35)

39.    All credit reporting to the national CRA's is prepared and exchanged in the Metro 2 format. (R. 24 at ¶ 32-35. See also Exhibit 2 at p 1-2; R. 24 at ¶33-35).

40.    In certain circumstances, 2020 Metro 2 requires the use of more than one field to completely and accurately convey the circumstances surrounding the consumer's account history. (See e.g. Exhibit 2 at FAQ 12 p. 6-9 and FAQ 27, p. 6-18.)

41.    Under Metro 2, the status of an account of a non-filing joint account holder is not changed by the filing of a bankruptcy petition. (Exhibit 2 at FAQ 27(b) p 6-21; FAQ 27(d).)

42.    Metro 2 instructs furnishers to note the charge off status of its accounts, which indicates the account is unpaid and delinquent. (*See e.g. Deposition of Trans Union by Kapetenakis*, Exhibit 8 at p. 11.)

5

43.    Accounts are not deemed delinquent unless and until they are at least 30 days past due. (Exhibit 2 at p. 2-2 and 6-8 at Question 10.)

44.    Metro 2 does not provide codes to indicate a "breach" of contract. See *Deposition of Experian Deposition by Simmons*, Exhibit 9 at p. 109. C.f. Exhibit 2 at 5-14 – 5-15.

45.    Metro 2 provides examples for situations involving filers and non-filers for bankruptcy whose secured accounts were charged off. Metro 2 requires furnishers to report with Status Code 11 and no date for first delinquency for the non-filing account holder. (*CDIA Bankruptcy Examples*, Exhibit 5, p. CDIA Suri000176; *Bankruptcy Webinar*, Exhibit 3 at CDIASURI0000139.)

46.    Metro2 (Exhibit 2 at 4-16 and 5-36) and the FCRA (15 U.S.C. § 1681s-2(a)(5))require furnishers to provide a date of first delinquency when reporting a "charge off" status.

47.    Had WFB correctly reported this account as never having been delinquent (i.e. no date of first delinquency), Trans Union and Experian would have rejected any reporting of the account as charged off. (Exhibit 8 at p. 30; Exhibit 9 at p. 118).

48.    The CDIA also advises data furnisher to comply with FTC Guidance when determining whether a furnisher may report an account as discharged due to bankruptcy. (*CDIA Bankruptcy Webinar*, Exhibit 5, at CDIASuri000164.)

6

49.    Data furnishers should not report the accounts included in a bankruptcy as charged off unless the account was charged off prior to the bankruptcy. *FTC Advisory Opinion Letter to Lovern dated April 24, 1998*, Appendix Exhibit 6.

50.    WFB is aware of, and has relied on the *Lovern Advisory Letter*, *WFB's R. 16, ND CA Case No 12-2895*, Exhibit 6.

51.    WFB failed to confirm the uncollectability of the Suri account before charging that account off.    (Exhibit 4, at 125-128.)

52.    Mrs. Suri independently filed bankruptcy, and Mr. Suri is a "non-filer" under the applicable standards. (Exhibit 7 at p. 231-232.)

53.    WFB understands that the reporting of a "delinquency" means that there is an unpaid balance. (Exhibit 7 at p. 110).

54.    TU understood WFB's reporting of the "Charged Off" status code to mean that Mr. Suri had not paid the account. (Exhibit 8 at p. 11.)

55.    Experian understood the Account Status field to indicate am account's delinquency and unpaid status. (Exhibit 9 at p 113.)

56.    Mr. Suri's mortgage broker at Wyndham Mortgage understood WFB's reporting to reflect the delinquency status of the WFB account (*Deposition of Wyndham Mortgage by Farris*, Exhibit 10 at 71, 75-77, 79 and 83.)

57.    Mr. Suri did not qualify for the mortgage terms that he sought from Wyndham, because of the WFB reporting (Exhibit 10 at 56-57 and 90.)

58.    WFB understands that the Metro 2 "Account Status" field (17a) is used to convey the measure of an account's delinquency. (Exhibit 7 at p. 111-112.)

59.    The *CDIA Bankruptcy Scenarios* instruct furnishers to report accounts like Mr. Suri's with an Account Status reflecting the status before the filing of a joint obligor's bankruptcy. (Exhibit 5 at Example 2.)

60.    WFB agrees Mr. Suri's account matches the example provided in the *CDIA Bankruptcy Scenarios* found in Exhibit 5 at example 2. (Exhibit 7 at p. 232-33.)

61.    Under WFB policy it should have reported an ECOA code of "T" (for terminated) on joint accounts where the primary consumer has filed for bankruptcy, but the consumer has not. (Exhibit 7 at p. 117 and 209-210.) WFB falsely verified its ECOA code (Exhibit 7 at p. 214 and 220-222) and agrees that this was error in the Suri's case. (Exhibit 7 at 220-221.)

62.    WFB's policy requires that the charge-off amount on an account that is charged off after a bankruptcy filing should be $0. (Exhibit 7 at p. 104-105 and 233-234.) WFB falsely reported the balance of Mr. Suri's account as of the date of bankruptcy as having been charged off, instead of reporting the charge off amount as $0.00. WFB agrees that this was error. (Exhibit 7 at p. 117 and 209-210.)

63.    WFB was required to include a Date of First Delinquency in its monthly reporting to the credit bureaus. WFB reported two separate dates of first delinquency

along with Mr. Suri's account. Neither was accurate, and WFB agrees this was error. (Exhibit 7 at p. 110; 117 and 211-212.)

64.     In April 2020, WFB reported to the CRA's that the prior status of the account reflected no available history, Code D. (Exhibit 7 at p. 212-213). This was false, as WFB had a complete history of the payment of the account. (Trans Union Source Data Reports, Exhibit 11 at TU000324).

65.     WFB agrees that it did not follow its own policies when if failed to consider whether Mr. Suri would or could repay the account. (Exhibit 7 at 15-126.)

66.     Mr. Suri's disputes — and the dispute notice information transmitted to Wells Fargo from the credit reporting agencies — unequivocally show that Mr. Suri disputed the accuracy and completeness of Wells Fargo's reporting beyond simply the charge-off designation. *Suri Dispute to Trans Union dated 2/8/21*, Exhibit 11. See also, *Suri Dispute to WFB dated 2/8/21*, Exhibit 12.

67.     Mr. Suri specifically disputed the fact that his account reflects that he had gone delinquent. (R. 105-2 at PageID 2470-2472) (dispute stating "**paid the full** balance **during the 60-month agreed to term, last payment made this past April, my credit report states we stopped payment over 1.5 years ago, which is incorrect**….**NO ADDITIONAL PAYMENT HISTORY?**")

68.    WFB acknowledges Mr. Suri's disputed the account history, status, and ratings (Exhibit 7 at p. 208.) not just the charge-off based on the notices WFB received from the CRAs. (Exhibit 7 at p. 222-223.)

69.    WFB agrees that Dispute Code 106 was on at least three separate ACDV dispute notices Wells Fargo received from the CRAs. (Exhibit 7at p. 247.)

STANDARD OF REVIEW

**1.    Misleading Information Is Inaccurate Under The FCRA.**

Furnishers must report information that is not only true, but also complete and not misleading. *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012). Accord *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 943 (6th Cir. 2020). That information must conform to industry standards in order to assure consistency in the treatment of similarly situated consumers. *NCLC Fair Credit Reporting Manual* § 6.3.3.2, Appendix 1. *See Shaw v. Experian Information Solutions, Inc.*, 891 F.3d 749, 752 (9th Cir. 2022).

**2.    Mr. Suri's Burden of Proof on Summary Judgment**

Mr. Suri must show WFB violated one of its five duties under Section 1681s-2(b). *Boggio* at 616. Mr. Suri must establish that the furnisher's investigations could have found facts establishing that the reporting was false. *Felts v. Wells Fargo Bank*, 893 F.3d 1305, 1313 (11th Cir. 2018). Consumers satisfy this burden by showing that the furnisher was aware of the inaccuracy and continued to report the disputed

10

information, *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 639 (6th Cir. 2018). The reporting of inaccurate information gives rise to a permissive inference that a furnisher's investigation was unreasonable. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 635 (6th Cir. 2018). See *Blankenship v. Monterey Fin. Servs.*, Civil Action No. 17-CV-13092, 2018 U.S. Dist. LEXIS 67309, at *7 (E.D. Mich. Apr. 20, 2018)(Citation omitted.)). Accord *Shaw v. Equifax Info. Sols., Inc.*, No. 15-14014, 2016 U.S. Dist. LEXIS 59138, at *14 (E.D. Mich. May 4, 2016); *Coburn v. L.J. Ross Assocs., Inc*., 2015 WL 6473606 (E.D. Mich. Sept. 29, 2015), adopted, 2015 WL 6449385 (E.D. Mich. Oct. 26, 2015). The reasonableness or willfulness of a furnisher's investigation is question of fact for the jury. *NCLC Fair Credit Reporting Manual* § 6.10.4.4, Appendix 2 (collecting cases).

**3.**     <u>**Available Standards for Accuracy of Charged off accounts.**</u>

✓ <u>**FTC**</u> -- Revolving accounts with co-obligors should not be reported as charged off as a result of a joint obligor's separate filing of bankruptcy. *FTC Advisory Opinion to Lovern dated 04/24/98*, Appendix 6. (Confirmed as an accurate statement of the law by WFB in its summary judgment brief. Statement of Material Facts, at ¶47; See *Montgomery v. Wells Fargo Bank*, NA, No. C12-3895 TEH, 2012 U.S. Dist. LEXIS 162912, at *10 (N.D. Cal. Nov. 13, 2012).

✓ <u>**Regulations**</u> -- Furnishers who report a charged off account must also report a date of first delinquency. 15 U.S.C. § 1681s-2(a)(5)(B). See also *Regulation V*

*Appendix M to 12 CFR Part 1022, Furnishers Duties*, Appendix 7. See also *CFPB, Supervisory Highlights*, Appendix 5 at p. 14-15; *Bibbs v. Trans Union LLC*, 43 F.4th 331 (3d Cir. 2022). The FCRA defines that date as "the month and year of the commencement of the delinquency on the account that immediately preceded the action" *Id*.

✓ **Industry Standards** -- The CDIA's Metro 2 Guide provides a uniform system of usage for defined data fields and codes. *Shaw v. Experian Info. Sols. Inc*., 891 F.3d 749, 752 (9th Cir. 2018). See also *Cassara v. DAC Servs.*, 276 F.3d 1210, 1219-20 (10th Cir. 2002); Regulation Appendix E to Part 1022, Section III(b); NCLC FCRA Manual §6.3.3.2.) The Guide instructs the status of that account for the non-bankruptcy filing obligor should continue to be reported in the same fashion as before the bankruptcy, until or unless that status changes.

✓ **Industry Training** -- CDIA training for furnishers instructs that reporting on accounts included in bankruptcy should comply with the FTC's guidance i.e. the *FTC Advisory Letter to Lovern*, Appendix 6; CSOMF at ¶42-47.

✓ **WFB Policy** – WFB's own internal credit reporting policies relating to charge offs requires independent confirmation of the uncollectability of a revolving account that has been disputed as charged off by WFB. CSOMF, at ¶56-59.

<u>LAW AND ARGUMENT</u>

1. **<u>WFB's reported Mr. Suri as paying late.</u>**

   a. **<u>WFB reported and verified objectively false information.</u>**

WFB claims that its reporting was accurate because it charged off the Suri account upon the separate filing of bankruptcy by Mrs. Suri. That argument fails to address how this reporting was understood within the credit industry. The evidence here shows that that a reporting of a "charge off" means that the account has been delinquent, is unpaid, and can't be collected. None of these scenarios is factually true for Mr. Suri. But the reporting by WFB necessarily gave recipients of Mr. Suri's credit file the false impression that Mr. Suri had been delinquent on his account, that the account was unpaid, and that the account was unlikely to be repaid. This reporting was facially false and misleading. Consequently, an issue of fact remains.

Starting in March 2020 – and consistent with WFB's charge off policy (CSOMF at ¶24) – WFB reported in good standing with code "11" (SOMF at ¶11). WFB only began reporting the Suri account with a "charge off" code "64" after Mr. Suri paid off the account (SOMF at ¶19.) WFB admits that it failed to follow its own procedures and reporting guidelines for verifying this account as properly charged off (CSOMF at ¶65) and that it outright incorrectly reported the supporting fields required to accurately report the "charge off" status   (CSOMF at ¶ 61-63.) -- specifically WFB agrees that it misreported the ECOA code, Date of First

Delinquency, and Charge Off Amount. (CSOMF at ¶ 61-63) Likewise, WFB admits that its reporting of the delinquency falsely communicated the fact that the Suri account was unpaid. (CSOMF at 53.)

The CRAs and Mr. Suri's mortgage broker understood this reporting by WFB to mean that Mr. Suri was delinquent on his account. (CSOMF at ¶50-52). Thus, WFB's reporting factually conveyed the Suri account was delinquent and uncollectable when all evidence -- including WFBs own *Reaffirmation Agreement* -- pointed to the opposite conclusion. Even according to WFB's own witness, this reporting falsely conveyed that Mr. Suri failed to timely make all payments and failed to timely pay his account. (CSMF at ¶53.)

The FTC advised furnishers against reporting discharged accounts as "charged off" unless the account was in charge off status prior to that bankruptcy. *FTC Advisory Opinion to Lovern dated 04/24/98,* Appendix 11. This opinion is "entitled to respect" as the view of the FTC. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). At least one federal court has adopted this rationale, and did so at the urging and with the agreement of WFB itself. *Montgomery v. Wells Fargo Bank*, NA, No. C12-3895 TEH, 2012 U.S. Dist. LEXIS 162912, at *10 (N.D. Cal. Nov. 13, 2012); *WFB's R. 16, ND CA Case No. 12-3895*, Exhibit 6) (stating "Wells Fargo has no qualms with the proposition, cited by Plaintiff, that '[i]t is not a reasonable procedure to label an

14

account that has been discharged in bankruptcy as 'charged off as bad debt' if the account was open and not charged off when the consumer filed bankruptcy.'").

The CDIA has agreed with the FTC's interpretation of how the "charge off" code should be used. The *2020 Metro 2 Guide* provides an explanation consistent with the FTC guidance. (CSOMF at ¶38-49.) Likewise, the CDIA's training materials have expressly instructed its members to review and defer to the FTC's interpretation when formulating their own policies (CSOMF at ¶48). As such, the FTC, CDIA, Metro 2 and WFB's own reporting prior to 2020 all agree that an account should not be reported as charged off unless the charge off occurred before the bankruptcy, especially for a non-bankruptcy filing joint obligor.

In this case, WFB agrees that Mr. Suri's situation is on all fours with the example accompanying the CDIA Bankruptcy Examples (CSOMF, at ¶59-60.) That example – as well as the FTC *Lovern* letter – required that WFB report Mr. Suri's in good standing rather than charged-off. WFB's reporting falsely conveyed that Mr. Suri had been delinquent. Such reporting is indisputably false. WFB's reporting violated the guidance of the FTC, CDIA and Metro 2. There is no genuine question that WFB's reporting was inaccurate in this regard. The Court should deny WFB's motion and schedule this matter for trial on the merits.

**b.**  **Wells Fargo Repeatedly Reported Other False Information.**

WFB reported other factually inaccurate and misleading information about the WFB account following Mr. Suri's disputes. Specifically, WFB provided false data concerning the Date of First Delinquency, ECOA Code, and Charged Off Amount.  Each of these codes was intended to support and provide coherent reporting concerning the "charge off" status.  In at least three separate ACDVs, the CRAs notified WFB that Mr. Suri disputed information about the account, and WFB responded by verifying this false information in violation of its duties outlined in *Boggio*.  Specifically

✖ Between April 2018 and March of 2020 – a time during which the account was charged off and was being repaid -- WFB reported Mr. Suri's account as being in good standing (code 11). It was only after Mr. Suri completed his payments in March of 2020 that WFB reported the account as having been previously charged off. (R. 105 at p. 6 ¶ 19.) This prior reporting contradicts the good standing status reported between April 2018 and March 2020.

✖ WFB reported and then verified two different dates of first delinquency on Mr. Suri's account (CSOMF ¶ 63.  Compare Exhibit 11 at TU <u>000330 with TU000332 and TU000335</u>), even though he was never delinquent. (CSOMF ¶ 36.)

- Wells Fargo repeatedly reported and verified an incorrect ECOA status code of "2" for Mr. Suri, instead of status code "T," as dictated by Wells Fargo's own policies. (CSOMF at ¶61.)

- Wells Fargo falsely reported and verified and inaccurate charged off amount of $3,067 where its own policies and Metro 2 required it to report $0 as the charged off amount. (CSOMF, at ¶62.)

- WFB's charge off of the account necessarily implied that it had done so consistent with its own procedures, but WFB's own procedures require a determination that the account is uncollectable before charging off. (CSOMF at ¶34). WFB's corporate representative had no information about this step having been taken (CSOMF at ¶51). WFB's reporting before March 2020 complies with FTC, Metro 2, CDIA and WFP guidelines, but the data reported and verified after that date does not.

By WFB's own concessions, these separate pieces of factual information that WFB reported were all inaccurate. Even after "investigating" at least four separate disputes, Wells Fargo verified this admittedly false and inaccurate information. In the face of this objectively inaccurate information, the Court should deny WFB's motion and permit Mr. Suri to proceed to trial.

c.    **WFB's reporting was materially misleading.**

A "Charge Off" is an accounting status that occurs when a creditor "treats the debt as a loss or expense *because payment is unlikely*." *WFB Motion for Summary Judgment*, R. 105 at p. 15 (emphasis added); *see also Shaw v. Equifax*, 2016 U.S. Dist. LEXIS 591138 at *9 (E.D. Mich. May 4, 2016). See also, *Montgomery, supra*. WFB maintains internal policies that establish when to charge off an account that is involved in a bankruptcy. Under that policy, WFB only charges off accounts that it deems uncollectable. (Statement of Material Facts, at ¶12 and 56)

WFB claims its reporting was accurate because it actually charged off Mr. Suri's account. But the record evidence establishes that WFB's reporting failed to inform the CRAs that the Suri account had been reaffirmed, was never derogatory in repayment status, was still collectable against Mr. Suri, and was subject to a security interest that more than covered the amount remaining. If disclosed, these facts would have conveyed to credit report users that there was no rational basis for WFB's verification of the "charge off" – as would have been indicated by a review of the accounts collectability (CSMF at ¶34 and 51) – of the Suri account, rendering the reporting incomplete and misleading. Further, WFB could not have possibly reported the account as a "Charge Off" if it had properly reported the remaining items required to support that Status Code.

In this case, the record stands devoid of any indication that payment from Mr. Suri was ever "unlikely" or that Wells Fargo ever considered his account as "uncollectable." To the contrary, Mr. Suri never missed a single payment and continued to be responsible for repayment); and the WFB charge off procedures required a determination that the account is uncollectable before charging off. Under the facts set forth above, there was no factual basis for any such determination and WFB's reports created a materially misleading impression of uncollectability. *Cassara v. DAC Servs.*, 276 F.3d 1210, 1219 (10th Cir. 2002) ("Common use of a common word invokes implicit criteria.") This omission rendered the reporting inaccurate and misleading for purpose of the FCRA. *Boggio*, 696 F.3d at 617. See also *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 942 (6th Cir. 2020). As such, a genuine issue of material fact exists, and summary judgment should be denied.

## 2. <u>WFB must resolve disputes over charged off accounts.</u>

WFB urges dismissal, claiming that Mr. Suri's disputes were "legal" in nature and not subject to liability. This argument misses the mark, factually and legally. *First*, WFB's argument sets forth a false equivalency, equating an accounting "charge off" with a contractual "default," thus straining to turn an ordinary factual inquiry into a legal one. This argument misstates what is reflected by the Account Status field by treating "default" and "charge off" as equivalents where the entire system of status ratings (Metro 2 fields 17a and 17b) facially requires a breach of

19

the agreement by nonpayment reporting a delinquency. The record evidence establishes that derogatory codes available for this Metro 2 field are intended to reflect the number of days of delinquency since the last payment. (CSOMF, at ¶53-56). These are factual inquiries, not legal ones.

*Second*, the term "charge off" is an accounting term with specific factual -- not legal -- predicates and meaning within the credit industry. In addition to denoting the uncollectability of an account, the term "Charge Off " also means that an account is delinquent and unpaid. (CSOMF, at ¶53-56). The term indicates that an account is uncollectable, *Montgomery v Wells Fargo*, supra at *9 (citing Black's Law Dictionary 266 (9th Ed. 2009). An experienced credit professional would have understood (and in this case did understand) the charge off to represent a delinquency. Because Mr. Suri was never past due, the post-March reporting was facially false and misled recipients to believe that Mr. Suri had not paid his account, when all evidence (and pre-March 2020) shows that he did. (CSOMF, at ¶56-57.)

*Third*, WFB's position that it is unable to resolve (allegedly) legal disputes contradicts the record evidence in this case. WFB's investigations into Mr. Suri's disputes through the ACDV system established that WFB received the disputes and processed those disputes without any concern for the claimed "legal" nature of the dispute or indication that the dispute could not be resolved by investigating. (C.f. R. 104-3, 104-5, and 104-8.) If WFB could not complete the dispute investigations

because disputed information was "unverifiable," the FCRA, 1681s-2(b)(1)(E) provides furnishers with guidance, specifically requiring that they report back to the CRA that its reporting "cannot be verified." *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 618 (6th Cir. 2012) (stating "a furnisher must either "modify," "delete," or "permanently block reporting of" information that it finds . . . ."cannot be verified after any reinvestigation."). WFB never provided any indication that it was not "qualified or obligated to resolve" legal disputes. Thus, if WFB is correct that Mr. Suri's disputes were "legal" in nature   then a question of fact remains as to whether it failed in its duty to report the unverifiability of that account.

*Fourth*, the FCRA does not allow furnishers to evade liability by claiming a dispute is "legal" in nature, even if CRAs are permitted this defense. Regulation V expressly requires furnishers to comply with accuracy standards that account for the legal "terms and liabilities" of the consumers. Reg. V, 12 CFR 1022.41.(a)(1). This position is consistent with the Sixth Circuit's view of these obligations. See *Boggio* (sustaining husband's challenge of liability as co-obligor, question of fact); *Pittman* (allowing plaintiff to proceed on question of whether parties had entered legally binding loan modification). Neither of these Sixth Circuit precedents could exist if WFB were correct that resolving alleged "legal" disputes was beyond the scope of furnishers' responsibilities.

Confirming the Sixth Circuit's position is CFPB's *Amicus* brief to the 9th Circuit (*CFPB Amicus Brief in Gross v Citi Mortgage*, Appendix 8) which this Court must accord with appropriate deference. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). The Ninth Circuit has agreed with the CFPB calling this distinction unworkable.

> Furnishers, on the other hand, "stand[] in a far better position to make a thorough investigation of a disputed debt. . ." *Gorman,* 584 F.3d at 1156. This means that FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance. As the Consumer Financial Protection Bureau emphasized in its amicus brief, FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct. The distinction between "legal" and "factual" issues is ambiguous, potentially unworkable, and could invite furnishers to "evade their investigation obligation by construing the relevant dispute as a 'legal' one."

*Gross v. CitiMortgage, Inc*., 33 F.4th 1246 (9th Cir. 2022). See also, *Denan v. Trans Union L.L.C.*, 959 F.3d 290, 295 (7th Cir. 2020). Even circuits courts that recognize the "legal dispute" exception for CRAs affirm the availability of the remedy as to furnishers  *Chuluunbat v. Experian Info. Sols., Inc*., 4 F.4th 562, 569 (7th Cir. 2021) ("The plaintiffs here are not left without recourse. They could confront the creditors who are in the best position to respond….").   Indeed WFB's arguments here prove the point made by the 9th Circuit, that such a distinction would only serve to allow furnishers to evade their duties of accuracy and leave consumers with no remedy for the publication of inherently unverifiable information.

3.      **Mr. Suri's disputes provided ample notice of the inaccuracies to WFB.**

WFB argues that it did not understand Mr. Suri's dispute as challenging the account history, payment status, and delinquency of the account. (R. 105 at p. 10.) Wells Fargo's argument fails for three reasons: 1) Mr. Suri's disputes themselves establish that he repeatedly disputed not only the express characterization of his account, but also the implication that he had not timely paid; 2) this argument is unambiguously contradicted by its own corporate representative's sworn deposition testimony; and 3) the ACDV dispute notices—received by WFB from the CRAs— direct WFB to verify specific information: the accounts history, status, and rating.

Mr. Suri expressly stated his dispute of the rating and history of the account (CSOMF at ¶66-67) supported by relevant documents. The CRAs understood the nature of the disputes as reflecting the account to be unpaid, delinquent, and uncollectable. (CSOMF at ¶68) Consequently, the ACDV notices belie that claim. WFB's claim that it could not understand Mr. Suri's dispute.   WFB's own corporate representative confirmed that WFB understood these disputes as challenging the account history, status, and ratings. (CSOMF at ¶68-69) There was simply no confusion about Mr. Suri's disputes until WFB filed its motion for summary judgment.

The plain language of Mr. Suri's disputes and the ACDVs reveal WFB's argument for the lawyer-made defense that it is, bearing no relationship to what the

parties did or understood at the time. WFB's insistence on its own inability to read these industry-standard dispute codes against its own reporting does not excuse it from reviewing al relevant information provided by the CRAs. *See* 15 U.S.C. § 1681s-2(b)(1)(B); *see also Boggio,* 696 F.3d 611, 617.WFB's investigations were not reasonable as a matter of law.

WFB claims 1) its investigations were reasonable because any investigation of Mr. Suri's dispute would have revealed that WFBW charged off the Suri account, and 2) Mr. Suri personally has no information about how his dispute was mishandled by Wells Fargo.

WFB's reporting did not conform to Metro 2, to the FTC guidance, or to WFB's own policies; and WFB verified objectively false and misleading information. WFB should have continued to report the account status as in good standing as it had immediately after Ms. Suri's bankruptcy in April 2018. This failure gives rise to a question of fact. *Boggio, supra*; *NCLC FCRA Manual* §6.10.4.4, Appendix 3. See also § 1 *ante*. Any reasonable investigation should have turned up the facts: 1) that the account had never been delinquent; 2) that the date of first delinquency reported by WFB in March of 2020 directly conflicted with WFB's prior reporting and its own payment history records; and 3) that Mr. Suri had never missed a single payment. Reporting this information correctly would have resulted in each of the rejecting WFB's account for Mr. Suri. (CSMF at ¶46 - 47).

Under Sixth Circuit authority, any one of these reasons would establish a question of fact. See § 2, *ante*. Mr. Suri need not have personal knowledge of every element of his claim and is not required to prove his case through a single witness. See *Ortiz-Ildefonso v. SNC Tech. Servs., LLC*, No. 15-1197 (JAG), 2016 U.S. Dist. LEXIS 197274, at *9 (D.P.R. Oct. 14, 2016) ("One witness need not prove the entire claim.") The evidence proffered by Mr. Suri (see CSOMF) gives rise to a reasonable inference that a reasonable investigation would have corrected the errors. WFB has failed to come forward with the testimony or declarations of its dispute handlers and instead offered only the testimony of a corporate representative with no personal knowledge. (SOMF, at ¶20-22)   Nor has WFB ever explained its failure to comply with the relevant standards.   This failure in its investigations confirms the genuine issue of material fact that remains as to the reasonableness of WFB's actions.

Respectfully Submitted,


By: */s/ Ian B. Lyngklip*
Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES,
CONSUMER LAW CENTER, PLC
Attorney for Tinny Suri
13751 W. 11 Mile Road
Oak Park, MI    48237
(248) 208-8864
Ian@ConsumerLawyers.com

Dated: November 3, 2022

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 3, 2022, I served this document on the following

parties by the means indicated:

| Party | Manner |
|---|---|
| Esther S. McDonald<br>Seyfarth Shaw LLP<br>1075 Peachtree Street<br>Suite 2500<br>Atlanta, GA   30309 | Via CM/ECF System |
| Callie Barr<br>Jones Day<br>150 W. Jefferson Ave.<br>Suite 2100<br>Detroit, MI   48226 | Via CM/ECF System |
| Scott E. Brady<br>William Huse<br>Schuckit & Associates, P.C.<br>4545 Northwestern Drive<br>Zionsville, IN   46077 | Via CM/ECF System |
| Mark Kundmueller<br>David Gettings<br>Troutman Pepper Hamilton Sanders LLP<br>222 Central Park Avenue<br>Suite 2000<br>Virginia Beach, VA   23462<br>Via CM/ECF System | Via CM/ECF System |

Respectfully Submitted,


By: */s/ Ian B. Lyngklip*
Ian B. Lyngklip P47173
LYNGKLIP & ASSOCIATES,
CONSUMER LAW CENTER, PLC
Attorney for Tinny Suri
13751 W. 11 Mile Road
Oak Park, MI   48237
(248) 208-8864
Ian@ConsumerLawyers.com

Dated: November 3, 2022

27